2/94

## STANDARD FORM OF OFFICE LEASE
### The Real Estate Board of New York, Inc.

*Agreement of Lease*, made as of the 19th day of February, 2013 between 210 EAST 86TH STREET CORP., a New York corporation with an address at c/o Perlbinder Realty, 429 East 52nd Street, New York, New York 10022, party of the first part, hereinafter referred to as OWNER, and REPLACEMENT ASSOCIATES, LLC, a New York not-for-profit corporation, with an address at 210 East 86th Street, New York, New York , party of the second part, hereinafter referred to as TENANT,

*Witnesseth:* Owner hereby leases to Tenant and Tenant hereby hires from Owner the entire third floor and a portion of the fifth floor, as more particularly designated on the diagrams annexed hereto as Exhibit A and made a part hereof, in the building known as 210 East 86th Street, in the Borough of New York, City and State of New York, for the term of five (5) years (or until such term shall sooner cease and expire as hereinafter provided) to commence on the first (1st) day of March, two thousand thirteen, and to end on the twenty-eighth (28th) day of February, two thousand eighteen, both dates inclusive, at the annual rental rates set forth in Article 56 of the rider annexed hereto and made a part hereof, which Tenant agrees to pay in lawful money of the United States which shall be legal tender in payment of all debts and dues, public and private, at the time of payment, in equal monthly installments in advance on the first day of each month during said term, at the office of Owner or such other place as Owner may designate, without any set off or deduction whatsoever, except that Tenant shall pay the first monthly installment on the execution hereof.

In the event that, at the commencement of the term of this lease, or thereafter, Tenant shall be in default in the payment of rent to Owner pursuant to the terms of another lease with Owner or with Owner's predecessor in interest, Owner may at Owner's option and without notice to Tenant add the amount of such arrears to any monthly installment of rent payable hereunder and the same shall be payable to Owner as additional rent.

The parties hereto, for themselves, their heirs, distributees, executors, administrators, legal representatives, successors and assigns, hereby covenant as follows:

Rent: 1. Tenant shall pay the rent as above and as hereinafter provided.

Occupancy: 2. Tenant shall use and occupy demised premises for general and/or medical offices and/or a renal dialysis unit only, and for no other purpose whatsoever.

**Tenant Alterations:** 3. Tenant shall make no changes in or to the demised premises of any nature without Owner's prior written consent. Subject to the prior written consent of Owner, and to the provisions of this article, Tenant, at Tenant's expense, may make alterations, installations, additions or improvements which are non-structural and which do not affect utility services or plumbing and electrical lines, in or to the interior of the demised premises by using contractors or mechanics first approved in each instance by Owner. Tenant shall, before making any alterations, additions, installations or improvements, at its expense, obtain all permits, approvals and certificates required by any governmental or quasi-governmental bodies and (upon completion) certificates of final approval thereof and shall deliver promptly duplicates of all such permits, approvals and certificates to Owner and Tenant agrees to carry and will cause Tenant's contractors and sub-contractors to carry such workman's compensation, general liability, personal and property damage insurance as Owner may require. If any mechanic's lien is filed against the demised premises, or the building of which the same forms a part, for work claimed to have been done for, or materials furnished to, Tenant, whether or not done pursuant to this article, the same shall be discharged by Tenant within thirty days thereafter, at Tenant's expense, by payment or filing the bond required by law. All fixtures and all paneling, partitions, railings and like installations, installed in the premises at any time, either by Tenant or by Owner on Tenant's behalf, shall, upon installation, become the property of Owner and shall remain upon and be surrendered with the demised premises unless Owner, by notice to Tenant no later than twenty days prior to the date fixed as the termination of this lease, elects to relinquish Owner's right thereto and to have them removed by Tenant, in which event the same shall be removed from the premises by Tenant prior to the expiration of the lease, at Tenant's expense. Nothing in this Article shall be construed to give Owner title to or to prevent Tenant's removal of trade fixtures, moveable office furniture and equipment, but upon removal of any such from the premises or upon removal of other installations as may be required by Owner, Tenant shall immediately and at its expense, repair and restore the premises to the condition existing prior to installation and repair any damage to the demised premises or the building due to such removal. All property permitted or required to be removed, by Tenant at the end of the term remaining in the premises after Tenant's removal shall be deemed abandoned and may, at the election of Owner, either be retained as Owner's property or may be removed from the premises by Owner, at Tenant's expense. * duly licensed

**Maintenance and Repairs:** 4. Tenant shall, throughout the term of this lease, take good care of the demised premises and the fixtures and appurtenances therein. Tenant shall be responsible for all damage or injury to the demised premises or any other part of the building and the systems and equipment thereof, whether requiring structural or nonstructural repairs caused by or resulting from carelessness, omission, neglect or improper conduct of Tenant, Tenant's subtenants, agents, employees, invitees or licensees, or which arise out of any work, labor, service or equipment done for or supplied to Tenant or any subtenant or arising out of the installation, use or operation of the property or equipment of Tenant or any subtenant. Tenant

shall also repair all damage to the building and the demised premises caused by the moving of Tenant's fixtures, furniture and equipment. Tenant shall promptly make, at Tenant's expense, all repairs in and to the demised premises for which Tenant is responsible, using only the contractor for the trade or trades in question, selected from a list of at least two such contractors per each submitted by Owner. Any other repairs in or to the building or the facilities and systems thereof for which Tenant is responsible shall be performed by Owner at the Tenant's expense. Owner shall maintain in good working order and repair the exterior and the structural portions of the building, including the structural portions of its demised premises, and the public portions of the building interior and the building plumbing, electrical, heating and ventilating systems (to the extent such systems presently exist) serving the demised premises. Tenant agrees to give prompt notice of any defective condition in the premises for which Owner may be responsible hereunder. There shall be no allowance to Tenant for diminution of rental value and no liability on the part of Owner by reason of inconvenience, annoyance or injury to business arising from Owner or others making repairs, alterations, additions or improvements in or to any portion of the building or the demised premises or in and to the fixtures, appurtenances or equipment thereof. It is specifically agreed that Tenant shall not be entitled to any setoff or reduction of rent by reason of any failure of Owner to comply with the covenants of this or any other article of this Lease. Tenant agrees that Tenant's sole remedy at law in such instance will be by way of an action for damages for breach of contract. The provisions of this Article 4 shall not apply in the case of fire or other casualty which are dealt with in Article 9 hereof. * a duly licensed

**Window Cleaning:** 5. Tenant will not clean nor require, permit, suffer or allow any window in the demised premises to be cleaned from the outside in violation of Section 202 of the Labor Law or any other applicable law or of the Rules of the Board of Standards and Appeals, or of any other Board or body having or asserting jurisdiction.

**Requirements of Law, Fire Insurance, Floor Loads:** 6. Prior to the commencement of the lease term, if Tenant is then in possession, and at all times thereafter, Tenant, at Tenant's sole cost and expense, shall promptly comply with all present and future laws, orders and regulations of all state, federal, municipal and local governments, departments, commissions and boards and any direction of any public officer pursuant to law, and all orders, rules and regulations of the New York Board of Fire Underwriters, Insurance Services Office, or any similar body which shall impose any violation, order or duty upon Owner or Tenant with respect to the demised premises, whether or not arising out of Tenant's use or manner of use thereof, (including Tenant's permitted use) or, with respect to the building if arising out of Tenant's use or manner of use of the premises or the building (including the use permitted under the lease). Nothing herein shall require Tenant to make structural repairs or alterations unless Tenant has, by its manner of use of the demised premises or method of operation therein, violated any such laws, ordinances, orders, rules, regulations or requirements with respect thereto. Tenant may, after securing Owner to

Owner's satisfaction against all damages, interest, penalties and expenses, including, but not limited to, reasonable attorney's fees, by cash deposit or by surety bond in an amount and in a company satisfactory to Owner, contest and appeal any such laws, ordinances, orders, rules, regulations or requirements provided same is done with all reasonable promptness and provided such appeal shall not subject Owner to prosecution for a criminal offense or constitute a default under any lease or mortgage under which Owner may be obligated, or cause the demised premises or any part thereof to be condemned or vacated. Tenant shall not do or permit any act or thing to be done in or to the demised premises which is contrary to law, or which will invalidate or be in conflict with public liability, fire or other policies of insurance at any time carried by or for the benefit of Owner with respect to the demised premises or the building of which the demised premises form a part, or which shall or might subject Owner to any liability or responsibility to any person or for property damage. Tenant shall not keep anything in the demised premises except as now or hereafter permitted by the Fire Department, Board of Fire Underwriters, Fire Insurance Rating Organization or other authority having jurisdiction, and then only in such manner and such quantity so as not to increase the rate for fire insurance applicable to the building, nor use the premises in a manner which will increase the insurance rate for the building or any property located therein over that in effect prior to the commencement of Tenant's occupancy. Tenant shall pay all costs, expenses, fines, penalties, or damages, which may be imposed upon Owner by reason of Tenant's failure to comply with the provisions of this article and if by reason of such failure the fire insurance rate shall, at the beginning of this lease or at any time thereafter, be higher than it otherwise would be, then Tenant shall reimburse Owner, as additional rent hereunder, for that portion of all fire insurance premiums thereafter paid by Owner which shall have been charged because of such failure by Tenant. In any action or proceeding wherein Owner and Tenant are parties, a schedule or "make-up" of rate for the building or demised premises issued by the New York Fire Insurance Exchange, or other body making fire insurance rates applicable to said premises shall be conclusive evidence of the facts therein stated and of the several items and charges in the fire insurance rates then applicable to said premises. Tenant shall not place a load upon any floor of the demised premises exceeding the floor load per square foot area which it was designed to carry and which is allowed by law. Owner reserves the right to prescribe the weight and position of all safes, business machines and mechanical equipment. Such installations shall be placed and maintained by Tenant, at Tenant's expense, in settings sufficient, in Owner's judgement, to absorb and prevent vibration, noise and annoyance.

**Subordination:**   7. This lease is subject and subordinate to all ground or underlying leases and to all mortgages which may now or hereafter affect such leases or the real property of which demised premises are a part and to all renewals, modifications, consolidations, replacements and extensions of any such underlying leases and mortgages. This clause shall be self-operative and no further instrument of subordination shall be required by any ground or underlying lessor or by any mortgagee, affecting any lease or the real property of which the demised premises are a part. In confirmation of such subordination, Tenant shall from time to time execute promptly any certificate that Owner may request.

**Property Loss, Damage Reimbursement Indemnity:**   8. Owner or its agents shall not be liable for any damage to property of Tenant or of others entrusted to employees of the building, nor for loss of or damage to any property of Tenant by theft or otherwise, nor for any injury or damage to persons or property resulting from any cause of whatsoever nature, unless caused by or due to the negligence of Owner, its agents, servants or employees. Owner or its agents will not be liable for any such damage caused by other tenants or persons in, upon or about said building or caused by operations in construction of any private, public or quasi public work. If at any time any windows of the demised premises are temporarily closed, darkened or bricked up (or permanently), for any reason whatsoever, or if required by law, for any reason whatsoever including, but not limited to Owner's own acts, Owner shall not be liable for any damage Tenant may sustain thereby and Tenant shall not be entitled to any compensation therefor nor abatement or diminution of rent nor shall the same release Tenant from its obligations hereunder nor constitute an eviction. Tenant shall indemnify and save harmless Owner against and from all liabilities, obligations, damages, penalties, claims, costs and expenses for which Owner shall not be reimbursed by insurance, including reasonable attorneys fees, paid, suffered or incurred as a result of any breach by Tenant, Tenant's agents, contractors, employees, invitees, or licensees, of any covenant or condition of this lease, or the carelessness, negligence or improper conduct of the Tenant, Tenant's agents, contractors, employees, invitees or licensees. Tenant's liability under this lease extends to the acts and omissions of any sub-tenant, and any agent, contractor, employee, invitee or licensee of any sub-tenant. In case any action or proceeding is brought against Owner by reason of any such claim, Tenant, upon written notice from Owner, will, at Tenant's expense, resist or defend such action or proceeding by counsel approved by Owner in writing, such approval not to be unreasonably withheld.

**Destruction, Fire and Other Casualty:**   9. (a) If the demised premises or any part thereof shall be damaged by fire or other casualty, Tenant shall give immediate notice thereof to Owner and this lease shall continue in full force and effect except as hereinafter set forth. (b) If the demised premises are partially damaged or rendered partially unusable by fire or other casualty, the damages thereto shall be repaired by and at the expense of Owner and the rent and other items of additional rent, until such repair shall be substantially completed, shall be apportioned from the day following the casualty according to the part of the premises which is usable. (c) If the demised premises are totally damaged or rendered wholly unusable by fire or other casualty, then the rent and other items of additional rent as hereinafter expressly provided shall be proportionately paid up to the time of the casualty and thenceforth shall cease until the date when the premises shall have been repaired and restored by Owner (or sooner reoccupied in part by Tenant then rent shall be apportioned as provided in subsection (b) above), subject to Owner's right to elect not to restore the same as hereinafter provided. (d) If the demised premises are rendered wholly unusable or (whether or not the demised premises are damaged in whole or in part) if the building shall be so damaged that Owner shall decide to demolish it or to rebuild it, then, in any of such events, Owner may elect to terminate this lease by written notice to Tenant, given within 90 days after such fire or casualty, or 30 days after adjustment of the insurance claim for such fire or casualty, whichever is sooner, specifying a date for the expiration of the lease, which date shall

☞ Rider to be added if necessary.

not be more than 60 days after the giving of such notice, and upon the date specified in such notice the term of this lease shall expire as fully and completely as if such date were the date set forth above for the termination of this lease and Tenant shall forthwith quit, surrender and vacate the premises without prejudice however, to Landlord's rights and remedies against Tenant under the lease provisions in effect prior to such termination, and any rent owing shall be paid up to such date and any payments of rent made by Tenant which were on account of any period subsequent to such date shall be returned to Tenant. Unless Owner shall serve a termination notice as provided herein, Owner shall make the repairs and restorations under the conditions of (b) and (c) hereof, with all reasonable expedition, subject to delays due to adjustment of insurance claims, labor troubles and causes beyond Owner's control. After any such casualty, Tenant shall cooperate with Owner's restoration by removing from the premises as promptly as reasonably possible, all of Tenant's salvageable inventory and moveable equipment, furniture, and other property. Tenant's liability for rent shall resume five (5) days after written notice from Owner that the premises are substantially ready for Tenant's occupancy. (e) Nothing contained hereinabove shall relieve Tenant from liability that may exist as a result of damage from fire or other casualty. Notwithstanding the foregoing, including Owner's obligation to restore under subparagraph (b) above, each party shall look first to any insurance in its favor before making any claim against the other party for recovery for loss or damage resulting from fire or other casualty, and to the extent that such insurance is in force and collectible and to the extent permitted by law, Owner and Tenant each hereby releases and waives all right of recovery with respect to subparagraphs (b), (d), and (e) above, against the other or any one claiming through or under each of them by way of subrogation or otherwise. The release and waiver herein referred to shall be deemed to include any loss or damage to the demised premises and/or to any personal property, equipment, trade fixtures, goods and merchandise located therein. The foregoing release and waiver shall be in force only if both releasors' insurance policies contain a clause providing that such a release or waiver shall not invalidate the insurance. If, and to the extent, that such waiver can be obtained only by the payment of additional premiums, then the party benefiting from the waiver shall pay such premium within ten days after written demand or shall be deemed to have agreed that the party obtaining insurance coverage shall be free of any further obligation under the provisions hereof with respect to waiver of subrogation. Tenant acknowledges that Owner will not carry insurance on Tenant's furniture and/or furnishings or any fixtures or equipment, improvements, or appurtenances removable by Tenant and agrees that Owner will not be obligated to repair any damage thereto or replace the same. (f) Tenant hereby waives the provisions of Section 227 of the Real Property Law and agrees that the provisions of this article shall govern and control in lieu thereof.

**Eminent Domain:**   10. If the whole or any part of the demised premises shall be acquired or condemned by Eminent Domain for any public or quasi public use or purpose, then and in that event, the term of this lease shall cease and terminate from the date of title vesting in such proceeding and Tenant shall have no claim for the value of any unexpired term of said lease and assigns to Owner, Tenant's entire interest in any such award. Tenant shall have the right to make an independent claim to the condemning authority for the value of Tenant's moving expenses and personal property, trade fixtures and equipment, provided Tenant is entitled pursuant to the terms of the lease to remove such property, trade fixture and equipment at the end of the term and provided further such claim does not reduce Owner's award.

**Assignment, Mortgage, Etc.:**   11. Tenant, for itself, its heirs, distributees, executors, administrators, legal representatives, successor and assigns, expressly covenants that it shall not assign, mortgage or encumber this agreement, nor underlet, or suffer or permit the demised premises or any part thereof to be used by others, without the prior written consent of Owner in each instance. Transfer of the majority of the stock of a corporate Tenant or the majority partnership interest of a partnership Tenant shall be deemed an assignment. If this lease be assigned, or if the demised premises or any part thereof be underlet or occupied by anybody other than Tenant, Owner may, after default by Tenant, collect rent from the assignee, under-tenant or occupant, and apply the net amount collected to the rent herein reserved, but no such assignment, underletting, occupancy or collection shall be deemed a waiver of this covenant, or the acceptance of the assignee, under-tenant or occupant as tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained. The consent by Owner to an assignment or underletting shall not in any wise be construed to relieve Tenant from obtaining the express consent in writing of Owner to any further assignment or underletting.

**Electric Current:**   12. ~~Rates and conditions in respect to submetering or rent inclusion, as the case may be, to be added in RIDER attached hereto.~~ Tenant covenants and agrees that at all times its use of electric current shall not exceed the capacity of existing feeders to the building or the risers or wiring installation and Tenant may not use any electrical equipment which, in Owner's opinion, reasonably exercised, will overload such installations or interfere with the use thereof by other tenants of the building. The change at any time of the character of electric service shall in no wise make Owner liable or responsible to Tenant, for any loss, damages or expenses which Tenant may sustain.

**Access to Premises:**   13. Owner or Owner's agents shall have the right (but shall not be obligated) to enter the demised premises in any emergency at any time, and, at other reasonable times, to examine the same and to make such repairs, replacements and improvements as Owner may deem necessary and reasonably desirable to the demised premises or to any other portion of the building or which Owner may elect to perform. Tenant shall permit Owner to use and maintain and replace pipes and conduits in and through the demised premises and to erect new pipes and conduits therein provided they are concealed within the walls, floor, or ceiling. Owner may, during the progress of any work in the demised premises, take all necessary materials and equipment into said premises without the same constituting an eviction nor shall the Tenant be entitled to any abatement of rent while such work is in progress nor to any damages by reason of loss or interruption of business or otherwise. Throughout the term hereof Owner shall have the right to enter the demised premises at reasonable hours for the purpose of showing the same to prospective purchasers or mortgagees of the building, and during the last six months of the term for the purpose of showing the

same to prospective tenants. If Tenant is not present to open and permit
an entry into the demised premises, Owner or Owner's agents may enter
the same whenever such entry may be necessary or permissible by master
key or forcibly and provided reasonable care is exercised to safeguard
Tenant's property, such entry shall not render Owner or its agents liable
therefor, nor in any event shall the obligations of Tenant hereunder be
affected. If during the last month of the term Tenant shall have removed
all or substantially all of Tenant's property therefrom Owner may
immediately enter, alter, renovate or redecorate the demised premises
without limitation or abatement of rent, or incurring liability to Tenant for
any compensation and such act shall have no effect on this lease or Tenant's
obligations hereunder.

**Vault,**     **14.** No Vaults, vault space or area, whether or not
**Vault Space,** enclosed or covered, not within the property line of
**Area:** the building is leased hereunder, anything contained
in or indicated on any sketch, blue print or plan, or
anything contained elsewhere in this lease to the contrary notwithstanding.
Owner makes no representation as to the location of the property line of the
building. All vaults and vault space and all such areas not within the
property line of the building, which Tenant may be permitted to use and/
or occupy, is to be used and/or occupied under a revocable license, and if
any such license be revoked, or if the amount of such space or area be
diminished or required by any federal, state or municipal authority or public
utility, Owner shall not be subject to any liability nor shall Tenant be entitled
to any compensation or diminution or abatement of rent, nor shall such
revocation, diminution or requisition be deemed constructive or actual
eviction. Any tax, fee or charge of municipal authorities for such vault or
area shall be paid by Tenant.

**Occupancy:**     **15.** Tenant will not at any time use or occupy the
demised premises in violation of the certificate of
occupancy issued for the building of which the demised premises are a part.
Tenant has inspected the premises and accepts them as is, subject to the
riders annexed hereto with respect to Owner's work, if any. In any event,
Owner makes no representation as to the condition of the premises and
Tenant agrees to accept the same subject to violations, whether or not of
record

**Bankruptcy:**    **16.** (a) Anything elsewhere in this lease to the
contrary notwithstanding, this lease may be can-
celled by Owner by the sending of a written notice to Tenant within a
reasonable time after the happening of any one or more of the following
events: (1) the commencement of a case in bankruptcy or under the laws of
any state naming Tenant as the debtor; or (2) the making by Tenant of an
assignment or any other arrangement for the benefit of creditors under any
state statute. Neither Tenant nor any person claiming through or under
Tenant, or by reason of any statute or order of court, shall thereafter be
entitled to possession of the premises demised but shall forthwith quit and
surrender the premises. If this lease shall be assigned in accordance with
its terms, the provisions of this Article 16 shall be applicable only to the
party then owning Tenant's interest in this lease.

(b) it is stipulated and agreed that in the event of the
termination of this lease pursuant to (a) hereof, Owner shall forthwith,
notwithstanding any other provisions of this lease to the contrary, be entitled
to recover from Tenant as and for liquidated damages an amount equal to
the difference between the rent reserved hereunder for the unexpired
portion of the term demised and the fair and reasonable rental value of the
demised premises for the same period. In the computation of such damages
the difference between any installment of rent becoming due hereunder after
the date of termination and the fair and reasonable rental value of the
demised premises for the period for which such installment was payable
shall be discounted to the date of termination at the rate of four percent (4%)
per annum. If such premises or any part thereof be re-let by the Owner for
the unexpired term of said lease, or any part thereof, before presentation
of proof of such liquidated damages to any court, commission or tribunal,
the amount of rent reserved upon such re-letting shall be deemed to be the
fair and reasonable rental value for the part or the whole of the premises so
re-let during the term of the re-letting. Nothing herein contained shall limit
or prejudice the right of the Owner to prove for and obtain as liquidated
damages by reason of such termination, an amount equal to the maximum
allowed by any statute or rule of law in effect at the time when, and
governing the proceedings in which, such damages are to be proved,
whether or not such amount be greater, equal to, or less than the amount
of the difference referred to above.

**Default:**     **17.** (1) If Tenant defaults in fulfilling any of the
covenants of this lease other than the covenants for
the payment of rent or additional rent; or ~~if the demised premises become~~
~~vacant or deserted~~; or if any execution or attachment shall be issued against
Tenant or any of Tenant's property whereupon the demised premises shall
be taken or occupied by someone other than Tenant; or if this lease be
rejected under §235 of Title 11 of the U.S. Code (bankruptcy code); ~~or if~~
~~Tenant shall fail to move into or take possession of the premises within thirty~~
~~(30) days after the commencement of the term of this lease~~; then, in any one
or more of such events, upon Owner serving a written fifteen (15) days
notice upon Tenant specifying the nature of said default and upon the
expiration of said fifteen (15) days, if Tenant shall have failed to comply
with or remedy such default, or if the said default or omission complained
of shall be of a nature that the same cannot be completely cured or remedied
within said fifteen (15) day period, and if Tenant shall not have diligently
commenced curing such default within such fifteen (15) day period, and
shall not thereafter with reasonable diligence and in good faith, proceed to
remedy or cure such default, then Owner may serve a written five (5) days'
notice of cancellation of this lease upon Tenant, and upon the expiration of
said five (5) days this lease and the term thereunder shall end and expire as
fully and completely as if the expiration of such five (5) day period were the
day herein definitely fixed for the end and expiration of this lease and the
term thereof and Tenant shall then quit and surrender the demised premises
to Owner but Tenant shall remain liable as hereinafter provided.

(2)If the notice provided for in (1) hereof shall have
been given, and the term shall expire as aforesaid; or if Tenant shall make
default in the payment of the rent reserved herein or any item of additional
rent herein mentioned or any part of either or in making any other payment
herein required; then and in any of such events Owner may without notice,
re-enter the demised premises either by force or otherwise, and dispossess
Tenant by summary proceedings or otherwise, and the legal representative
of Tenant or other occupant of demised premises and remove their effects and
hold the premises as if this lease had not been made, and Tenant hereby waives

the service of notice of intention to re-enter or to institute legal proceedings
to that end. If Tenant shall make default hereunder prior to the date fixed as
the commencement of any term or extension of this lease, Owner may
cancel and terminate such renewal or extension agreement by written notice.

**Remedies of**    **18.** In case of any such default, re-entry, expiration
**Owner and** and/or dispossess by summary proceedings or other
**Waiver of** wise, (a) the rent shall become due thereupon and be
**Redemption:** paid up to the time of such re-entry, dispossess and/
or expiration, (b) Owner may re-let the premises or
any part or parts thereof, either in the name of Owner or otherwise, for a
term or terms, which may at Owner's option be less than or exceed the
period which would otherwise have constituted the balance of the term of
this lease and may grant concessions or free rent or charge a higher rental
than that in this lease, and/or (c) Tenant or the legal representatives of
Tenant shall also pay Owner as liquidated damages for the failure of Tenant
to observe and perform said Tenant's covenants herein contained, any
deficiency between the rent hereby reserved and/or covenanted to be paid
and the net amount, if any, of the rents collected on account of the lease or
leases of the demised premises for each month of the period which would
otherwise have constituted the balance of the term of this lease. The failure
of Owner to re-let the premises or any part or parts thereof shall not release
or affect Tenant's liability for damages. In computing such liquidated
damages there shall be added to the said deficiency such expenses as Owner
may incur in connection with re-letting, such as legal expenses, reasonable
attorneys' fees, brokerage, advertising and for keeping the demised
premises in good order or for preparing the same for re-letting. Any such
liquidated damages shall be paid in monthly installments by Tenant on the
rent day specified in this lease and any suit brought to collect the amount
of the deficiency for any month shall not prejudice in any way the rights of
Owner to collect the deficiency for any subsequent month by a similar
proceeding. Owner, in putting the demised premises in good order or
preparing the same for re-rental may, at Owner's option, make such
alterations, repairs, replacements, and/or decorations in the demised
premises as Owner, in Owner's sole judgement, considers advisable and
necessary for the purpose of re-letting the demised premises, and the
making of such alterations, repairs, replacements, and/or decorations shall
not operate or be construed to release Tenant from liability hereunder as
aforesaid. Owner shall in no event be liable in any way whatsoever for
failure to re-let the demised premises, or in the event that the demised
premises are re-let, for failure to collect the rent thereof under such re-
letting, and in no event shall Tenant be entitled to receive any excess, if any,
of such net rents collected over the sums payable by Tenant to Owner
hereunder. In the event of a breach or threatened breach by Tenant of any
of the covenants or provisions hereof, Owner shall have the right of
injunction and the right to invoke any remedy allowed at law or in equity
as if re-entry, summary proceedings and other remedies were not herein
provided for. Mention in this lease of any particular remedy, shall not
preclude Owner from any other remedy, in law or in equity. Tenant hereby
expressly waives any and all rights of redemption granted by or under any
present or future laws in the event of Tenant being evicted or dispossessed
for any cause, or in the event of Owner obtaining possession of demised
premises, by reason of the violation by Tenant of any of the covenants and
conditions of this lease, or otherwise.

**Fees and**     **19.** If Tenant shall default in the observance or
**Expenses:** performance of any term or covenant on Tenant's
part to be observed or performed under or by virtue
of any of the terms or provisions in any article of this lease, after notice if
required and upon expiration of any applicable grace period if any, (except
in an emergency), then, unless otherwise provided elsewhere in this lease,
Owner may immediately, or at any time thereafter and without notice,
perform the obligation of Tenant thereunder. If Owner, in connection with
the foregoing or in connection with any default by Tenant in the covenant
to pay rent hereunder, makes any expenditures or incurs any obligations for
the payment of money, including but not limited to reasonable attorneys'
fees, in instituting, prosecuting or defending any action or proceeding, such
prevails in any such action or proceeding then Tenant will reimburse Owner
for such sums so paid or obligations incurred with interest and costs. The
foregoing expenses incurred by reason of Tenant's default shall be deemed
to be additional rent hereunder and shall be paid by Tenant to Owner within
ten (10) days of rendition of any bill or statement to Tenant therefor. If
Tenant's lease term shall have expired at the time of making of such
expenditures or incurring of such obligations, such sums shall be recover-
able by Owner, as damages.

**Building**     **20.** Owner shall have the right at any time
**Alterations** without the issue constituting an eviction and with-
**and** out incurring liability to Tenant therefor to change
**Management:** the arrangement and/or location of public entrances,
passageways, doors, doorways, corridors, eleva-
tors, stairs, toilets or other public parts of the building and to change the
name, number or designation by which the building may be known. There
shall be no allowance to Tenant for diminution of rental value and no liability
on the part of Owner by reason of inconvenience, annoyance or injury to
business arising from Owner or other Tenant making any repairs in the
building or any such alterations, additions and improvements. Further-
more, Tenant shall not have any claim against Owner by reason of Owner's
imposition of such controls of the manner of access to the building by
Tenant's social or business visitors as the Owner may deem necessary for
the security of the building and its occupants.

**No Repre-**    **21.** Neither Owner nor Owner's agents have made
**sentations** any representations or promises with respect to the
**by Owner:** physical condition of the building, the land upon
which it is erected or the demised premises, the
rents, leases, expenses of operation or any other matter or thing affecting
or related to the premises except as herein expressly set forth and no rights,
easements or licenses are acquired by Tenant by implication or otherwise
except as expressly set forth in the provisions of this lease. Tenant has
inspected the building and the demised premises and is thoroughly ac-
quainted with their condition and agrees to take the same "as is" and
acknowledges that the taking of possession of the demised premises by
Tenant shall be conclusive evidence that the said premises and the building
of which the same form a part were in good and satisfactory condition at the
time such possession was so taken, except as to latent defects. All
understandings and agreements heretofore made between the parties hereto
are merged in this contract, which alone fully and expressly expresses the
agreement between Owner and Tenant and any executory agreement

**End of
Term:** 22. Upon the expiration or other termination of the term of this lease, Tenant shall quit and surrender to Owner the demised premises, broom clean, in good order and condition, ordinary wear and damages which Tenant is not required to repair as provided elsewhere in this lease excepted, and Tenant shall remove all its property. Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of this lease. If the last day of the term of this Lease or any renewal thereof, falls on Sunday, this lease shall expire at noon on the preceding Saturday unless it be a legal holiday in which case it shall expire at noon on the preceding business day.

**Quiet
Enjoyment:** 23. Owner covenants and agrees with Tenant that upon Tenant paying the rent and additional rent and observing and performing all the terms, covenants and conditions, on Tenant's part to be observed and performed, Tenant may peaceably and quietly enjoy the premises hereby demised, subject, nevertheless, to the terms and conditions of this lease including, but not limited to, Article 31 hereof and to the ground leases, underlying leases and mortgages hereinbefore mentioned.

**Failure
to Give
Possession:** 24. If Owner is unable to give possession of the demised premises on the date of the commencement of the term hereof, because of the holding over or retention of possession of any tenant, undertenant or occupants or if the demised premises are located in a building being constructed, because such building has not been sufficiently completed to make the premises ready for occupancy or because of the fact that a certificate of occupancy has not been obtained or for any other reason, Owner shall not be subject to any liability for failure to give possession on said date and the validity of the lease shall not be impaired under such circumstances, nor shall the same be construed in any wise to extend the term of this lease, but the rent payable hereunder shall be abated (provided Tenant is not responsible for Owner's inability to obtain possession or complete construction) until after Owner shall have given Tenant written notice that the Owner is able to deliver possession in condition required by this lease. If permission is given to Tenant to enter into the possession of the demised premises or to occupy premises other than the demised premises prior to the date specified in the commencement of the term of this lease, Tenant covenants and agrees that such possession and/or occupancy shall be deemed to be under all the terms, covenants, conditions and provisions of this lease except the obligation to pay the fixed annual rent set forth in the preamble to this lease. The provisions of this article are intended to constitute "an express provision to the contrary" within the meaning of Section 223-a of the New York Real Property Law.

**No Waiver:** 25. The failure of Owner to seek redress for violation of, or to insist upon the strict performance of any covenant or condition of this lease or of any of the Rules or Regulations, set forth or hereafter adopted by Owner, shall not prevent a subsequent act which would have originally constituted a violation from having all the force and effect of an original violation. The receipt by Owner of rent and/or additional rent with knowledge of the breach of any covenant of this lease shall not be deemed a waiver of such breach and no provision of this lease shall be deemed to have been waived by Owner unless such waiver be in writing signed by Owner. No payment by Tenant or receipt by Owner of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement of any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Owner may accept such check or payment without prejudice to Owner's right to recover the balance of such rent or pursue any other remedy in this lease provided. No act or thing done by Owner or Owner's agents during the term hereby demised shall be deemed an acceptance of a surrender of said premises, and no agreement to accept such surrender shall be valid unless in writing signed by Owner. No employee of Owner or Owner's agent shall have any power to accept the keys of said premises prior to the termination of the lease and the delivery of keys to any such agent or employee shall not operate as a termination of the lease or a surrender of the premises.

**Waiver of
Trial by Jury:** 26. It is mutually agreed by and between Owner and Tenant that the respective parties hereto shall and they hereby do waive trial by jury in any action proceeding or counterclaim brought by either of the parties hereto against the other (except for personal injury or property damage) on any matters whatsoever arising out of or in any way connected with this lease, the relationship of Owner and Tenant, Tenant's use of or occupancy of said premises, and any emergency statutory or any other statutory remedy. It is further mutually agreed that in the event Owner commences any proceeding or action for possession including a summary proceeding for possession of the premises, Tenant will not interpose any counterclaim of whatever nature or description in any such proceeding including a counterclaim under Article 4 except for statutory mandatory counterclaims.

**Inability to
Perform:** 27. This Lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on part of Tenant to be performed shall in no wise be affected, impaired or excused because Owner is unable to fulfill any of its obligations under this lease or to supply or is delayed in supplying any service expressly or impliedly to be supplied or is unable to make, or is delayed in making any repair, additions, alterations or decorations or is unable to supply or is delayed in supplying any equipment, fixtures, or other materials if Owner is prevented or delayed from so doing by reason of strike or labor troubles or any cause whatsoever including, but not limited to, government preemption or restrictions or by reason of any rule, order or regulation of any department or subdivision thereof of any government agency or by reason of the conditions which have been or are affected, either directly or indirectly, by war or other emergency.

**Bills and
Notices:** 28. Except as otherwise in this Lease provided, a bill, statement, notice or communication which Owner may desire or be required to give to Tenant, shall be deemed sufficiently given or rendered if, in writing, delivered to Tenant personally or sent by registered or certified mail addressed to Tenant at the building of which the demised premises form a part or at the last known residence address or business address of Tenant or left at any of the aforesaid premises addressed to Tenant, and the time of the rendition of such bill or statement and of the giving of such notice or communication shall be deemed to be the time when the same is delivered to Tenant, mailed, or left at the premises as herein provided. Any notice by Tenant to Owner must be served by registered or certified mail addressed to Owner at the address first hereinabove given or at such other address as Owner shall designate by written notice.

**Services
Provided by
Owners:** 29. As long as Tenant is not in default under any of the covenants of this lease beyond the applicable grace period provided in this lease for the curing of such defaults, Owner shall provide: (a) necessary elevator facilities on business days from 8 a.m. to 6 p.m. and one elevator subject to call at all other times; (b) heat to the demised premises when and as required by law, on business days from 8 a.m. to 6 p.m.; (c) water for ordinary lavatory purposes, but if Tenant uses or consumes water for any other purposes or in unusual quantities (of which fact Owner shall be the sole judge), Owner may install a water meter at Tenant's expense which Tenant shall thereafter maintain at Tenant's expense in good working order and repair to register such water consumption and Tenant shall pay for water consumed as shown on said meter at additional rent as and when bills are rendered; (d) cleaning service for the demised premises on business days at Owner's expense provided that the same are kept in order by Tenant. If, however, said premises are to be kept clean by Tenant, it shall be done at Tenant's sole expense, in a manner reasonably satisfactory to Owner and no one other than persons approved by Owner shall be permitted to enter said premises or the building of which they are a part for such purpose. Tenant shall pay Owner the cost of removal of any of Tenant's refuse and rubbish from the building; (e) If the demised premises are serviced by Owner's air conditioning/cooling and ventilating system, air conditioning/ cooling will be furnished to tenant from May 15th through September 30th on business days (Mondays through Fridays, holidays excepted) from 8:00 a.m. to 6:00 p.m., and ventilation will be furnished on business days during the aforesaid hours except when air conditioning/cooling is being furnished as aforesaid. If Tenant requires air conditioning/cooling or ventilation for more extended hours or on Saturdays, Sundays or on holidays, as defined under Owner's contract with Operating Engineers Local 94-94A, Owner will furnish the same at Tenant's expense. RIDER to be added in respect to rates and conditions for such additional service; (f) Owner reserves the right to stop services of the heating, elevators, plumbing, air-conditioning, electric, power systems or cleaning or other services, if any, when necessary by reason of accident or for repairs, alterations, replacements or improvements necessary or desirable in the judgment of Owner for as long as may be reasonably required by reason thereof. If the building of which the demised premises are a part supplies manually operated elevator service, Owner at any time may substitute automatic control elevator service and proceed diligently with alterations necessary therefor without in any wise affecting this lease or the obligation of Tenant hereunder.

**Captions:** 30. The Captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this lease nor the intent of any provisions thereof.

**Definitions:** 31. The term "office", or "offices", wherever used in this lease, shall not be construed to mean premises used as a store or stores, for the sale or display, at any time, of goods, wares or merchandise, of any kind, or as a restaurant, shop, booth, bootblack or other stand, barber shop, or for other similar purposes or for manufacturing. The term "Owner" means a landlord or lessor, and as used in this lease means only the owner, or the mortgagee in possession, for the time being of the land and building (or the owner of a lease of the building or of the land and building) of which the demised premises form a part, so that in the event of any sale or sales of said land and building or of said lease, or in the event of a lease of said building, or of the land and building, the said Owner shall be and hereby is entirely freed and relieved of all covenants and obligations of Owner hereunder, and it shall be deemed and construed without further agreement between the parties or their successors in interest, or between the parties and the purchaser, at any such sale, or the said lessee of the building, or of the land and building, that the purchaser or the lessee of the building has assumed and agreed to carry out any and all covenants and obligations of Owner, hereunder. The words "re-enter" and "re-entry" as used in this lease are not restricted to their technical legal meaning. The term "business days" as used in this lease shall exclude Saturdays, Sundays and all days as observed by the State or Federal Government as legal holidays and those designated as holidays by the applicable Operating Engineers contract with respect to HVAC service. Wherever it is expressly provided in this lease that consent shall not be unreasonably withheld, such consent shall not be unreasonably delayed.

**Adjacent
Excavation-
Shoring:** 32. If an excavation shall be made upon land adjacent to the demised premises, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation, license to enter upon the demised premises for the purpose of doing such work as said person shall deem necessary to preserve the wall of the building of which demised premises form a part from injury or damage and to support the same by proper foundations without any claim for damages or indemnity against Owner, or diminution or abatement of rent.

**Rules and
Regulations:** 33. Tenant and Tenant's servants, employees, agents, visitors, and licensees shall observe faithfully, and comply strictly with, the Rules and Regulations and such other and further reasonable Rules and Regulations as Owner or Owner's agents may from time to time adopt. Notice of any additional rules or regulations shall be given in such manner as Owner may elect. In case Tenant disputes the reasonableness of any additional Rule or Regulation hereafter made or adopted by Owner or Owner's agents, the parties hereto agree to submit the question of the reasonableness of such Rule or Regulation for decision to the New York office of the American Arbitration Association, whose determination shall be final and conclusive upon the parties hereto. The right to dispute the reasonableness of any additional Rule or Regulation upon Tenant's part shall be deemed waived unless the same shall be asserted by service of a notice, in writing upon Owner within fifteen (15) days after the giving of notice thereof. Nothing

Rider to be added if necessary.

*any reason beyond Owner's reasonable control

See Rider Annexed Hereto and Made a Part Hereof.

**In Witness Whereof,** Owner and Tenant have respectively signed and sealed this lease as of the day and year first above written.

Witness for Owner:

..........................................

Owner: 210 East 86th Street Corp..........

By:.......................................
    Name: B. Mark Perlbinder
    Title:

Witness for Tenant:

..........................................

Tenant: Replacement Associates, LLC

By:.......................................
    Name: MORTON KLEINER
    Title: MEMBER

## ACKNOWLEDGEMENTS

CORPORATE OWNER
STATE OF NEW YORK,        ss.:
County of

   On this        day of               , 19    ,
before me personally came
to me known, who being by me duly sworn, did depose and say that
he resides in                                  ;
that he is the                    of
the corporation described in and which executed the foregoing
instrument, that he knows the seal of said corporation;
the seal affixed to said instrument is such corporate seal; that it was
so affixed by order of the Board of Directors of said corporation,
and that he signed his name thereto by like order.

CORPORATE TENANT
STATE OF NEW YORK,        ss.:
County of RICHMOND

   On this 28 day of FEBRUARY 2013
before me personally came
to me known, who being by me duly sworn, did depose and say that
he resides in NEW YORK
that he is the MEMBER of REPLACEMENT ASSOC, LLC
the corporation described in and which executed the foregoing
instrument, that he knows the seal of said corporation; and
the seal affixed to said instrument is such corporate seal; that it was
so affixed by order of the Board of Directors of said corporation,
and that he signed his name thereto by like order.

BRIGID BARNES
Notary Public, State of New York
No. 43-4734220
Qualified in Richmond County
Commission Expires 08/07/2014

INDIVIDUAL OWNER
STATE OF NEW YORK,        ss.:
County of

   On this        day of               , 19    ,
before me personally came
to be known and known to me to be the individual
described in and who, as OWNER, executed the foregoing instru-
ment and acknowledged to me that                    he
executed the same.

INDIVIDUAL TENANT
STATE OF NEW YORK,        ss.:
County of

   On this        day of               , 19    ,
before me personally came
to be known and known to me to be the individual
described in and who, as TENANT, executed the foregoing
instrument and acknowledged to me that                    he
executed the same.

**RIDER TO LEASE DATED AS OF FEBRUARY 28, 2013
BETWEEN 210 EAST 86TH STREET CORP., OWNER, AND
REPLACEMENT ASSOCIATES, LLC TENANT, IN
RESPECT OF THE ENTIRE THIRD FLOOR
AND A PORTION OF THE FIFTH FLOOR
IN THE BUILDING KNOWN AS
210 EAST 86TH STREET, NEW YORK, NEW YORK**

37.    Provisions of Rider

If any of the provisions of this rider conflict are otherwise inconsistent with any of the provisions contained in the pre-printed REBNY portion of this Lease, or with any of the rules and regulations appended to this Lease, the provisions of this rider shall prevail.

38.    Binding Effect

Submission by Owner of the within Lease for execution by Tenant shall confer no rights nor impose any obligations on either party unless and until both Owner and Tenant shall have executed this Lease and duplicate originals thereof shall have been delivered to the respective parties.

39.    Definitions

For purposes of this Lease, unless the context otherwise requires:

39.1.  The term "Additional Rent" shall mean all sums of money, other than Fixed Rent, as shall become due and payable from Tenant to Owner hereunder, and Owner shall have the same remedies for the nonpayment thereof as for the nonpayment of Fixed Rent. Unless otherwise specified herein, Additional Rent shall be due and payable to Owner on the first day of the calendar month immediately following the calendar month in which Tenant shall have been billed therefor.

39.2.  The term "alterations" shall refer to alterations, installations, additions, improvements, demolition and other work as set forth in Article 3 and Article 41.

39.3.  The term "Building" shall refer to the building of which the Premises form a part.

39.4.  The term "Fixed Rent" shall mean rent at the annual rental rates provided for in Article 56 of this rider.

39.5. The words "herein", "hereof", "hereby", "hereunder" and words of similar import shall be construed to refer to this Lease as a whole and not to any particular Article or subdivision thereof unless expressly so stated.

39.6.  Reference to Tenant being "in default hereunder", and words of like import, shall mean that Tenant is in default in the performance of one or more of Tenant's obligations hereunder, or that a condition of the character described in Article 17 has occurred and continues.

39.7. The words "include", "including" and "such as" shall each be construed as if followed by the phrase "without being limited to".

39.8.  The term "Premises" shall refer to the demised premises.

39.9.  The term "Rents" shall mean Fixed Rent and Additional Rent.

39.10.  Notwithstanding the date of this Lease, or the date on which Tenant shall actually take possession of the Premises, or anything to the contrary contained herein, the term "Commencement Date" shall mean March 1, 2013 and the term "Expiration Date" shall mean February 28, 2018.

39.11.  The term "obligations of this Lease" and words of like import, shall mean the covenants to pay Fixed Rent and Additional Rent under this Lease and all of the other covenants and conditions contained in this Lease.  Reference to "performance" of Tenant's obligations under this Lease shall be construed as "performance and observance".  Tenant's obligations hereunder shall be construed in each and every instance as conditions as well as covenants.

39.12.  The terms "Owner" and "Landlord" may be used interchangeably in this Lease.

39.13.  Words and phrases used in the singular shall be deemed to include the plural and vice versa and nouns and pronouns used in any particular gender shall be deemed to include any other gender if the context so requires.

39.14.  All references in this Lease to numbered Articles and lettered Exhibits are references to Articles of this Lease and Exhibits annexed to (and thereby made part of) this Lease, as the case may be, unless expressly otherwise designated in the context.

40.    Occupancy (Supplementing Article 2)

40.1.  Tenant shall use and occupy the Premises solely for general and/or medical offices and/or a renal dialysis unit only and for no other purpose whatsoever.  Tenant's use of the Premises shall at all times be strictly in accordance with the terms of this Lease.  The use of the Premises for the purposes specified in Article 2 and this Article 40 shall not in any event be deemed to include, and Tenant shall not use, or permit the use of, the Premises or any part thereof for (a) any activity which might, in Owner's reasonable opinion, damage the Premises or the Building or unreasonably annoy, interfere with or disrupt other tenants or occupants of the Building; (b) the sale, storage, handling or furnishing of any materials which are flammable or explosive and the storage of which would cause the rate of insurance for the Building to be increased; (c) a shared health facility, clinic or center, drug or other substance rehabilitation facility, clinic or center or a commercial laboratory; (d) the display or sale of any items which are or may be regarded as obscene or pornographic and Tenant shall not bring or permit any obscene or pornographic material on the Premises; (e) any parties, recitals, benefits, shows, openings or social gatherings; (f) the providing of massages or other types of physical therapy; (g) the harboring of animals; or (h) residential use or occupancy.  Tenant shall at all times provide adequate floor covering to protect the floors from damage.

40.2.  Owner shall have the absolute right to prohibit the continued use by Tenant of any unethical, unfair or improper method of advertising or interior display which is visible outside of the Premises if, in Owner's reasonable opinion, the continued use thereof would impair the reputation of the Building or is otherwise out of harmony with the general character thereof, and, upon notice from Owner, Tenant shall forthwith refrain from or discontinue such activities.  Furthermore, Tenant agrees not to (a) use or permit to be used the sidewalks or other space outside of the Building for any display, sale or similar undertaking or storage, (b) use or permit to be used any loudspeaker, phonograph, or other sound system which may be heard outside the Premises, (c) perform or permit any live music of any nature whatsoever to be played or performed within the Premises or (d) distribute or permit to be distributed handbills or other matter to persons outside the Premises.

40.3.  This Lease is subject to all of the terms, conditions and requirements of the certificate of occupancy for the Building and to any amendment to such certificate of occupancy.  Owner covenants that Owner will not amend the current certificate of occupancy to the extent that Tenant's permitted use of the Premises as set forth in Article 40.1 above shall be legally prohibited.  However, notwithstanding the foregoing or anything else to the contrary set forth in this Lease, Owner has made no representation that the use to be made

N:/gsf/GSF/WPDocs/210E86th/Replacement Associates, LLC/Execution Versions/Replacement Associates  RIDER 2-28-13 (final) V2.wpd

2

of the Premises, as specified herein, is or will be consistent with those uses permitted under such certificate of occupancy or any amendment thereto or any amended certificate of occupancy. If such use is inconsistent with said certificate of occupancy or any amendment thereto or any amended certificate of occupancy and further, if the Department of Buildings or other governmental agency having jurisdiction issues a violation based on such inconsistent use, Tenant shall forthwith take such action, at Tenant's sole cost and expense, but subject to Owner's prior written reasonable approval in all respects, as may be necessary to secure an amended certificate of occupancy conforming with Tenant's use of the Premises; provided, however, that in no event shall Tenant take any actions which may adversely affect the Building or any other matter relating to the permissible legal occupancy of the Building or any portion thereof.

40.4.   Tenant shall conduct Tenant's operations at the Premises using special care and precaution so as not to cause unreasonable annoyance, discomfort and/or injury to the other occupants and users of the Building and shall maintain the proper appearance of the Premises.   Tenant will not permit any garbage or refuse to accumulate within the Premises or within any other portion of the Building, or be kept in other than sealed containers, or be placed on the sidewalk in front of the Building at any time of the day or night (except solely for such limited period of time as shall be necessary in connection with any pre-scheduled evening pick-up by Tenant's carting company).   Owner shall have the right to establish reasonable additional rules and regulations concerning the storage and removal of Tenant's garbage and refuse in Owner's discretion, effective upon notice thereof to Tenant.   Tenant, at Tenant's sole cost and expense, shall employ an exterminating service for the Premises as and when needed.

40.5.   Tenant shall not use any portion of the Building other than the Premises as a reception area or waiting room.   Further, Tenant shall not permit any of its patients or clientele to remain in the lobby, public hallways or corridors of the Building at any time. Tenant shall strictly comply with any and all rules, orders and regulations of any applicable governmental agencies having jurisdiction with respect to the disposal of its medical waste, garbage and refuse.   Without limitation of the foregoing, Tenant acknowledges the extreme importance to Owner of Tenant's strict compliance with the provisions of Title XII of the Public Health Law of the State of New York and Section 755(2-7.3) of the Administrative Code of the City of New York and any other laws, rules, ordinances or regulations relating to the disposition of infectious waste and agrees to comply strictly with all of the provisions thereof relating to Tenant or Tenant's use of the Premises.

40.6.   During the term of this Lease, Tenant shall not: (a) use or permit to be used, any advertising medium, and/or loud speaker, and/or sound amplifier and/or radio or television broadcast which may be heard outside the Premises or which does not comply with Owner's general policies or rules and regulations then in effect;   (b) use the plumbing facilities for any purpose other than that for which they were constructed, or dispose of any medical waste, garbage or other foreign substance therein, whether through the utilization of so-called "disposal" or similar units or otherwise; (b) perform any act or carry on any practice which may damage, mar or deface the Premises or any other part of the Building; (c) install, operate or maintain in the Premises any electrical equipment which will overload the electrical system therein, or any machine or other installation therein, or otherwise suffer, allow or permit the same to constitute a nuisance or otherwise unreasonably interfere with the safety, comfort or convenience of Owner or any of the other occupants of the Building or their customers, agents or invitees; (d) suffer, allow or permit the erection or display in, on or from the Premises of any exhibits, banners, decorations, flags, bunting or any other similar kind or form of description or display without Owner's prior written consent in each instance; (e) permit any business to be operated in or from the Premises by any concessionaire or licensee without the prior written consent of Owner in each instance (except as may otherwise be provided in this Lease); or (f) subject any fixtures or equipment in or on the Premises which are affixed to the realty, to any mortgages, liens, conditional sales agreements, security interests or encumbrances.

N:/gsf/GSF/WPDocs/210E86th/Replacement Associates, LLC/Execution Versions/Replacement Associates  RIDER 2-28-13 (final) V2.wpd

3

40.7    Provided and on condition that Tenant shall not be in default under this Lease (after the expiration of any applicable cure period specifically provided for in this Lease with regard to such default, if any), Tenant shall have the exclusive right during the term of this Lease to lease space in the Building for use as a renal dialysis facility.  However, nothing herein contained shall be deemed to give Tenant an exclusive right to lease space in the Building for any other medical or non-medical use except solely for a renal dialysis facility.

41.    Alterations (Supplementing Article 3)

41.1.  If Tenant desires to perform any renovations, additions, installations, improvements and/or alterations of any kind or nature in the Premises during the term of this Lease (hereinafter called "Tenant's Work"), Tenant will deliver to Owner plans and specifications therefor for Owner's prior written approval.  Owner shall provide Tenant with its comments on the proposed work, and Tenant shall provide Owner with revised plans at least three days prior to the commencement of Tenant's Work incorporating Owner's comments.  However, Owner agrees not to unreasonably withhold or delay its consent to any proposed non-structural alterations, provided and on condition that such alterations (i) are not visible from the outside of the Building; (ii) do not affect any part of the Building, including, without limitation, the electrical, plumbing, HVAC and other Building systems, other than the Premises; (iii) do not affect any service required to be furnished by Owner to Tenant or to any other tenant or occupant of the Building; (iv) do not reduce the value or utility of the Building; (v) do not adversely affect the proper functioning of any Building systems; (vi) do not affect the certificate of occupancy for the Building or the Premises.

41.2.  Prior to the commencement of any Tenant's Work, Tenant shall:

41.2.1.  Obtain the necessary permits, consents, authorizations and licenses from all federal, state and/or municipal authorities having jurisdiction over such work;

41.2.2.  Furnish to Owner a copy of any contract made by Tenant with the licensed contractor and/or other person or persons who will perform Tenant's Work, which contract will provide, among other things, as follows:

41.2.2.1.    that the work will be done in accordance with the approved plans and specifications and the consents, authorizations and licenses obtained;

41.2.2.2.  that the contractor or other persons performing the work will look solely to Tenant for payment and will hold Owner and the Premises and the Building free from all liens and claims of all persons furnishing labor or materials therefor, or both; and

41.2.2.3.  that similar waivers of the right to file mechanic's liens shall be obtained from all subcontractors and materialmen after payment.

41.2.2.4.  Notwithstanding the provisions of 41.2.2.2 and 41.2.2.3, if Tenant shall be unable to secure such contractual agreement as is set forth therein, Tenant shall be obligated to post a performance and completion bond in favor of Owner in the full amount of the construction work to be performed with a surety company reasonably acceptable to Owner.

41.2.3.  Cause Tenant's contractor(s) to furnish to Owner a certificate or certificates of Worker's Compensation Insurance covering all persons who will perform Tenant's Work for Tenant or any contractor, subcontractor or other person; and

41.2.4. Cause Tenant's contractor(s) to furnish to Owner an original policy of comprehensive general public liability and property damage insurance covering Owner with a broad form contractual liability endorsement with a minimum combined single limit of liability with respect to each occurrence in an amount of not less than five million ($5,000,000.00) dollars for injuries and/or deaths and property damage.  Such policy shall be maintained at all times during the progress of Tenant's Work and until completion thereof,

N:/gsf/GSF/WPDocs/210E86th/Replacement Associates, LLC/Execution Versions/Replacement Associates  RIDER 2-28-13 (final) V2.wpd

4

and shall provide that no cancellation shall be effective unless thirty days' prior written notice shall have been given to Owner by certified mail, return receipt requested. Tenant agrees to indemnify and save Owner harmless from and against: any and all bills for labor performed and equipment, fixtures and materials furnished to Tenant; any and all liens, bills or claims therefor against Owner or against the Premises or the Building; and all losses, damages, liabilities, costs, expenses (including attorneys' fees), suits and claims whatsoever in connection with Tenant's Work. Tenant shall keep the Premises and the Building free at all times of liens for labor and materials supplied or claimed to have been supplied in connection with Tenant's Work. If the performance of Tenant's Work shall interfere with the comfort and/or convenience of other tenants in the Building or adjacent buildings, Tenant shall, upon Owner's demand, remedy or remove the condition or conditions complained of. Tenant shall not take any action or perform any act, nor permit the same by any other party, which will violate any of Owner's union contracts affecting the Building of which Tenant has actual or constructive notice, nor create any work stoppage, picketing, labor disruption or dispute which will interfere with the operation by Owner of the Building. Tenant further covenants and agrees to indemnify and save Owner harmless from and against any and all claims, losses, damages, liabilities, costs, expenses, suits and claims whatsoever made or asserted against Owner by reason of the foregoing.

42. Maintenance and Repairs (Supplementing Article 4)

42.1. Tenant shall take good care of the Premises and the fixtures, appurtenances, equipment and facilities therein and shall make, as and when needed, all repairs to the interior of the Premises, required to keep them in good order and condition; such repairs to be of at least equal quality to the original work. In addition, Tenant shall keep the interior and exterior surfaces of all windows clean. Any and all damage or injury to the Premises or to any other part of the Building, or to its fixtures, equipment and appurtenances, whether requiring structural or nonstructural repairs, caused by or resulting from Tenant's Work or the acts, carelessness, omission, neglect or improper conduct of Tenant, Tenant's agents, employees, contractors, invitees or licensees, shall be repaired at Tenant's sole cost and expense, by Tenant if the required repairs are nonstructural in nature or by Owner if the required repairs are structural in nature. In addition to any other rights and remedies which Owner may have under the terms of this Lease, Owner shall be entitled to a decree specifically enforcing the provisions of this Article.

42.2. Owner reserves the right to suspend the service of any utilities, elevator or other building systems or services, by reason of accident or repairs, alterations or improvements to be made in the Premises or the Building until such repairs, alterations or improvements shall have been completed, and Owner shall have no responsibility or liability for such suspension of service. However, if and to the extent reasonably practicable, Owner shall perform any such repairs, alterations and improvements with reasonable diligence, subject to delays beyond Owner's reasonable control. The provisions of this Article shall not be deemed to impose upon Owner any obligation for the furnishing of any service, maintenance or repair other than as specifically set forth in this Lease.

43. Subordination (Supplementing Article 7)

43.1. The ground and underlying leases and mortgages referred to in Article 7, to which this Lease is subject and subordinate, are hereinafter sometimes called "superior leases" and "superior mortgages" respectively, and the lessor of a superior lease or its successor in interest is hereinafter sometimes called the "lessor" of such superior lease.

43.2. In the event of any act or omission of Owner which would give Tenant the right, immediately or after a lapse of a period of time, to cancel or terminate this Lease, or claim a partial or total eviction, Tenant shall not exercise such right (i) until it has given written notice of such act or omission to the holder of each superior mortgage and the lessor of each superior lease whose name and address shall have been furnished to Tenant in writing, and (ii) unless such act or omission shall be one which is not capable of being remedied by Owner or such mortgage holder or lessor within a reasonable period of time, until a reasonable period for remedying such act or omission shall have elapsed following the giving

N:/gsf/GSF/WPDocs/210E86th/Replacement Associates, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

5

of such notice and following the time when such holder or lessor shall have become entitled under such superior mortgage or superior lease, as the case may be, to remedy the same (which reasonable period shall in no event be less than the period to which Owner would be entitled under this Lease or otherwise, after similar notice, to effect such remedy), provided such holder or lessor shall with due diligence give Tenant written notice of intention to, and commence and continue to, remedy such act or omission.

43.3.  If the lessor of a superior lease or the holder of a superior mortgage shall succeed to Owner's estate in the Building or the rights of Owner under this Lease, whether through possession or foreclosure action or delivery of a new lease or a deed or otherwise, then, at the election of such party so succeeding to Owner's rights (herein sometimes called "successor landlord"), Tenant shall attorn to and recognize such successor landlord as Tenant's landlord under this Lease, and shall promptly execute and deliver any instrument which such successor landlord may reasonably request to evidence such attornment.  Tenant hereby irrevocably appoints such successor landlord Tenant's attorney-in-fact to execute and deliver such instrument for and on behalf of Tenant.

44.  <u>Tenant's Liability Insurance</u> (Supplementing Article 8)

44.1.  Tenant shall defend, indemnify and save harmless Owner and its agents against and from (a) any and all claims, losses, liabilities, damages, demands, actions, causes of action, judgments, costs and expenses, including, without limitation, attorneys' fees, arising from or in connection with (i) the conduct of Tenant's business in the Premises or any work or thing whatsoever done or any condition created in or about the Premises during the term of this Lease; (ii) any act or omission of Tenant or any of its subtenants or licensees or its or their guests, invitees, patrons, employees, agents or contractors; and (iii) any default by Tenant in the performance of any of the covenants, terms, provisions, conditions and/or obligations on its part to be performed hereunder, and (b) all costs and expenses (including attorneys' fees) and liabilities incurred in or in connection with each such claim or action or proceeding brought thereon.  In case any action or proceeding be brought against Owner by reason of any such claim, Tenant, upon notice from Owner, shall resist and defend such action or proceeding by counsel chosen by Tenant who shall be reasonably satisfactory to Owner.  Upon request of Owner, Tenant or its counsel shall keep Owner fully apprised at all times of the status of such defense.

44.2.  Without limiting Tenant's liability under the indemnity provided for in this Article, Tenant shall provide on or before the commencement date of this Lease ("Commencement Date"), and shall keep in force continuously throughout the term of this Lease, for the benefit of Owner and Tenant, insurance of the kinds and in the limits hereinafter specified against any liability whatsoever occasioned by any occurrence in, on or about, or resulting from the use, operation and/or maintenance of, the Premises, or the fixtures or equipment therein or the elevator, stairways,  passageways and other areas adjacent to the Premises, and shall cause Owner and its agents to be named as additional insureds in all policies of such insurance.  Tenant may maintain all coverage required hereunder under a blanket policy covering the Premises and all of Tenant's other leased properties.  Such kinds and limits of insurance are as follows:

44.2.1.  Worker's Compensation Insurance to the extent required by law in statutory limits covering all persons employed in connection with the performance of work upon, in or about the Premises.

44.2.2.  Comprehensive general public liability and property damage insurance with a broad form contractual liability endorsement with a minimum combined single limit of liability with respect to each occurrence in an amount of not less than five million ($5,000,000.00) dollars, and in an amount of not less than five million ($5,000,000.00) dollars in the aggregate, for injuries and/or deaths and property damage and adequate water and fire insurance with extended coverage, covering Tenant's trade fixtures, merchandise and other personal property as well as property owned by others but in the possession of Tenant at the Premises.

N:/gs/GSF/WPDocs/210E86th/Replacement Associates, LLC/Execution Versions/Replacement Associates  RIDER 2-28-13 (final) V2.wpd

6

44.2.3.  Insurance against such other risks, and in such limits as are or shall be customarily insured against in businesses and use and occupancy similar to that operated by Tenant in the Premises.

44.3.  If Tenant is permitted to enter the Premises prior to the Commencement Date, Tenant shall obtain insurance of the kinds and limits as set forth hereinabove prior to the Commencement Date, and such insurance shall be effective as of the date of which Tenant first enters upon the Premises.

44.4.  The policies of insurance provided for in Section 44.2. shall be issued by insurance companies reasonably satisfactory to Owner, shall be non-cancelable except on at least thirty (30) days' prior written notice to Owner by certified mail, return receipt requested, and, to the extent obtainable, shall not be invalidated as against one assured by reason of any act or omission of another assured.  Such insurance companies shall be responsible, authorized to issue the relevant insurance coverage, authorized to do business in New York and have a policyholder's rating of no less than "A+10" in the most current edition of Best's Insurance Reports or its successor.  Not later than the earlier to occur of the day prior to the date Tenant first enters upon the Premises or the day prior to the Commencement Date, Tenant shall furnish Owner with a duplicate original policy or a certificate thereof evidencing each such insurance policy.  All such policies shall contain agreements by the insurers that the coverage afforded thereby shall not be affected by the performance of any work upon, in or about the Premises.

44.5.  Tenant shall pay all premiums and charges for all policies of insurance required to be secured and provided by Tenant pursuant to this Lease and shall pay for any increases in premiums thereon as required by this Article, or otherwise.  If Tenant shall fail to make any such payment when due or provide any such coverage, Owner may, but shall not be obligated to, make such payment or secure such policy, and the amount paid by Owner, with interest thereon, shall be repaid to Owner by Tenant on demand, and all such amounts so repayable, together with such interest, shall be considered as Additional Rent for the collection of which Owner shall have all of the remedies provided for hereunder or by law.  Payment by Owner of any such premium, increase in premium, other charge or the securing by Owner of any such policy shall not be deemed to waive or release the default of Tenant with respect thereto.

45.    Eminent Domain (Supplementing Article 10)

45.1.  If the whole of the Premises shall be taken under the power of eminent domain of any public or private authority, then this Lease shall be deemed terminated as of the date of such taking and unearned rent or other charges, if any, paid in advance, shall be refunded to Tenant.

45.2.  If only a portion of the Premises shall be taken under the power of eminent domain by any public or private authority, then this Lease shall continue in full force and effect, at Owner's option, provided, however, that Owner shall, at its own expense, restore that portion of the Premises which remains to substantially the same condition as prior to the condemnation.  There shall be a pro rata abatement of the Fixed Rent to the extent that the amount of floor space so taken compares to the amount of space prior to such condemnation, to compensate Tenant for its loss of use of such portion of the Premises.

45.3.  Tenant shall not be entitled to any award for the loss or damage in any such condemnation proceeding and in no event shall the condemnation award be apportioned.  However, Tenant shall be permitted to make a claim for loss of Tenant's personal property by reason of any condemnation, provided and on condition that such claim by Tenant does not adversely affect any claim made by Owner.

46.    Fees and Expenses (Supplementing Article 19)

Tenant shall pay to Owner all reasonable attorneys' fees and disbursements (and all other court costs or reasonable expenses of legal proceedings) and such other fees and

N:/gsf/GSF/WPDocs/210E86th/Replacement Associates, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

7

reasonable costs which Owner may incur or pay out by reason of, or in connection with: (a) any action or proceeding by Owner to terminate this Lease; (b) any other action or proceeding by Owner against Tenant based upon a default under this Lease; (c) any default by Tenant in the observance or performance of any obligation under this Lease after notice and the expiration of any applicable cure period which are specifically provided for in this Lease (including, but not limited to, matters involving: payment of Fixed Rent and Additional Rent; alterations or other Tenant's Work; and subletting or assignment) whether or not Owner commences any action or proceeding against Tenant; (d) any action or proceeding brought by Tenant against Owner (or any officer, partner or employee of Owner); (e) any assignment or sublease proposed or granted by Tenant whether or not permitted under this Lease, except subletting for a medical use, and all negotiations with respect thereto. Tenant shall also pay to Owner all reasonable architectural and engineering fees which Owner may incur in connection with any alteration of the Premises by Tenant, and all negotiations with respect thereto. Owner shall not be entitled to reasonable attorneys' fees or disbursements in connection with this Article 46 in any action or proceeding where Tenant shall demonstrate to the satisfaction of the Court that such action or proceeding commenced by Owner was not likely to succeed or any action or proceeding commenced by Tenant was likely to succeed.

47. No Representations by Owner (Supplementing Article 21)

47.1. Tenant acknowledges that it has inspected the Premises and agrees to accept possession thereof in its "as-is" physical condition on the date of this Lease, it being understood and agreed that Owner shall not be obligated to perform any alterations or improvements to the Premises, except solely for Owner's Work and the Additional Work as specifically set forth in Article 69 below, which shall be performed by Owner at Tenant's sole cost and expense as more particularly set forth in Article 69 below. Without limiting the foregoing, Tenant acknowledges and agrees that Owner shall not be obligated to provide any security to the Premises.

47.2. Owner shall have no liability for lost, stolen or damaged property or for injuries to Tenant, its employees, its customers, invitees or guests. Owner shall have no obligation to provide locks, fences, guards or other security devices or measures for the Premises.

48. Quiet Enjoyment (Supplementing Article 22)

Tenant shall not interfere with the quiet enjoyment of the other tenants of the Building. Tenant shall indemnify and save Owner harmless from and against any and all claims made, and liabilities, losses and damages sustained (including all costs, expenses, penalties and attorneys' fees), which Owner may sustain arising out of Tenant's breach or default of the terms of this Article. In addition to any other rights and remedies which Owner may have under the terms of this Lease, Owner shall be entitled to a decree specifically enforcing the provisions of this Article and enjoining Tenant from the breach or default of the terms hereof.

49. Bills and Notices (Supplementing Article 28)

49.1. Any bill, notice or other communication which either party may desire or be required to give to the other under this Lease shall be in writing and shall be deemed sufficiently given or rendered if delivered by certified mail, return receipt requested, by a recognized next business day courier (such as Federal Express) or by personal delivery as follows: In the case of notice to Tenant, one copy shall be mailed to Tenant at the address first hereinabove set forth and a copy of any notice of default shall be mailed or delivered to Tenant c/o Gerald Padian, Esq., Tashjian & Padian, 729 Seventh Avenue, New York, New York 10019. In the case of notice to Owner, one copy shall be mailed to Owner at the address first hereinabove set forth and a copy shall be mailed to Owner c/o Kaufman Friedman Plotnicki & Grun, LLP, 300 East 42nd Street, New York, New York 10017, Attention: Gary S. Friedman, Esq. Either party shall have the right to substitute addresses for such notices upon prior written notice to the other, given in the manner hereinabove set

N:/gsf/GSF/WPDocs/210E86th/Replacement Associates, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

8

forth. A bill, notice or other communication given by a party's attorneys shall be deemed given by such party.

49.2. Whenever either party shall consist of more than one person or entity, any bill, notice, statement, demand or other communication required or permitted to be given, rendered or made to or by, and any payment to be made to such party, shall be deemed duly given, rendered, made or paid if addressed to or by (or in the case of payment by check, to the direct order of) one of such persons or entities who shall be designated from time to time by all persons or entities then comprising such party. Such party shall promptly notify the other of the identity of such person or entity who is so to act on behalf of all persons and entities then comprising such party and of all changes in such identity.

49.3. Notwithstanding anything to the contrary contained herein, all bills for Rent and/or Additional Rent may be given by regular mail.

50. <u>Security</u> - Intentionally Deleted.

51. <u>Glass</u>

Tenant shall promptly replace, at its sole cost and expense, all glass damaged or broken from any cause whatsoever in or about the Premises.

52. <u>Certificates</u>

52.1. Tenant shall, at any time and from time to time, at the request of Owner, upon not less than ten days' notice, execute and deliver to Owner a statement in recordable form certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), certifying the dates to which the Fixed Rent and Additional Rent have been paid, stating whether or not there are then any known existing setoffs or defenses against the enforcement of any of the agreements, terms, covenants or conditions hereof upon the part of Tenant to be performed or complied with and, if so, specifying same, and stating whether or not Owner is in default in performance of any of its obligations under this Lease, and, if so, specifying each such default, and including such other statements and information as may be requested or required by the holder of any superior mortgage or the holder of any superior lease, it being intended that any such statement delivered pursuant hereto may be relied upon by Owner as well as by others with whom the Owner may be dealing.

52.2. At the request of Owner, Tenant shall promptly execute, acknowledge and deliver a memorandum in recordable form with respect to any circumstance which may be deemed to change or otherwise affect any of the obligations or provisions of this lease.

53. <u>Waiver of Subrogation</u>

53.1. Tenant shall cause to be included in each of its insurance policies insuring Tenant's property and business interest in the Premises against loss, damage or destruction by fire or other casualty (i) a waiver of the insurer's right of subrogation against Owner, and (ii) an express agreement that such policy shall not be invalidated if, prior to the occurrence of a casualty, the insured waives the right of recovery against any party responsible for a casualty covered by the policy. If such waiver or permission shall not be, or shall cease to be, obtainable without additional charge or at all, Tenant shall so notify Owner promptly after learning thereof. In such case, if Owner shall so elect and shall pay the insurer's additional charge therefor, such waiver shall be included in the policy. Each such policy shall name Owner as an additional insured and shall contain, if obtainable, agreements by the insurer that the policy will not be canceled without at least thirty days' prior notice to both assureds and that the act or omission of Tenant will not invalidate the policy as to Owner. Tenant hereby releases Owner with respect to any claim (including a claim for negligence) which it might otherwise have against Owner for loss, damage or destruction with respect and to the extent to which it is required to be insured under a policy or policies containing a waiver of subrogation or naming Owner as an additional insured, as provided in this Lease, whether

N:/gsf/GSF/WPDocs/210E86th/Replacement Associates, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

9

or not the Tenant is actually so insured and whether or not the loss, damage or destruction is due to the carelessness or negligence of Owner, its servants, agents or employees.

53.2.   Owner shall cause to be included in each of its insurance policies insuring the Premises and the Building against loss, damage or destruction by fire or other casualty (i) a waiver of the insurer's right of subrogation against Tenant, and (ii) an express agreement that such policy shall not be invalidated if, prior to the occurrence of a casualty, the insured waives the right of recovery against any party responsible for a casualty covered by the policy.  If such waiver or permission shall not be, or shall cease to be, obtainable without additional charge or at all, Owner shall so notify Tenant promptly after learning thereof.  In such case, if Tenant shall so elect and shall pay the insurer's additional charge therefor, such waiver shall be included in the policy.  Each such policy shall name Tenant as an additional insured and shall contain agreements by the insurer that the policy will not be canceled without at least thirty days' prior notice to both insureds by certified mail, return receipt requested, and that the act or omission of Owner will not invalidate the policy as to Tenant. Owner hereby releases Tenant with respect to any claim (including a claim for negligence) which it might otherwise have against Tenant for loss, damage or destruction with respect and to the extent to which it is required to be insured under a policy or policies containing a waiver of subrogation or naming Tenant as an additional assured, as provided in this Article, whether or not the Owner is actually so insured and whether or not the loss, damage or destruction is due to the carelessness or negligence of Tenant, its servants, agents or employees.

54.   Limitation of Liability

54.1.   The liability of Owner under this Lease and all matters pertaining to or arising out of the tenancy and the use and occupancy of the Premises, shall be limited to Owner's interest in the Building (which interest is a fee interest) and in no event shall Tenant make any claim against or seek to impose any personal liability upon Owner or Owner's managing agent or any officer, director, stockholder, partner, principal, employee, contractor or agent of Owner or of Owner's managing agent or any other person affiliated with or constituting Owner, or any principal of any firm or corporation that may hereafter be or become the Owner or the Owner's managing agent.  Without limitation of the foregoing, Tenant shall look solely to the estate and property of Owner in the Building for the satisfaction of Tenant's remedies for the collection of any judgment (or other judicial process) requiring the payment of money by Owner in the event of any default or breach by Owner with respect to any of the terms, covenants and conditions of the Lease to be observed and/or performed by Owner, and no other property or assets of Owner, or of Owner's managing agent (or any officer, director, stockholder, partner, principal, employee, contractor or agent of Owner or of Owner's managing agent) shall be subject to levy, execution or other enforcement procedures for the satisfaction of Tenant's remedies under or with respect to this Lease, the relationship of landlord and tenant hereunder, or Tenant's use and occupancy of the Premises.

54.2.   If Owner shall at any time covenant that its consent to or approval of any matter relating to this Lease shall not be unreasonably withheld and/or delayed, Tenant waives any claim against Owner for money damages which it may have, based upon its assertion that Owner has unreasonably withheld or delayed its consent to or approval of Tenant's proposed action or work.  Tenant's sole remedy shall be an action or proceeding, or an arbitration pursuant to the provisions of Article 76 below, to enforce such provisions of this Lease or for specific performance, injunction or declaratory judgment.

55.   Broker

55.1   Tenant and Owner each represent and warrant that such party dealt with no broker in connection with this Lease other than MDM Management, Inc. (the "Broker").  Tenant shall indemnify and hold Owner harmless from and against any claims for brokerage commissions arising out of any conversations or negotiations had by Tenant with any broker, finder or like agent other than the Broker concerning the execution of this Lease.  Owner shall pay a commission to the Broker pursuant to a separate agreement with the Broker and shall indemnify and hold Tenant harmless from and against any claims for brokerage

N:/gsf/GSF/WPDocs/210E86th/Replacement Associates, LLC/Execution Versions/Replacement Associates  RIDER 2-28-13 (final) V2.wpd

10

commission made by Broker with regard to this Lease. The provisions of this Article shall survive the expiration or earlier termination of this Lease.

55.2    Tenant covenants that if Tenant shall at any time desire to lease other space in the Building, or to amend, modify, extend or renew this Lease, or to lease space in any other property in which the principals of Owner have an interest, Tenant shall deal directly with Owner and, at Owner's direction, with the Broker, and Tenant shall not contact, consult with, involve, retain or otherwise deal with other real estate broker other than Broker (if so directed by Owner) in connection therewith.

56.    Payment of Rents

56.1.  The Fixed Rent payable by Tenant hereunder shall be at the following rates and shall be paid as follows:

56.1.1.  nine hundred twenty-one thousand six hundred eighty-four and 00/100 ($921,684.00) dollars per annum ($76,807.00 per month) during the period commencing March 1, 2013 through and including February 28, 2014;

56.1.2.  nine hundred forty-nine thousand three hundred thirty-two and 00/100 ($949,332.00) dollars per annum ($79,111.00 per month) during the one (1) year period commencing March 1, 2014 through and including February 28, 2015;

56.1.3.  nine hundred seventy-seven thousand eight hundred twenty and 00/100 ($977,820.00) dollars per annum ($81,485.00 per month) during the one (1) year period commencing March 1, 2015 through and including February 29, 2016;

56.1.4.    one million seven thousand one hundred forty-eight and 00/100 ($1,007,148.00) dollars per annum ($83,929.00 per month) during the one (1) year period commencing March 1, 2016 through and including February 28, 2017; and

56.1.5.  one million thirty-seven thousand three hundred sixty-four and 00/100 ($1,037,364.00) dollars per annum ($86,447.00 per month) during the one (1) year period commencing March 1, 2017 through and including February 28, 2018.

56.2    Fixed Rent shall be payable in advance in equal, consecutive, monthly installments in advance on the first day of each and every calendar month hereunder without any credits, off-sets or reduction. Tenant's liability to pay the Rents due under this Lease shall survive the expiration of this Lease.

56.3.  If any installment or installments of Fixed Rent or Additional Rent shall not be received by Owner within five (5) days of the date due, and Owner shall give Tenant notice of such fact (which notice may be written or oral) and such installment is not thereafter tendered to Owner within one (1) business day of such notice, time being of the essence, then a late payment fee equal to six percent (6%) of each late payment shall become immediately due to Owner for the purpose of defraying the expenses incident to handling such delinquent payment. The notice referred to in the immediately preceding sentence need not be given by Owner more than two (2) times in any calendar year during the term of this Lease. Such fee shall be payable on the first business day of the following month as Additional Rent hereunder. Further, if any installment(s) of Fixed Rent or Additional Rent shall not be received by Owner within thirty (30) days of the date due, such payment, in addition to the aforesaid late payment fee shall bear interest from the date it is payable until it shall have been paid, at a rate equal to the lesser of (a) sixteen percent (16%) per annum or (b) the maximum rate of interest allowed by law. Notwithstanding the foregoing, nothing herein contained shall at any time whatever be construed as a consent on the part of Owner to any delay or postponement of such payments.

56.4.  Tenant's failure to timely pay any Rents under this Lease shall be deemed a breach by Tenant of the terms of this Lease and Owner shall have the same rights and

N:\gsf\GSF\WPDocs\210E86th\REPLACEMENT ASSOCIATES, LLC\Execution Versions\Replacement Associates RIDER 2-28-13 (final) V2.wpd

11

remedies with respect to such breach as it has with respect to any other breach by Tenant of any covenant hereunder and Owner shall not be limited to the commencement of a non-payment summary proceeding with respect thereto.

57.     Electricity

57.1. Tenant shall contract directly with the public utility company furnishing electric current to the Building for the supply, at Tenant's sole cost and expense, of all electric current to be used in the Premises. Tenant, at Tenant's expense, shall furnish and install all meters and other equipment necessary to measure Tenant's consumption of electricity at the Premises. Tenant shall pay directly to the utility company supplying electricity to the Premises the amounts due for electric current consumed by Tenant as indicated by meters measuring Tenant's consumption thereof.

57.2. Tenant's use of electric current in the Premises shall not at any time exceed the capacity of any of the electrical conduits and equipment in or otherwise serving the Premises. Tenant shall not make or perform or permit the making or performing of, any alterations to wiring, installations or other electrical facilities in or serving the Premises and the Building without the prior written consent of Owner in each instance. Should Owner grant any such consent, all additional risers or other equipment required therefor shall be installed by Owner and the cost therefor shall be paid by Tenant upon Owner's demand.

57.3. Owner shall not be liable in any way to Tenant for any failure or defect in the supply or character of electric energy furnished to the Premises by reason of any requirement, act or omission of the public utility providing the Building with electricity or for any other reason whatsoever.

58.     Utility and Other Charges

58.1    Tenant shall timely pay to Owner an amount equal to all charges imposed by reason of Tenant's consumption of water at the Building other than for ordinary lavatory purposes. Tenant acknowledges that no utilities or other services, except as may be specifically provided herein, have been included in Rents and that, without limitation of the foregoing, Owner has no obligation to furnish or supply electricity, gas, heat, air conditioning or any other utility or service to or for the Premises.

58.2    Tenant shall pay to Owner, as Additional Rent, the sum of two thousand nine hundred forty and 00/100 ($2,940.00) per month for each month or portion thereof during the term of this Lease, for supplemental air conditioning currently being provided to the Premises for extended hours (until approximately 11:30 p.m. on Monday through Saturday and when the Premises is open for operation certain Sundays immediately preceding or following Christmas, New Year's Day and Thanksgiving). The Additional Rent payable pursuant to the provisions of this Section 58.2 shall be payable on a monthly basis throughout each year during the term of this Lease notwithstanding that air conditioning is only provided to the Premises during a portion of each year.

59.     Tenant's Compliance with Notices

Tenant shall comply, at its own expense, with all notes, notices of violation of law or municipal ordinances, orders and requirements which may be issued by the Departments of Housing, Buildings, Fire, Labor, Health or other state, city or municipal departments having jurisdiction.

60.     Permits

Tenant, at its sole cost and expense, shall obtain all necessary permits, licenses, franchises or other authorizations as may be required by law, to carry on the purposes set forth in Article 2 above and for the installation of any equipment, appliances and other services to and upon the Premises.

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

12

61.  <u>Assignment/Subletting/Occupancy</u> (Supplementing Article 11)

61.1.  Tenant shall not (a) assign or otherwise transfer this Lease or the term or estate hereby granted or (b) sublet the Premises or any part thereof or allow the same to be used or occupied by others or in violation of any of the provisions of this Lease, without, in each instance, obtaining the prior written consent of Owner.  Except as otherwise specifically set forth in Section 61.2. below, such consent may be withheld for any reason (whether reasonable, unreasonable or arbitrary) or for no reason.

61.2  Owner shall not unreasonably withhold or delay its consent to a subletting of a portion or all of the Premises, provided and on condition that:

61.2.1.  Tenant is not in default in the performance of any of the terms and conditions of this Lease (after notice and the expiration of the applicable cure period, if any, which are specifically provided for in this Lease with respect to such default, if any) both on the date Tenant's request for consent to such subletting is submitted to Owner and on the date that such subletting is to become effective;

61.2.2.  The proposed subtenant shall use the Premises solely for the use permitted under this Lease;

61.2.3.  Tenant shall furnish Owner at least fifteen (15) days prior to any subletting with the name and business address of the proposed subtenant, a counterpart of the proposed subleasing agreement, satisfactory information with respect to the nature and character of the business of the proposed subtenant, and current financial information and references reasonably satisfactory to Owner including, without limitation, the completion and submission to Owner of Owner's then current form application to lease and, based on such information, Owner shall reasonably determine that the proposed subtenant is acceptable;

61.2.4.  The proposed subtenant  is not then a tenant or sublessee of Owner, or an occupant of any part of the Building; and

61.2.5.  The subletting is effected pursuant to a written instrument in form reasonably satisfactory to Owner and its counsel, and contains an agreement by the subtenant to perform, to the extent applicable, all of the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed other than the payment of Rents and that a duplicate original thereof be delivered to Owner within five days following the date of its execution or not less than ten days prior to its effective date, whichever shall be sooner.

61.3.  Notwithstanding any subletting or assignment and/or acceptance of Fixed Rent or Additional Rent by Owner directly from any subtenant or assignee, Tenant shall and will remain fully liable for the payment of Rents due and to become due hereunder and for the performance of all the covenants, agreements, terms, provisions and conditions contained in this Lease on the part of Tenant to be performed.  The liability of Tenant hereunder shall be unaffected by any changes, modifications, extensions, renewals or amendments of this Lease or by any extensions of time or other concessions which Owner may grant to any assignee for the payment of Rents or other charges due hereunder or for the performance of any other term, covenant or condition of this Lease (provided, however, that the monetary liability of Tenant from and after such assignment shall not be greater than the monetary liability of Tenant under this Lease, as same may have been modified or amended through the effective date of the assignment, except if Tenant consents in writing to any such changes, modifications, extensions, renewals or amendments).

61.4.  Tenant hereby waives any claim against Owner for money damages which it may have based upon any assertion that Owner shall have unreasonably withheld or unreasonably delayed any consent to a subletting pursuant to the terms of this Article.  Tenant's sole remedy shall be an action or proceeding, or an expedited arbitration pursuant to the provisions of Article 76 below, to enforce such provision or for specific performance, injunction or declaratory judgment.

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

13

61.5. In the event of any assignment of this Lease or any subletting of the Premises or any portion thereof, all sums or other consideration payable by or on behalf of any assignee directly or indirectly to Tenant or Tenant's shareholders or principals in connection with such assignment (in the event of an assignment), or in the case of a sublease, all sums or other consideration in excess of the Fixed Rent due, or, in the case of a sublease of a portion of the Premises, all sums or other consideration in excess of the Fixed Rent allocable to that portion of the Premises being sublet, which are payable directly or indirectly to Tenant or Tenant's shareholders or principals by such subtenant in consideration of or in connection with said subletting, including, without limitation, in the event of either an assignment or a subletting, all sums paid as additional rent or for the sale or rental of Tenant's fixtures, leasehold improvements, equipment, furniture, trade name, goodwill, business or other personal or real property interest of any nature whatsoever, shall be disclosed to Owner. In the event of an assignment, all of such sums shall be deemed Additional Rent payable directly to Owner by Tenant as and when received by Tenant. In the event of a subletting, all of such sums shall be deemed Additional Rent payable directly to Owner by Tenant on a monthly basis or otherwise as and when received by Tenant. However, in the event of a subletting, Tenant shall be permitted to deduct from the amount payable to Owner as Additional Rent each month pursuant to the provisions of this Section 61.5, an amount equal to the "Partial Monthly Amortized Amount". The term Partial Monthly Amortized Amount shall mean the aggregate amount of Tenant's reasonable, actual out-of-pocket costs incurred for brokerage fees, legal fees, Tenant's Work and such items of Owner's Work which are paid for by Tenant pursuant to the provisions of this Lease, if any, necessary to prepare the Premises (or any portion thereof) for a subtenant, documented to Owner's reasonable satisfaction, divided by ninety (90) (i.e., such costs incurred by Tenant shall be amortized over a period of seven and one-half (7 ½) years. However, the entire cost of Tenant's Initial Work performed pursuant to Section 69 below shall be excluded from the calculation of the Partial Monthly Amortized Amount. The obligation to make any payment(s) of Additional Rent pursuant to this Section 61.5 shall be binding upon Tenant as well as the assignee or subtenant, as the case may be, and the payment of any such monies to Tenant by the assignee or subtenant, as the case may be, shall not be deemed a defense in any action commenced by Owner against Tenant for monies due and owing under this Article.

61.6. Anything herein contained to the contrary notwithstanding, should Tenant desire to assign this Lease or sublet the Premises or any portion thereof, Tenant shall send to Owner a written notice by registered mail, return receipt requested, at least thirty days prior to the date that Tenant intends such assignment or subletting to commence, setting forth the proposed commencement date of such assignment or subletting and in the case of subletting, the terms of such subletting. In the case of a subletting of a portion of the Premises, such notice shall be accompanied by a reasonably accurate floor plan of that portion of the Premises to be sublet. In the case of (i) an assignment or (ii) a subletting of the entire Premises to a proposed subtenant who is not affiliated with Tenant or for non-medical use, within thirty days after receipt of the aforesaid notice, Owner may notify Tenant that Owner elects (a) to cancel this Lease, in which event such cancellation shall become effective on the date set forth in Tenant's notice as the proposed commencement date of the proposed assignment or subletting, with the same force and effect as if said date were the expiration date of the Lease, or (b) to require Tenant to assign this Lease to Owner or sublet to Owner the entire Premises effective from the date set forth in Tenant's notice as the proposed commencement date of the assignment or subletting, in which event Tenant shall be obligated to surrender possession of the Premises in the same condition as Tenant is obligated to surrender possession at the end of the term as provided in this Lease. Such assignment or subletting to Owner shall provide that the parties to such assignment or subletting expressly negate any intent that any estate created under such assignment or subletting be merged with any other estate held by either of said parties. If Owner fails to exercise the option to terminate this Lease, to accept an assignment of this Lease or enter into the sublease as provided in this Article, then Owner shall not unreasonably withhold Owner's consent to the assignment of this Lease or subletting of the entire Premises in accordance with the terms set forth in the notice to Owner and subject to the terms and conditions set forth in this Article.

N:/gs/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

14

61.7.  If Tenant is a corporation, partnership or other entity, the transfer or other disposition of in excess of twenty-five percent (25%) of its capital stock, partnership interests or other ownership interests during the term of this Lease, whether in one or more transfers, shall be deemed an assignment and shall thus require the prior written consent of Owner.

61.8.  Notwithstanding the provisions of this Section 61 (except that the provisions of Section 61.3 above shall nevertheless be applicable), but subject in all respects to all of the other provisions of this Lease including, without limitation, the restrictions on use of the Premises set forth in Article 40 above, Tenant may assign this Lease to any successor of Tenant by merger, consolidation or sale of all or substantially all of the assets or stock of Tenant, (whether or not Tenant survives such merger, consolidation or sale) and Tenant may sublet the Premises, or assign this Lease, to any entity that controls, is controlled by, or is under common control with Tenant; provided and on condition that, with regard to any such assignment or subletting: (i) Tenant shall not be in default under this Lease (after notice and the expiration of the applicable cure period which are specifically provided for in this Lease with respect to such default, if any); (ii) in the case of an assignment, the net worth of the assignee (or in the case of a merger, consolidation or sale, the net worth of the assignee after giving effect to such merger, consolidation or sale) is not less than the net worth of the Tenant named herein as of the date hereof or on the effective date of the assignment, whichever shall be greater; and (iii) a copy of said assignment, in recordable form and otherwise reasonably satisfactory to Owner, containing a full assumption by the assignee of all the Tenant's obligations hereunder, or said sublease, as the case may be, is delivered to Owner prior to the effective date thereof or within five business days after execution thereof, whichever shall be sooner.

61.9.  Notwithstanding the provisions of this Article 61, Tenant shall be permitted to sublet the Premises or a portion thereof to a licensed professional medical entity which is affiliated with Tenant to operate a renal dialysis unit and/or to licensed physicians who are affiliated with Tenant and/or to other health care professionals who are affiliated with Tenant, upon not less than ten (10) days' prior notice to Owner, but without requiring the prior written consent of Owner, provided and on condition that: (i) Tenant shall not be in default under this Lease (after notice and the expiration of any applicable cure period which are specifically provided for in this Lease with respect to such default, if any); (ii) any such subletting shall be subject to all of the provisions of this Lease (including, without limitation, the restrictions on use of the Premises set forth in Article 40 above as well as the provisions of Sections 61.2.2., 61.3 and 61.5 of this Article 61); and (iii) such subtenant(s) shall be of demonstrably reputable character to the reasonable satisfaction of Owner.

62.  Signs; Building Directory

62.1.  Neither Tenant nor any permitted subtenants shall display or erect any exterior decorations, lettering, signs, advertisements, notices, posters, displays, projections, curtains, blinds, shades, screens or awnings on the outside of the Premises or any interior signs which are visible from the outside (collectively, "Signs") without obtaining Owner's prior written approval thereto, which approval shall be granted or withheld in Owner's sole discretion.  All Signs shall comply with all of the laws, orders, rules and regulations of the governmental authorities having jurisdiction thereof, including zoning laws, building codes and as required by insurance underwriters.  Tenant shall obtain and pay for all permits required therefor.  No Signs shall be installed until all approvals and permits are first obtained and copies thereof delivered to Owner with evidence of payment for any fees pertaining thereto.  Tenant acknowledges that Owner's approval of the dimensions, material, content, location and/or design of any Signs shall not be deemed a representation that such Signs or the installation thereof comply with applicable laws or building codes or are otherwise safely and properly manufactured and installed.  Tenant shall be solely liable for all loss, damage and/or injury to persons and/or property arising out of or in connection with the installation and maintenance of all Signs in or about the Premises.

62.2.  If Owner shall deem it necessary to remove any Signs in order to paint or to make any other repairs, alterations or improvements in or upon the Premises or the Building

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

15

or any part thereof, Tenant, upon demand, shall remove same at Tenant's expense and, upon completion of said repairs, alterations or improvements, Owner shall have same replaced at Tenant's expense.

62.3.   The names of all physicians affiliated with Tenant or any approved subtenant may be placed on the Building's directory.  Tenant shall furnish all such names to Owner in writing.

63.   <u>Tenant Holdover</u>

63.1.  Should Tenant hold over in possession after the expiration or sooner termination of the term or of any extended term of this Lease, such holding over shall not be deemed to extend the term or renew the Lease, but such holding over thereafter shall continue upon the covenants and conditions herein set forth except that the charge for use and occupancy of such holding over for each month or part thereof (even if such part shall be a small fraction of a month) shall be the product of: (a) one-twelfth of the annual Rents payable for the twelve-month period immediately preceding such holding over multiplied by (b) 2.5., which amount Tenant shall pay to Owner promptly upon demand, in full without set-off.

63.2.  The aforesaid provisions of this Article shall survive the expiration or sooner termination of this Lease and shall not be deemed to limit Owner's rights or remedies hereunder or at law or in equity.

64.   <u>Default</u>

Tenant expressly recognizes that Tenant's due and punctual performance of each of its covenants and obligations under this Lease throughout the term hereof is of paramount importance to Owner.  Accordingly, without limiting the provisions of Article 17, if Tenant shall fail at any time to make payment of any installment of Fixed Rent or Additional Rent within five (5) days of its respective due date or if Tenant shall otherwise default in the timely performance of any obligation of Tenant under this Lease, and in each and every instance that any such failure or default shall occur more than two (2) times in any twelve (12) month period, then notwithstanding that such failure or other default shall have been cured within the applicable period provided in said Article 17, Tenant shall be obligated to immediately tender and deliver to Owner an amount equal to one (1) month of the then current Fixed Rent, to be held and applied as a security deposit or an additional security deposit, as the case may be, pursuant and subject to the provisions of Article 34 above.

65.   <u>Increase in Taxes</u>

65.1. Tenant shall pay to Owner, for each fiscal tax year subsequent to the Base Tax Year (hereinafter defined) falling in whole or in part within the term of this Lease, twelve and fifty-eight one hundredths (12.58%) percent (such percentage is hereinafter referred to as "Tenant's Proportionate Share") of any and all increases in Real Estate Taxes above those for the 2012/2013 fiscal tax year (hereinafter referred to as the "Base Tax Year") imposed on the land and/or Building during the term of this Lease, whether any such increase results from a higher tax rate or an increase in the assessed valuation of the property, or both. "Real Estate Taxes" shall include any special assessment imposed for any purpose whatsoever. If due to a change in the method of taxation any franchise, income, profit or other tax, however designated, shall be levied against Owner's interest in the land and Building in whole or in part for or in lieu of any tax which would otherwise constitute Real Estate Taxes, such taxes shall be included in the term "Real Estate Taxes" for purposes hereof. All such payments shall be appropriately pro-rated for any partial years in which the term of this Lease shall commence or expire. A copy of the tax bill of the City of New York shall be sufficient evidence of the amount of Real Estate Taxes.

65.2. Owner shall give Tenant written notice of each change in Real Estate Taxes which will be effective to create or change Tenant's obligation to pay Additional Rent pursuant to the provisions of this Article and such notice shall include a copy of the tax bill(s)

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates Rider 2-28-13 (final) V2.wpd

16

on which it is based and shall contain Owner's calculation of the annual rate of Additional Rent payable resulting from such increase in Real Estate Taxes. Every notice given by Owner pursuant to this Section shall be conclusive and binding upon Tenant in the absence of computational error.

65.3. Only Owner shall be eligible to institute tax reduction or other proceedings to reduce the assessed valuation of the land and/or Building. Should Owner be successful in any such reduction proceeding and obtain a rebate for periods during which Tenant has paid its share of increases, Owner shall, after deducting its actual expenses including, without limitation, attorneys' fees and disbursements in connection therewith, return to Tenant its pro rata share of such rebate except that Tenant may not obtain any portion of the benefits which may accrue to Owner from any reduction in Real Estate Taxes, for any year, below those imposed in the Base Tax Year. Should Owner be successful in reducing the Real Estate Taxes for the Base Tax Year, the amount of such taxes, as finally determined, shall be used in computing the Additional Rent payable by Tenant pursuant to this Article.

65.4. The amounts due under Section 65.1. shall be collectible without set-off or deduction within thirty (30) days after the rendering of a notice thereof by Owner. However, after the first notice of change in Real Estate Taxes is given to Tenant pursuant to this Article 65, Tenant shall thereafter pay to Owner, prior to July 1 of each fiscal tax year during the term of this Lease, the same amount as was payable by Tenant pursuant to this Article 65 for the immediately preceding fiscal tax year, as same shall have been adjusted in accordance with the provisions of the immediately following sentence. After the real estate tax bill for such fiscal tax year has been received by Owner, Owner shall notify Tenant of any necessary adjustment in such amount paid by Tenant and Tenant shall pay the amount of such adjustment within thirty (30) days after notice from Tenant, or if such adjustment is in favor of Tenant, Tenant may deduct the amount of such adjustment from the next regular monthly installment of Fixed Rent due hereunder.

65.5. Owner's failure during the Term to prepare and deliver any of the foregoing tax bills, statements or bills, or Owner's failure to make a demand, shall not in any way cause Owner to forfeit or surrender its rights to collect the sums due to Owner pursuant to this Article and such rights shall survive the expiration or other termination of this Lease.

65.6. Notwithstanding the expiration of this Lease or termination of this Lease prior to the Expiration Date, Tenant's obligation to pay Additional Rent under this Article shall continue and shall cover all periods up to and including the Expiration Date, and shall survive any expiration or termination of this Lease.

65.7. If any time during the term of this Lease, Owner shall construct additional floors on top of the existing portion of the Building, then and in such event, effective from and after the completion of such construction, there shall be an equitable adjustment in Tenant's Proportionate Share set forth in Section 65.1 above to reflect such addition. Such equitable adjustment shall be made by multiplying Tenant's Proportionate Share set forth above by a fraction, the numerator of which shall be the total number of floors currently contained in the Building and the denominator of which shall be the total number of floors contained in the Building upon completion of the construction referred to above. In no event, however, shall Owner's conversion of the theatre premises in the Building to a quad theatre be deemed to invoke the provisions of this Section 65.7.

66.    Electricity and Gas Costs

66.1.   Definitions: for purposes of this Article, the following definition shall apply: the term "Electricity and Gas Costs" shall mean all annual costs and expenses incurred or borne by Owner with respect to all electric and gas purchased for the common areas of the Building.

66.2.   Tenant shall pay to Owner, as Additional Rent, which shall be collectible as such under the terms of this Lease, an amount equal to twelve and fifty-eight one hundredths

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates Rider 2-28-13 (final) V2.wpd

17

(12.58%) percent of Owner's increase in Electricity and Gas Costs, if any, for the Building for each calendar year or portion thereof falling within the term of this Lease, over the Electricity and Gas Costs for the calendar year 2013. At the end of each calendar year, Owner shall calculate such increased cost and bill Tenant for its share, which bill shall be due and payable with the next regular installment of Fixed Rent. This obligation will survive the expiration or termination of this Lease or any renewals thereof except that should Tenant's term expire other than at the end of a calendar year, Tenant shall only be obligated pro-rata for the number of months in such year which formed a part of its term.

66.3. Every bill given by Owner pursuant to Section 66.2. shall be conclusive and binding upon Tenant in the absence of a computational error.

66.4. Owner's failure during the lease term to prepare and deliver any of the foregoing bills or Owner's failure to make a demand, shall not in any way waive or cause Owner to forfeit or surrender its rights to thereafter render such bills or make such demand nor constitute a waiver of, nor in any way impair the continuing obligation of Tenant to pay Additional Rent as required by this Article.

66.5. Notwithstanding any expiration of this Lease or the termination of this Lease prior to the lease expiration date, Tenant's obligation to pay Additional Rent under the Article shall continue and shall cover all periods up to and including the lease expiration date, and shall survive the expiration or termination of this Lease.

66.6. Any provision in this Article to the contrary notwithstanding, under no circumstances shall the Rents payable under this Lease for any calendar year during the term of this Lease be reduced below the Rents payable for the immediately preceding calendar year, as same may have been increased.

67.   Rent Control

If at the commencement of, or at any time or times during the term of this Lease, the Rents reserved in this Lease shall not be fully collectible by reason of any Federal, State, County or City law, proclamation, order or regulation, or direction of a public officer or body pursuant to law, Tenant shall enter into such agreements and take such other steps as Owner may request and as may be legally permissible to permit Owner to collect the maximum Rents which may from time to time during the continuance of such legal rent restriction be legally permissible (and not in excess of the amounts reserved therefor under this Lease). Upon the termination of such legal rent restriction prior to the expiration of the term of this Lease, (i) the Rents shall become and thereafter be payable hereunder in accordance with the amounts reserved in this Lease for the Owner and if legally permissible, an amount equal to (a) the Rents which would have been paid pursuant to this Lease but for such legal rent restriction less (b) the Rents paid by Tenant to Owner during the period or periods such legal rent restriction was in effect, shall be forthwith paid to Owner.

68.   Hazardous Materials/Odor/Asbestos

68.1. Tenant shall not use or permit the use of, nor bring or permit to be brought or kept in or on or about the Premises, any flammable, combustible or explosive fluid, material, chemical or substance or any other material which may constitute a fire or other hazard, or cause or permit any odors of cooking or other processes, or any unusual, offensive or other objectionable odors to permeate in or emanate from the Premises. In the event of the violation of the foregoing by Tenant, without limitation of Owner's other rights and remedies, Owner may inspect the Premises and may remove any such materials and repair any damage caused by or arising out of a violation of this provision and may charge the expense incurred thereby to Tenant as Additional Rent payable on demand to Tenant, which expense shall include the cost to Owner of inspecting the Premises.

68.2. If any asbestos containing material ("ACM") or other hazardous substance contained in or about the Premises shall be required by applicable laws, rules or regulations

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates Rider 2-28-13 (final) V2.wpd

18

of any applicable governmental authority (collectively, "ACM Laws") to be removed, encapsulated or otherwise abated in connection with or arising out of alterations performed by or on behalf of Tenant or any other act or omission by Tenant or Tenant's principals, officers, directors, employees, agents, clients, customers or contractors, then it shall be solely Tenant's obligation, at Tenant's sole cost and expense, to so remove, encapsulate or otherwise abate such ACM or other hazardous substance in accordance with all ACM Laws. If Tenant is required to abate ACM or any other hazardous substances in accordance with the foregoing provisions of this Article 68 then, notwithstanding anything herein to the contrary, Owner, at Owner's election, shall have the option to abate the ACM or other hazardous substance and, in such event, Tenant shall reimburse Owner for all of Owner's costs and expenses in connection therewith as Additional Rent within ten (10) days following the rendition of a statement by Owner to Tenant requesting such reimbursement.

69.   Owner's Work and Additional Work

69.1   (a)   For purposes of this Lease, the term "Owner's Work" shall mean the work set forth in the plans and specifications attached hereto as Exhibit B (hereinafter, "Tenant's Initial Plans"). Owner shall substantially complete Owner's Work within approximately six (6) months after the issuance and receipt by Owner of all building department and other governmental and municipal permits and approvals required or otherwise typically obtained in connection with the performance of Owner's Work; but subject to "force majeure" and delays beyond Owner's reasonable control (including, without limitation, such occurrences as are specified in Section 69.3 below). Owner's Work and the Additional Work (if any) shall be performed by Owner at Tenant's sole cost and expense, as more particularly set forth in Sections 69.5, 69.6 and 69.7 below.

(b)   (i)   Tenant hereby designates William Selan (hereinafter, "Tenant's Consultant") as Tenant's authorized agent and representative who shall monitor the performance of Owner's Work and any Additional Work on behalf of Tenant, at Tenant's sole risk, cost and expense.

(ii)   Tenant's Consultant shall be fully authorized and empowered by Tenant to communicate and deal directly with Owner and Owner's representatives and to make on behalf of Tenant and bind Tenant to any decisions and determinations with regard to the performance of Owner's Work and the Additional Work (if any) including, without limitation, approving any changes or revisions thereof.

(iii)   Tenant shall cause Tenant's Consultant to perform daily or other reasonable periodic inspections of the Premises during the performance of Owner's Work and any Additional Work and to report in writing to Tenant (with a copy of each report being simultaneously furnished by Tenant's Consultant to Owner) on a regular basis as to the progress of Owner's Work and any Additional Work and any other material issues or matters relating thereto which Tenant's Consultant deems relevant. However, in no event shall any such report of Tenant's Consultant, or any other finding or conclusion of Tenant's Consultant, be binding upon Owner or be deemed to affect any of the provisions of this Lease or the rights and remedies of Owner with regard thereto in any respect whatsoever.

(c)   Notwithstanding anything to the contrary set forth in this Lease, except as may be otherwise set forth in Tenant's Initial Plans as same shall have been approved by Owner (hereinafter, "Tenant's Approved Plans"), all of Owner's Work and all Additional Work shall be performed to "building standard". The term "building standard" as used herein shall mean such materials and construction techniques as Owner may elect to use from time to time as part of its standard construction in the Building. Without limitation of the foregoing, in no event shall "building standard" be deemed to include (i) any special, custom or above-building standard work which may have previously been performed by Owner or any tenant of the Building or which may hereafter be performed by Owner or any tenant of the Building or (ii) any work in or to the lobbies of the Building.

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

19

(d)     For purposes of this Lease, Owner's Work shall be the work described in Tenant's Approved Plans; subject, however, to such reasonable revisions as Owner or Owner's architect or engineer may require. For the general description of Owner's Work set forth above and notwithstanding anything to the contrary set forth in this Lease, Tenant's Initial Plans or Tenant's Approved Plans, in no event shall Owner's Work exceed in any manner or respect the nature and scope of work or materials which are set forth in Tenant's Approved Plans.

(e)     Notwithstanding the provisions of Section 69.1(a) above, Tenant shall perform and complete the portion of Owner's Work described as "Remove Metal Pan bottom of Millwork for Acid Basin, Quantity-3" set forth in the category designated as "CSI #0250-Demolition-Third Floor" in the Construction Cost Estimate (as such term is hereinafter defined) annexed hereto as Exhibit B-1 within seven (7) days after Tenant's receipt of notice from Owner to proceed with such work, time being of the essence. If Tenant shall perform and complete such work within such seven (7) day period as aforesaid, time being of the essence, then Tenant shall be entitled to receive a credit against the cost of Owner's Work payable by Tenant in the amount of five thousand one hundred ($5,100.00) dollars, such credit being applied to the first Progress Payment (as such term is hereinafter defined) due from Tenant subsequent to the date such work shall be completed by Tenant. However, if Tenant shall not perform and complete such work within such seven (7) day period as aforesaid, time being of the essence, then Owner shall perform and complete such work and Tenant shall not be entitled to receive the aforementioned credit.

69.2     Any and all further installations, improvements, revisions, enhancements, details of construction, finishes and other work in addition to Owner's Work as hereinabove described and as reflected in Tenant's Approved Plans which may be necessary or which Tenant may desire to perform in and to the Premises (such further installations, improvements, revisions, enhancements, details of construction, finishes and other work are hereinafter collectively referred to as the "Additional Work") shall be performed by Owner at Tenant's sole cost and expense in the same manner and pursuant to the same conditions as the performance of Owner's Work (except as may be otherwise herein specifically set forth), pursuant to plans and specifications and/or revised plans and specifications or change orders which shall be prepared by Tenant's Consultant and submitted to Owner for prior written approval pursuant to the provisions of Section 41.1 above as if the Additional Work were "Tenant's Work" as such term is defined therein. It is expressly understood and agreed that the items set forth under the captions "Qualifications" and "Exclusions" in the Construction Cost Estimate dated February 15, 2013, revised February 26, 2013, prepared by McQuilkin Associates, LLC, and annexed hereto as Exhibit B-1 (the "Construction Cost Estimate"), shall not constitute Owner's Work, but shall be deemed to constitute Additional Work if and to the extent Tenant shall authorize such items to be performed. The cost of the Additional Work shall be mutually agreed upon by Owner and Tenant in writing prior to the commencement of the Additional Work and shall be paid by Tenant, as Additional Rent, either in full prior to commencement of the Additional Work  or pursuant to the provisions of Section 69.5, 69.6 and 69.7 below.  Without limitation of the other provisions of this Article 69, Owner shall not be obligated to perform any Additional Work pursuant to the provisions of this Article 69 unless and until Owner and Tenant shall agree in writing as to the cost of the Additional Work as aforesaid.  Further, Owner makes no representation with regard to the period of time it shall require Owner to perform and substantially complete the Additional Work, inasmuch as the time of performance of the Additional Work by Owner shall depend upon a number of factors yet to be determined, including, without limitation, the scope of the Additional Work and the materials which will be required to perform same.

69.3     No promise, agreement or representation, verbal or otherwise, has been made to Tenant by Owner, its agents or employees and no expenditure for work or materials will be made by Owner in the Premises, except as herein specifically set forth.  If work of any nature is agreed herein to be done by Owner before commencement of this Lease or at any approximate or specific time, Tenant agrees that if Owner shall be delayed in substantially completing Owner's Work or the Additional Work as a result of: (i) any act or omission of Tenant or any of Tenant's principals, employees, agents or contractors (including, without

N:/gs/f/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

20

limitation, Tenant's failure or delay in performing any work, making any payments or furnishing any materials required from Tenant); (ii) strikes, lockouts or labor difficulties; or (iii) any other cause beyond the reasonable control of Owner, such work may be done at any other time convenient to Owner, even though same shall be after commencement of the term. The failure or delay in process of completion of Owner's Work or the Additional Work shall not constitute grounds for any abatement of Rents or delay in the payment thereof when due or for any other remedy of Tenant. It is distinctly understood and agreed that Owner's agreement to perform Owner's Work and any Additional Work, as expressed herein, shall be applicable only to the particular term herein demised and shall not in any manner be operative in connection with any extension of the term or any renewal of this Lease, by operation of law or otherwise.

69.4   For purposes of this Article, Owner's Work and the Additional Work shall be deemed substantially completed notwithstanding that: mechanical adjustment; finishing and/or decorating work; or details of construction which do not materially interfere with Tenant's use of the Premises, remain to be performed.

69.5   Tenant shall pay to Owner the entire cost of Owner's Work in the agreed amount of one million, one hundred seventy-two thousand, sixty-six and   00/100 ($1,172,066.00) dollars, as well as the entire cost of the Additional Work, by means of an initial payment and subsequent periodic progress payments (such initial payment and subsequent periodic progress payments are collectively hereinafter referred to as "Progress Payments" and each as a "Progress Payment") as hereinbelow set forth. Upon the expiration of each period of two (2) weeks (hereinafter, a "Progress Payment Period") falling within the period during which Owner's Work and any Additional Work shall be performed, time being of the essence, and also upon notice from Owner to Tenant that Owner's Work and/or the Additional Work has been or is about to be substantially completed, time being of the essence, Tenant shall cause Tenant's Consultant to inspect the portion of Owner's Work and/or the Additional Work which shall have been substantially completed during such Progress Payment Period and to simultaneously deliver to Owner and to Tenant a certificate for payment (hereinafter, a "Certificate for Payment") which shall specify the percentage of substantial completion of Owner's Work and/or the Additional Work which shall have occurred during such Progress Payment Period. Based upon each Certificate for Payment delivered by Tenant's Consultant, Owner shall deliver to Tenant a notice (hereinafter, a "Progress Payment Notice") stating the amount of the Progress Payment due from Tenant to Owner in respect of such Certificate for Payment. Within three (3) business days after Owner shall have given such Progress Payment Notice to Tenant, time being of the essence, Tenant shall pay to Owner the full amount of the Progress Payment set forth in such Progress Payment Notice, without any set-off or deduction whatsoever. Owner's determination of the amount due pursuant to each Progress Payment Notice shall not be subject to challenge by Tenant or Tenant's Consultant and shall be conclusive and binding on the parties. Further, if at any time during the progress of Owner's Work or any Additional Work, Owner shall determine that Tenant's Consultant has failed to timely issue a Certificate for Payment covering any Progress Payment Period or that the Certificate for Payment covering any Progress Payment Period does not state the correct percentage of completion or is otherwise in error, then without limitation of Owner's other rights and remedies, Owner shall have the right to have Owner's architect inspect the progress of Owner's Work for such Progress Payment Period and to issue a Certificate for Payment which shall supersede and prevail over any Certificate of Payment which shall have been or should have been issued by Tenant's Consultant for such Progress Payment Period. Within three (3) business days after notice from Owner to Tenant of the substantial completion of Owner's Work and/or the Additional Work, time being of the essence, Tenant shall pay to Owner, as the final Progress Payment, the entire unpaid balance of the cost of Owner's Work and/or the Additional Work, as the case may be, without any set-off or deduction whatsoever.

69.6   (a)   In order to secure Tenant's obligation to pay the cost of Owner's Work and the cost of any Additional Work and to timely make each Progress Payment pursuant to the provisions of Section 69.5, but without limitation of Owner's other rights and remedies should any Certificate of Payment not be timely or properly issued by Tenant's Consultant

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates Rider 2-28-13 (final) V2.wpd

21

or should Tenant fail to timely make any Progress Payment, <u>time being of the essence</u>, Tenant shall deliver to Owner, upon Tenant's execution and delivery of this Lease (but in any event prior to the commencement of Owner's Work), (a) an official bank check in the amount of two hundred thousand and 00/100 ($200,000.00) dollars payable to the direct order of Owner, in payment of the initial Progress Payment to be paid to Owner pursuant to the provisions of Section 69.5 above, <u>plus</u> (b) an official bank check in the amount of five hundred thousand and 00/100 ($500,000.00) dollars payable to the direct order of Kaufman Friedman Plotnicki & Grun, LLP, as escrow agent ("Escrow Agent"), the proceeds of which (hereinafter, the "Escrow Amount") shall be deposited and held in escrow by Escrow Agent and disbursed by Escrow Agent in accordance with the provisions of Section 69.7 below.

(b)     In addition to the payments required pursuant to the provisions of Section 69.6(a) above, as further security for Tenant's obligation to pay the cost of Owner's Work and the cost of any Additional Work and to timely make each Progress Payment pursuant to the provisions of Section 69.5, but without limitation of Owner's other rights and remedies, Tenant shall deliver to Owner, within five (5) business days after Owner gives Tenant notice that the Escrow Amount has been reduced to an amount equal to two hundred fifty thousand and 00/100 ($250,000.00) dollars or less, <u>time being of the essence</u>, an official bank check in the amount of four hundred seventy-two thousand sixty-six and 00/100 ($472,066.00) dollars payable to the direct order of Escrow Agent, the proceeds of which shall be added to the Escrow Amount and shall be held and disbursed by the Escrow Agent in accordance with the provisions of Section 69.7 below.

(c)     If Tenant shall fail to timely deliver to Owner the official bank check required pursuant to the provisions of Section 69.6(b) above, <u>time being of the essence</u>, then without limitation of Owner's other rights and remedies with regard to such default under this Lease, at law and/or in equity, Owner shall have the right to suspend the performance of Owner's Work (and any Additional Work) until such time as (i) such official bank check shall be delivered to Owner <u>and</u> (ii) as a further condition for Owner to recommence the performance of Owner's Work, Tenant shall pay to Owner, by official bank check payable to the direct order of Owner, an administrative fee in the amount of forty-seven thousand, two hundred six and 60/100 ($47,206.60) dollars, as agreed upon compensation for certain additional costs to be incurred by Owner as a result of the suspension of Owner's Work, and not as a penalty.  Additionally, Owner shall have no liability to Tenant arising out of the suspension of Owner's Work (or any Additional Work) due to Tenant's failure to timely deliver to Owner the official bank check required pursuant to the provisions of Section 69.6(b) above.

69.7    The Escrow Amount shall be held and disbursed by Escrow Agent in accordance with the following:

69.7.1.   The Escrow Amount shall be deposited by Escrow Agent in one or more interest-bearing bank or money market accounts and/or certificates of deposit, and shall be disbursed at the direction of Owner in connection with the performance of Owner's Work and any Additional Work as hereinbelow set forth in this Section 69.7.  Upon notification from Owner to Escrow Agent that payment for a portion of Owner's Work and/or Additional Work is due, which notification shall include a copy of the Progress Payment Notice relating to the portion of Owner's Work and/or Additional Work for which to Owner payment is due, Escrow Agent shall be irrevocably and unconditionally authorized, empowered and directed to release from escrow the amount requested by Owner and to disburse such sum to Owner or Owner's designee(s).  Escrow Agent shall give notice to Tenant of each such disbursement concurrently with such disbursement being made.  Any interest earned on the sums representing the Escrow Amount shall be disbursed by Escrow Agent to Tenant within a reasonable period of time following Escrow Agent's receipt of notice from Owner of substantial completion of and full payment by Tenant for Owner's Work and any Additional Work.  Tenant shall have no right to contest or prohibit any disbursements made or to be made by Escrow Agent pursuant to any notification or direction from Owner.  Within a reasonable period of time after Escrow Agent's receipt of notice from Owner that Owner's Work and any Additional Work have been fully paid for by Tenant pursuant to the provisions

N:\gsf\GSF\WPDocs\210E86th\REPLACEMENT ASSOCIATES, LLC\Execution Versions\Replacement Associates RIDER 2-28-13 (final) V2.wpd

22

of this Article 69, Escrow Agent shall be authorized and empowered to release the balance of the Escrow Amount, if any, to Tenant. Following the release of any portion of the Escrow Funds as aforesaid, Escrow Agent shall be released from all responsibility and liability in connection with the funds so released.

69.7.2. Owner and Tenant hereby agree, jointly and severally, to indemnify and hold Escrow Agent harmless as to any liability it may incur to any other person by reason of its acting as Escrow Agent pursuant to this Lease and to reimburse Escrow Agent for all of its expenses, including, among other things, attorneys' fees (either paid to retained attorneys or in an amount representing the fair value of legal services rendered to itself), incurred in connection herewith otherwise than in connection with the performance of its ministerial duties hereunder.

69.7.3. Escrow Agent shall not be responsible or liable in any manner whatsoever for (a) the sufficiency, correctness, genuineness or validity of any document deposited with it, or any notice or demand given to it, or (b) the form of execution of such document, notice or demand, or (c) the identification, authority or rights of any person executing, depositing or giving the same or (d) the terms and conditions of any instrument pursuant to which the parties may act.

69.7.4. It is expressly understood that Escrow Agent acts hereunder solely as an accommodation to the parties hereto. Escrow Agent shall not have any duties or responsibilities except those specifically set forth in this Article 69, which the parties agree are ministerial in nature, and Escrow Agent shall not incur any liability: (a) in acting upon any signature, notice, demand, request, waiver, consent, receipt or other paper or document believed by Escrow Agent to be genuine, and Escrow Agent may assume that any person purporting to give it any notice on behalf of one or both of Owner and Tenant in accordance with the provisions hereof has been duly authorized to do so; or (b) in otherwise acting or failing to act under this Lease except in the case of Escrow Agent's gross negligence.

69.7.5. Notwithstanding Escrow Agent's duties and responsibilities hereunder, Escrow Agent may nevertheless continue to represent Owner in connection with this Lease and any dispute, litigation or arbitration arising hereunder.

69.8 Without limitation of the provisions of Section 69.6 above, Owner shall also have the same remedies for Tenant's failure to timely pay to Owner each of the Progress Payments as Owner shall have for the non-payment of Rents under this Lease.

70.  Security Agreements

70.1. No security agreement, whether by way of conditional bill of sale, chattel mortgage or instrument of similar import, shall be placed upon any improvements made by Tenant which is affixed to the Premises.

70.2. If any of the machinery, fixtures, furniture and equipment installed by Tenant in the Premises are purchased or acquired by Tenant subject to a chattel mortgage, conditional sale agreement or other title retention or security agreement, Tenant undertakes and agrees (i) that no such chattel mortgage, conditional sale agreement or other title retention or security agreement shall be permitted to be filed as a lien against the Building and (ii) to cause to be inserted in any of the above described title retention, chattel mortgage or security agreements the following provision: "Notwithstanding anything to the contrary herein, this chattel mortgage, conditional sale agreement, title retention agreement or security agreement shall not create or be filed as a lien against the land, building or improvements comprising the real property in which goods, machinery, equipment, appliances or other personal property covered hereby are to be located or installed."

70.3. If any such lien or UCC filing statement, is filed against the Building, Tenant shall immediately cause such lien or statement to be removed and discharged of record at Tenant's cost and expense.

N:/gs/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

23

71.    Joint Tenants

If Tenant shall consist of more than one individual or entity, then each of the parties constituting Tenant shall be jointly and severally liable and responsible for the observance and performance of all of the terms, covenants and provisions of this Lease to be observed and/or performed by Tenant including, without limitation, the timely payment of Rent and Additional Rent.

72.    Building Security

72.1.   Owner has installed a security system servicing the Building which provides for access into the Building twenty-four (24) hours per day, seven (7) days per week, by way of a coded pass-card system. Tenant shall pay to Owner the sum of $30.00 per month, as Additional Rent, in advance on each monthly rent day, for such security system. In addition, Tenant shall obtain from Owner a coded pass-card for each of Tenant's employees. Tenant shall deposit with Owner, as security, the sum of $10.00 for each individual employee or guest coded pass-card so obtained. Such security deposits shall be returned to Tenant upon the surrender to Owner of all the coded pass-cards. Tenant shall give Owner not less than three (3) business days' advance written notice for any guest pass-cards required. Tenant shall not have more than ten (10) coded pass cards outstanding at any one time.

72.2.   Tenant shall keep the entrance door to the Building locked at all times. Tenant will not distribute the coded pass-cards except to Tenant's employees nor suffer or permit anyone affiliated with Tenant to do so. Tenant shall furnish Owner with a complete, accurate and current list setting forth: (i) the name of each employee or guest who has access to a coded pass-card, and (ii) the position of such employee. Tenant shall notify Owner as promptly as possible after discovery that a coded pass-card is either lost or transferred and in the case of a transfer such notice shall set forth the name and position of the new pass-card holder.

73.    Anti-Terrorism and other Legal Requirements

Tenant represents and warrants that (i) neither Tenant, nor any person who owns any direct or indirect beneficial interest in Tenant, or any of them, is listed on the list maintained by the United States Department of the Treasury, Office of Foreign Assets Control (commonly known as the OFAC List) or otherwise qualifies as a person with whom business by a United States citizen or resident is prohibited and (ii) neither Tenant, nor any person who owns any direct or indirect beneficial interest in Tenant, or any of them, is in violation of any anti-money laundering or anti-terrorism statute, including, without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, U.S. Public Law 107-56 (commonly known as the USA PATRIOT Act), and the related regulations issued thereunder, including temporary regulations, all as amended from time to time.

74.    Intentionally Deleted.

75.    Miscellaneous

75.1.   Tenant shall not record or attempt to record this Lease or any memorandum hereof.

75.2.   This Lease represents the entire agreement between the parties with respect to the subject matter hereof and all prior negotiations, understandings, commitments and agreements relating thereto are superseded hereby.

75.3.   If any provision of this Lease is found to be void or unenforceable by a court of competent jurisdiction, the remaining provisions of this Lease shall nevertheless be

N:/gs/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

24

binding upon Owner and Tenant with the same effect as though the void or unenforceable part had been severed and deleted.

75.4.  Irrespective of the place of execution or performance of this Lease, this Lease shall be governed by and construed and interpreted in accordance with the internal laws of the State of New York.

75.5.  This Lease shall be construed and interpreted without regard to any presumption or other rule requiring construction or interpretation against the party causing this Lease to be drafted.

75.6.  All terms and words used in this Lease, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require.

75.7.  The obligations of Owner under this Lease shall not be binding upon Owner named herein after the sale, conveyance, assignment or transfer by such Owner (or upon any subsequent landlord after the sale, conveyance, assignment or transfer by such subsequent landlord) or its interest in the Premises and in the event of any such sale, conveyance, assignment or transfer, Owner shall be and hereby is entirely freed and relieved of all covenants and obligations of Owner hereunder to the extent that such transferee assumes the obligations of Owner under this Lease, subject to the terms hereof.  Neither the partners comprising Owner, nor the shareholders, partners, principals, agents, directors or officers of any of such partners shall be liable for the performance of Owner's obligations under this Lease.  Tenant shall look solely to Owner to enforce Owner's obligations hereunder.  Prior to any such sale, conveyance, assignment or transfer, the liability of Owner for Owner's obligations under this Lease shall be limited to Owner's interest in the Premises and Tenant shall not look to any other property or assets of Owner or the property or assets of Owner or any of its partners in seeking either to enforce Owner's obligations under this Lease or to satisfy a judgement for Owner's failure to perform such obligations.  After any such sale, conveyance, assignment or transfer, to the extent that the transferee shall have not assumed Owner's obligations under this Lease, the liability of Owner for such obligations shall be limited to the proceeds of such transfer received by it.

75.8.  Notwithstanding anything contained in this Lease to the contrary, all amounts payable by Tenant to or on behalf of Owner under this Lease, whether or not expressly denominated Fixed Rent, Additional Rent or other charges, shall constitute rent for the purposes of Section 502(b)(7) of the Bankruptcy Code.

75.9.  If Tenant is in arrears in payment of Fixed Rent or Additional Rent hereunder, Tenant waives Tenant's right, if any, to designate the items against which any payments made by Tenant are to be credited, and Owner may apply any payments made by Tenant to any items Owner sees fit, irrespective of and notwithstanding any designation or request by Tenant as to the items against which any such payments shall be credited.

75.10.  Except as may be otherwise specifically set forth in this Lease, whenever Owner's consent or approval is required or requested, same may be withheld for any reason or for no reason, in Owner's sole and absolute discretion.

75.11.  Whenever in this Lease it shall be provided that Owner shall not unreasonably withhold or delay Owner's consent or approval to Tenant's proposed action or work, Tenant hereby waives any claim against Owner for money damages which Tenant may have based upon any assertion that Owner has unreasonably withheld or unreasonably delayed any such consent or approval to Tenant's proposed action or work.  Tenant's sole remedy shall be an action or proceeding, or expedited arbitration pursuant to the provisions of Article 76 below, to enforce such provisions of this Lease or for specific performance.

N:/gs/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

25

76.     Expedited Arbitration Concerning Owner's Consent or Approval.

        If Tenant shall assert that Owner has unreasonably withheld or delayed Owner's consent or approval solely with regard to (i) any proposed subletting or assignment by Tenant in accordance with the provisions of Article 61 above with respect to which Owner's consent is not to be unreasonably withheld or delayed pursuant to the provisions of Article 61 above or (ii) any proposed Tenant's Work with respect to which Owner's approval is not to be unreasonably withheld pursuant to the provisions of Article 41 above, then and in such event only, Tenant shall have the right, at Tenant's option, to submit the resolution of any resulting dispute to binding expedited arbitration before the American Arbitration Association. If Owner shall assert that Tenant has unreasonably withheld or delayed Tenant's consent or approval with regard to any matter with respect to which Tenant has agreed not to unreasonably withhold or delay Tenant's consent or approval, then Owner shall have the right, at Owner's option, to submit the resolution of any resulting dispute to such binding expedited arbitration. Each of the parties shall bear its respective costs and expenses relating to such arbitration including, without limitation, attorneys' fees. The award issued by the arbitrator shall be final and judgment based on such award may be entered in any court having jurisdiction.

77.     Owner's Self-Help.

        Anything to the contrary in this Lease notwithstanding, but subject to and without limitation of Owner's right of access as provided in this Lease, Owner agrees that, prior to the date on which the term of this Lease shall cease and expire, Owner shall not exercise any right Owner may possess at common law or under this Lease to re-enter the Premises upon the early termination of this Lease without a lawful court determination or as may otherwise be permitted by applicable statute, ordinance or regulation. However, nothing contained herein shall prevent or impair Owner from, or limit Owner's rights with regard to, instituting any action or proceeding or pursuing any other remedy(ies) against Tenant which are or may become available to Owner under or pursuant to this Lease, at law or in equity.

78.     First Option to Extend

        78.1.     Provided and on condition that Tenant shall not be in default in the performance of any of the terms and conditions of this Lease, then Tenant shall have one (1) option (the "First Option") to extend the term of this Lease for one (1) additional term of five (5) years (the "First Extension Term") commencing on the day immediately following the Expiration Date (the "First Extension Commencement Date") and expiring on the day immediately preceding the fifth anniversary of the First Extension Commencement Date (the "First Extension Expiration Date"). Except solely for the rates at which the Fixed Rent shall be payable during the First Extension Term, as shall be established pursuant to the provisions of Sections 78.4 and 78.5 below, all of the terms, conditions and provisions of this Lease shall continue unmodified and in full force and effect during the First Extension Term. Except as specifically set forth in Article 79 below, Tenant shall have no further right or option to extend the term of this Lease beyond the First Extension Expiration Date.

        78.2.     The First Option may only be exercised by Tenant giving written notice to Owner of Tenant's exercise of the First Option in accordance with the notice provisions of this Lease (the "First Option Exercise Notice") by no earlier than the date which is eighteen (18) months prior to the Expiration Date and by no later than the date which is twelve (12) months prior to the Expiration Date, time being of the essence. Upon Tenant's proper and timely giving of the First Option Exercise Notice, the term of this Lease shall be automatically extended for the First Extension Term upon the terms and conditions specified in this Article, without the execution of an extension agreement or other instrument. If Tenant shall not give Owner the First Option Exercise Notice in strict compliance with the provisions of this Section 78.2 and during the period and in the manner set forth above, time being of the essence, then the First Option shall thereupon terminate and be deemed irrevocably waived by Tenant and shall be of no further force or effect.

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

26

78.3.  Notwithstanding the foregoing provisions of this Article, if on the date that Tenant exercises the First Option, or if on any subsequent date up to and including the date upon which the First Extension Term commences, Tenant is in default in the payment of Fixed Rent or Additional Rent under this Lease, or in the performance of any of the other terms, conditions or provisions of this Lease, then and in any such event, at the option of Owner exercised by notice to Tenant, Tenant's exercise of the First Option, and the First Extension Term, shall be rendered null and void and of no force or effect, and Tenant shall have no other or additional right to exercise the First Option, and the First Option shall thereupon be deemed irrevocably waived by Tenant.

78.4.  During the First Extension Term, Fixed Rent shall be payable at the following rates:

78.4.1.  Annual Initial First Extension Term Fixed Rent (as such term is defined below), during the one (1) year period commencing on the First Extension Commencement Date through and including the date immediately preceding the first anniversary of the First Extension Commencement Date;

78.4.2.  Annual Initial First Extension Term Fixed Rent multiplied by the First Extension Term Rent Increase Factor (as such term is hereinafter defined), during the one (1) year period commencing on the first anniversary of the First Extension Commencement Date through and including the day immediately preceding the second anniversary of the First Extension Commencement Date;

78.4.3.  An amount equal to the Fixed Rent payable for the one (1) year period referred to in Section 78.4.2 above multiplied by the First Extension Term Rent Increase Factor, during the one (1) year period commencing on the second anniversary of the First Extension Commencement Date through and including the day immediately preceding the third anniversary of the First Extension Commencement Date;

78.4.4.  An amount equal to the Fixed Rent payable for the one (1) year period referred to in Section 78.4.3 above multiplied by the First Extension Term Rent Increase Factor, during the one (1) year period commencing on the third anniversary of the First Extension Commencement Date through and including the day immediately preceding the fourth anniversary of the First Extension Commencement Date; and

78.4.5.  An amount equal to the Fixed Rent payable for the one (1) year period referred to in Section 78.4.4 above multiplied by the First Extension Term Rent Increase Factor, during the one (1) year period commencing on the fourth anniversary of the First Extension Commencement Date through and including the First Extension Expiration Date.

78.5.  For purposes of this Article 78, Annual Initial First Extension Term Fixed Rent shall be determined by Owner as follows:

78.5.1.  Prior to the commencement of the First Extension Term, Owner shall send Tenant a notice ("First Extension Term Rent Notice") stating the amount determined by Owner pursuant to the provisions of subparagraph 78.5.2 below, or the amount determined pursuant to the provisions of subparagraph 78.5.3 below, as the case may be, (hereinafter the "Annual Initial First Extension Term Fixed Rent") which shall constitute the annual amount of fair market rent, exclusive of all items of Additional Rent and all increases in Fixed Rent provided for in this Lease, for the first year of the First Extension Term. The Annual Initial First Extension Term Fixed Rent shall constitute the amount of Fixed Rent payable for the first year of the First Extension Term, subject to further increases as provided in or otherwise consistent with the provisions of this Lease, as more particularly set forth in Section 78.5.5 below. Accordingly, all of the provisions of this Lease relating to the payment of Additional Rent shall be unaffected by the determination of the Annual Initial First Extension Term Fixed Rent and shall continue unmodified and in full force and effect during the First Extension Term.

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

27

78.5.2. For purposes of this Section 78.5, Annual Initial First Extension Term Fixed Rent shall be determined by Owner as shall be set forth in the First Extension Term Rent Notice in accordance with the following formula:

$$\text{Annual Initial First Extension Term Fixed Rent} = (A / B) \times C$$

Where A = the product of the aggregate amount of Rents, as determined by Owner, payable during the one (1) year period ending on the last day of the initial term of this Lease (such one (1) year period is hereinafter referred to as the "Comparison Year") by all of the tenants of the Building who were in occupancy of the Building during the Comparison Year or any portion thereof pursuant to all of the lease agreements for space in the Building in effect prior to the date of the First Extension Term Rent Notice (or, with regard to such tenants who were not in occupancy throughout the entire Comparison Year, the annualized Rents for the Comparison Year payable by such tenants), provided, however, that Owner may disregard any lease agreement which Owner reasonably believes is not reflective of the then current fair market rental value of comparable office space in the Building;

B = the aggregate rentable square footage area (as determined by Owner) covered by the lease agreements referred to in the definition of "A" above; and

C = 13,100, plus the aggregate rentable square footage area of all space which shall have been incorporated in the Premises from and after the Commencement Date, if any, as shall be determined by Owner.

However, in no event shall Annual Initial First Extension Term Fixed Rent be less than the annual amount of Rents payable by Tenant under this Lease for the Comparison Year multiplied by one hundred three (103%) percent. Owner's determination of Annual Initial First Extension Term Fixed Rent shall be conclusive and binding on Tenant.

78.5.3. As an alternative to utilizing the formula set forth in Section 78.5.2 above, Owner may elect, in Owner's sole and absolute discretion, to submit the determination of the Annual Initial First Extension Term Fixed Rent to an appraiser (the "Appraiser") who shall be Jerome Haims Realty, Inc. 369 Lexington Avenue, New York, New York (or any successor firm), or if Owner shall so elect, such other appraiser with comparable experience selected by Owner. In such event, the fees and expenses of the Appraiser shall be borne equally by the parties. The Appraiser shall determine the Annual Initial First Extension Term Fixed Rent as of a date prior to the commencement of the First Extension Term and shall render a decision as to its determination to both Owner and Tenant within thirty (30) days after the appointment of the Appraiser or as soon thereafter as is practicable. In rendering such decision, the Appraiser shall not modify the provisions of this Lease and shall take into consideration all relevant factors including, without limitation, market rents then being charged for comparable office space in other first-class office buildings in the vicinity of the Building (if any); provided, however, that the Appraiser shall give primary consideration to the Rents then being charged by Owner under all of the lease agreements for space in the Building in effect as of the date the First Extension Term Rent Notice shall have been given to Tenant. Notwithstanding the provisions of the immediately preceding sentence, however, the Appraiser shall disregard the terms of any lease agreement for space in the Building upon the request of Owner if Owner can establish, to the reasonable satisfaction of the Appraiser, that the terms of such lease agreement are not representative of the then current fair market rental value of the office space in the Building. The Appraiser shall also take into account all of the following assumptions: (i) the Annual Initial First Extension Term Fixed Rent shall be the then current fair market rental value of the Premises determined on the basis of the highest and best use of the Premises: (ii) Owner has had a reasonable period of time to locate a tenant who rents with the knowledge of the uses to which the Premises can be adapted; (iii) the Premises are free and clear of all leases and tenancies; (iv) neither Owner nor Tenant is under any compulsion to rent; (v) in the event the Premises have been destroyed or damaged by fire or other casualty, they have been fully restored; and (vi) in no event shall the Annual

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

28

Initial First Extension Term Fixed Rent be less than the Rents payable by Tenant under this Lease during the Comparison Year multiplied by 103%. The decision of the Appraiser shall be in writing and shall be final and conclusive on both parties and counterpart copies thereof shall be delivered to each of said parties.

78.5.4. For purposes of this Article 78, the term "First Extension Term Rent Increase Factor" shall mean the greatest of: (i) one hundred three (103%) percent; (ii) the average annual percentage increase in fixed rent provided for in the lease agreements referred to in the definition of "A" in Section 78.5.2 above plus (ii) one hundred (100%) percent; and (iii) in the event that Annual Initial First Extension Term Fixed Rent shall be determined by the Appraiser as provided in Section 78.5.3 above, the sum of (a) the then current fair market value fixed rent annual percentage increase applicable to five (5) year leases of the Premises, as shall be determined by the Appraiser, plus (b) one hundred (100%) percent.

78.5.5. Except solely for the provisions concerning Annual Initial First Extension Term Fixed Rent set forth above in this Section 78.5, the terms and provisions relating to the payment of Fixed Rent contained in Article 56 above and elsewhere in this Lease, and all of the provisions of this Lease relating to the payment of increases in Fixed Rent and Additional Rent including, without limitation, the provisions of Article 65 ("Increase in Taxes") and Article 66 ("Electricity and Gas"), shall remain unmodified and in full force and effect during the First Extension Term.

78.5.6. Notwithstanding anything to the contrary in this Lease, the First Option may only be exercised by Tenant, and the provisions of this Article 78 shall only be effective and applicable, if as of the date the First Option shall be exercised, (i) the original named Tenant as of the inception of this Lease (i.e. Replacement Associates LLC) is still the tenant of record and in occupancy of the Premises and (ii) this Lease shall not have been assigned nor shall any portion of the Premises sublet.

79. Second Option to Extend

79.1. Provided and on condition that (i) Tenant shall have properly and timely exercised the First Option pursuant to the provisions of Article 78 above and Tenant shall have been in possession of the Premises throughout the First Extension Term and (ii) Tenant shall not be in default in the performance of any of the terms and conditions of this Lease, then Tenant shall have one (1) option (the "Second Option") to further extend the term of this Lease for one (1) additional term of five (5) years (the "Second Extension Term") commencing on the day immediately following the First Extension Expiration Date (the "Second Extension Commencement Date") and expiring on the day immediately preceding the fifth anniversary of the Second Extension Commencement Date (the "Second Extension Expiration Date"). Except solely for the rates at which the Fixed Rent shall be payable during the Second Extension Term, as shall be established pursuant to the provisions of Sections 79.4 and 79.5 below, all of the terms, conditions and provisions of this Lease shall continue unmodified and in full force and effect during the Second Extension Term. Tenant shall have no further right or option to extend the term of this Lease beyond the Second Extension Expiration Date.

79.2. The Second Option may only be exercised by Tenant giving written notice to Owner of Tenant's exercise of the Second Option in accordance with the notice provisions of this Lease (the "Second Option Exercise Notice") by no earlier than the date which is eighteen (18) months prior to the First Extension Expiration Date and by no later than the date which is twelve (12) months prior to the First Extension Expiration Date, time being of the essence. Upon Tenant's proper and timely giving of the Second Option Exercise Notice, the term of this Lease shall be automatically extended for the Second Extension Term upon the terms and conditions specified in this Article, without the execution of an extension agreement or other instrument. If Tenant shall not give Owner the Second Option Exercise Notice in strict compliance with the provisions of this Section 79.2 and during the period and in the manner set forth above, time being of the

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

29

essence, then the Second Option shall thereupon terminate and be deemed irrevocably waived by Tenant and shall be of no further force or effect.

79.3.   Notwithstanding the foregoing provisions of this Article, if on the date that Tenant exercises the Second Option, or if on any subsequent date up to and including the date upon which the Second Extension Term commences, Tenant is in default in the payment of Fixed Rent or Additional Rent under this Lease, or in the performance of any of the other terms, conditions or provisions of this Lease, then and in any such event, at the option of Owner exercised by notice to Tenant, Tenant's exercise of the Second Option, and the Second Extension Term, shall be rendered null and void and of no force or effect, and Tenant shall have no other or additional right to exercise the Second Option, and the Second Option shall thereupon be deemed irrevocably waived by Tenant.

79.4.   During the Second Extension Term, Fixed Rent shall be payable at the following rates:

79.4.1.   Annual Initial Second Extension Term Fixed Rent (as such term is defined below), during the one (1) year period commencing on the Second Extension Commencement Date through and including the date immediately preceding the first anniversary of the Second Extension Commencement Date;

79.4.2.   Annual Initial Second Extension Term Fixed Rent multiplied by the Second Extension Term Rent Increase Factor (as such term is hereinafter defined), during the one (1) year period commencing on the first anniversary of the Second Extension Commencement Date through and including the day immediately preceding the second anniversary of the Second Extension Commencement Date;

79.4.3.   An amount equal to the Fixed Rent payable for the one (1) year period referred to in Section 79.4.2 above multiplied by the Second Extension Term Rent Increase Factor, during the one (1) year period commencing on the second anniversary of the Second Extension Commencement Date through and including the day immediately preceding the third anniversary of the Second Extension Commencement Date;

79.4.4.   An amount equal to the Fixed Rent payable for the one (1) year period referred to in Section 79.4.3 above multiplied by the Second Extension Term Rent Increase Factor, during the one (1) year period commencing on the third anniversary of the Second Extension Commencement Date through and including the day immediately preceding the fourth anniversary of the Second Extension Commencement Date; and

79.4.5.   An amount equal to the Fixed Rent payable for the one (1) year period referred to in Section 79.4.4 above multiplied by the Second Extension Term Rent Increase Factor, during the one (1) year period commencing on the fourth anniversary of the Second Extension Commencement Date through and including the Second Extension Expiration Date.

79.5.   For purposes of this Article 79, Annual Initial Second Extension Term Fixed Rent shall be determined by Owner as follows:

79.5.1.   Prior to the commencement of the Second Extension Term, Owner shall send Tenant a notice ("Second Extension Term Rent Notice") stating the amount determined by Owner pursuant to the provisions of subparagraph 79.5.2 below, or the amount determined pursuant to the provisions of subparagraph 79.5.3 below, as the case may be, (hereinafter the "Annual Initial Second Extension Term Fixed Rent") which shall constitute the annual amount of fair market rent, exclusive of all items of Additional Rent and all increases in Fixed Rent provided for in this Lease, for the first year of the Second Extension Term. The Annual Initial Second Extension Term Fixed Rent shall constitute the amount of Fixed Rent payable for the first year of the Second Extension Term, subject to further increases as provided in or otherwise consistent with the provisions of this Lease, as more particularly set forth in Section 79.5.5 below. Accordingly, all of the provisions of this

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates Rider 2-28-13 (final) V2.wpd

30

Lease relating to the payment of Additional Rent shall be unaffected by the determination of the Annual Initial Second Extension Term Fixed Rent and shall continue unmodified and in full force and effect during the Second Extension Term.

79.5.2.  For purposes of this Section 79.5, Annual Initial Second Extension Term Fixed Rent shall be determined by Owner as shall be set forth in the Second Extension Term Rent Notice in accordance with the following formula:

Annual Initial Second Extension Term Fixed Rent   =   (D / E) x F

Where D =   the product of the aggregate amount of Rents, as determined by Owner, payable during the one (1) year period ending on the last day of the First Extension Term (such one (1) year period is hereinafter referred to as the "Second Extension Term Comparison Year") by all of the tenants of the Building who were in occupancy of the Building during the Second Extension Term Comparison Year or any portion thereof pursuant to all of the lease agreements for space in the Building in effect prior to the date of the Second Extension Term Rent Notice (or, with regard to such tenants who were not in occupancy throughout the entire Second Extension Term Comparison Year, the annualized Rents for the Second Extension Term Comparison Year payable by such tenants), provided, however, that Owner may disregard any new lease agreement which Owner reasonably believes is not reflective of the then current fair market rental value of comparable office space in the Building;

E =   the aggregate rentable square footage area (as determined by Owner) covered by the lease agreements referred to in the definition of "D" above; and

F =   13,100, plus the aggregate rentable square footage area of all space which shall have been incorporated in the Premises from and after the Commencement Date, if any, as shall be determined by Owner.

However, in no event shall Annual Initial Second Extension Term Fixed Rent be less than the annual amount of Rents payable by Tenant under this Lease for the Comparison Year multiplied by one hundred three (103%) percent. Owner's determination of Annual Initial Second Extension Term Fixed Rent shall be conclusive and binding on Tenant.

79.5.3. As an alternative to utilizing the formula set forth in Section 79.5.2 above, Owner may elect, in Owner's sole and absolute discretion, to submit the determination of the Annual Initial Second Extension Term Fixed Rent to an appraiser (the "Appraiser") who shall be Jerome Haims Realty, Inc. 369 Lexington Avenue, New York, New York (or any successor firm), or if Owner shall so elect, such other appraiser with comparable experience selected by Owner.  In such event, the fees and expenses of the Appraiser shall be borne equally by the parties. The Appraiser shall determine the Annual Initial Second Extension Term Fixed Rent as of a date prior to the commencement of the Second Extension Term and shall render a decision as to its determination to both Owner and Tenant within thirty (30) days after the appointment of the Appraiser or as soon thereafter as is practicable. In rendering such decision, the Appraiser shall not modify the provisions of this Lease and shall take into consideration all relevant factors including, without limitation, market rents then being charged for comparable office space in other first-class office buildings in the vicinity of the Building (if any);  provided, however, that the Appraiser shall give primary consideration to the Rents then being charged by Owner for all the lease agreements for space in the Building in effect as of the Second Extension Term Rent Notice shall have been given to Tenant.  Notwithstanding the provisions of the immediately preceding sentence, however, the Appraiser shall disregard the terms of any lease agreement for space in the Building upon the request of Owner if Owner can establish, to the reasonable satisfaction of the Appraiser, that the terms of such lease agreement are not representative of the then current fair market rental value of the office space in the Building.  The Appraiser shall also take into account all of the following assumptions: (i) the Annual Initial Second Extension Term Fixed Rent shall be the then current fair market rental value of the Premises determined

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates Rider 2-28-13 (final) V2.wpd

31

on the basis of the highest and best use of the Premises: (ii) Owner has had a reasonable period of time to locate a tenant who rents with the knowledge of the uses to which the Premises can be adapted; (iii) the Premises are free and clear of all leases and tenancies; (iv) neither Owner nor Tenant is under any compulsion to rent; (v) in the event the Premises have been destroyed or damaged by fire or other casualty, they have been fully restored; and (vi) in no event shall the Annual Initial Second Extension Term Fixed Rent be less than the Rents payable by Tenant under this Lease during the Comparison Year multiplied by 103%. The decision of the Appraiser shall be in writing and shall be final and conclusive on both parties and counterpart copies thereof shall be delivered to each of said parties.

79.5.4. For purposes of this Article 79, the term "Second Extension Term Rent Increase Factor" shall mean the greatest of: (i) one hundred three (103%) percent; (ii) the average annual percentage increase in fixed rent provided for in the lease agreements referred to in the definition of "A" in Section 79.5.2 above plus (ii) one hundred (100%) percent; and (iii) in the event that Annual Initial Second Extension Term Fixed Rent shall be determined by the Appraiser as provided in Section 79.5.3 above, the sum of (a) the then current fair market value fixed rent annual percentage increase applicable to five (5) year leases of the Premises, as shall be determined by the Appraiser, plus (b) one hundred (100%) percent.

79.5.5. Except solely for the provisions concerning Annual Initial Second Extension Term Fixed Rent set forth above in this Section 79.5, the terms and provisions relating to the payment of Fixed Rent contained in Article 56 above and elsewhere in this Lease, and all of the provisions of this Lease relating to the payment of increases in Fixed Rent and Additional Rent including, without limitation, the provisions of Article 65 ("Increase in Taxes") and Article 66 ("Electricity and Gas"), shall remain unmodified and in full force and effect during the Second Extension Term.

79.5.6. Notwithstanding anything to the contrary in this Lease, the Second Option may only be exercised by Tenant, and the provisions of this Article 79 shall only be effective and applicable, if as of the date the Second Option shall be exercised, (i) the original named Tenant as of the inception of this Lease (i.e. Replacement Associates LLC) is still the tenant of record and in occupancy of the Premises and (ii) this Lease shall not have been assigned nor shall any portion of the Premises sublet.

80.    Additional Provisions Concerning Public Health Law.

Owner acknowledges that its rights of reentry into the Premises set forth in this Lease do not confer on it any authority to operate a hospital as defined in Article 28 of the New York State Public Health Law in the Premises and agrees that it will give the New York State Department of Health, Tower Building, Empire State Plaza, Albany, New York 12237, notification by certified mail of its intent to reenter the Premises or to initiate dispossess proceedings or that the Lease is due to expire, at least thirty (30) days prior to the date on which Owner intends to exercise a right of reentry or to initiate such proceedings or at least (60) days prior to the expiration of this Lease. Upon receipt of notice from Owner of its intent to exercise its right of reentry or upon the service of process in dispossess proceedings and sixty (60) days prior to the expiration of this Lease, Tenant shall immediately notify by certified mail the New York State Department of Health, Tower Building, Empire State Plaza, Albany, New York 12237, of the receipt of such notice or service of such process or that this Lease is about to expire.

81.    Payment Settlement of Claims for Compensatory Damages by Tenant

81.1.   (a)    Simultaneously with Tenant's execution and delivery of this Lease, Tenant shall pay to Owner, by official bank check or wire transfer, the sum of one hundred

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

32

seventy-seven thousand nine hundred twenty-seven and 00/100 ($177,927.00) dollars (the "Settlement Payment"). The Settlement Payment shall be in full settlement of Owner's claim for compensatory damages for costs heretofore incurred by Owner to remediate various conditions in the Premises and the Building arising out of Tenant's alleged improper use of the plumbing and discharge lines servicing the Premises.

(b)     Conditioned upon payment in full of the Settlement Payment by Tenant and collection thereof by Owner, and for other good and sufficient consideration, Owner, in all of its capacities, on behalf of itself any other party, person or entity claiming under or through it, each of its successors, assigns, agents, employees, officers, directors, shareholders, parents, subsidiaries or parents, subsidiaries, affiliates, fiduciaries, beneficiaries, trustees, heirs and representatives, does hereby release, discharge and acquit Tenant (including its sub-landlord Lenox Hill Hospital and its insurer, Traders & General Insurance Company, a member of the OneBecon Insurance Group, its parent companies, successors, assigns, agents, employees, officers, directors, shareholders, parents, subsidiaries or parents, subsidiaries, affiliates, fiduciaries, beneficiaries, trustees, heirs and representatives) from any and all claims, liability, demands, rights of action related, obligations, damages, losses, costs, reasonable attorneys fees and expenses (collectively, "Claims"), arising out of or related to Tenant's allegedly improper use of the plumbing and discharge lines servicing the Premises prior to the date hereof, which Claims were brought or could have been brought in the action entitled Replacement Assocs. LLC v. 210 East 86th Street Corp., et al., Index No. 652821/2011 and/or Lenox Hill Hospital v. 210 East 86th Street Corp., Index No. 111725/2011, previously pending in the Supreme Court of the State of New York.

81.2.   Tenant, in all of its capacities, on behalf of itself any other party, person or entity claiming under or through it (including its sub-landlord Lenox Hill Hospital), each of its successors, assigns, agents, employees, officers, directors, shareholders, parents, subsidiaries or parents, subsidiaries, affiliates, fiduciaries, beneficiaries, trustees, heirs and representatives, hereby releases, discharges and acquits Owner, and Owner's successors, assigns, agents, employees, officers, directors, shareholders, parents, subsidiaries or parents, subsidiaries, affiliates, fiduciaries, beneficiaries, trustees, heirs and representatives, from any and all Claims arising out of or related to Tenant's use of the plumbing and discharge lines servicing the Premises prior to the date hereof.

210 East 86th Street Corp., Owner

By: _____
    Name:
    Title:

Replacement Associates LLC, Tenant

By: _____
    Name: MORTON J. KLEINER, MD
    Title: MEMBER

N:\gs\OSF\WPDocs\210E86th\REPLACEMENT ASSOCIATES, LLC\Execution Versions\Replacement Associates RIDER 2-28-13 (final) V2.wpd

33

State of New York    )
                  : ss.
County of New York)

On the _____ day of _____ in the year 2013, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Signature and Office of individual
taking acknowledgment

State of New York    )
                  : ss.
County of New York)

On the _____ day of _____ in the year 2013, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Signature and Office of individual
taking acknowledgment

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

34

## EXHIBIT A



The location and dimensions of walls, partitions, columns, stairs and openings are approximate and subject to revisions due to mechanical work, job conditions and requirements of governmental departments and authorities, and no resulting deviation shall affect the rent or Tenant's obligations under this Lease.

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

36

# EXHIBIT B

## TENANT'S INITIAL PLANS

Plans T-000.00, A-100.00, A-101.00 as prepared by RBSD Architects dated 1/15/13 and plans P-100.00 through P-108.00, SP-100.00 as prepared by T/S Associates Mechanical Consultants dated 12/28/12

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

37

## EXHIBIT B-1

## COST ESTIMATE FOR OWNER'S WORK

ISLAND REHABILITATIVE SERVICES

210 East 38th Street

NEW YORK, NY

CONSTRUCTION COST ESTIMATE

February 15, 2013

Revised February 26, 2013

McQUILKIN ASSOCIATES, LLC

500 Morris Avenue
Springfield, NJ 07081
Tel: 973-218-1600
Fax: 973-218-1700

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

38

McQUILKIN ASSOCIATES,LLC                                    DATE:   2/15/13
PROJ: ISLAND REHABILITATIVE SERVICES                       REV:    2/26/13
LOC: NEW YORK, NY

## QUALIFICATIONS

1.  Costs based on plans T-000.00, A-100.00, A-101.00 as prepared by RBSD Architects
    dated 1/15/13 and plans P-100.00 through P-108.00, SP-100.00 as prepared by
    T/S Associates Mechanical Consultants dated 12/26/12
2.  Escalation - Costs based on Construction Start 2nd Quarter 2013
3.  Estimate includes up to 30% ceiling tile replacement.

## EXCLUSIONS

1.   Builder's risk insurance.
2.   Interior Plants/Planters
3.   Performance Bond
4.   Audio/Visual work
5.   Hazardous material Removal
6.   Furniture
7.   Architectural/Engineering Fees
8.   Network/Lan Costs
9.   Telephone/Data/TV Cabling Costs
10.  Permits/Filing/Expeditiong Fees
11.  Controlled Testing & Inspections
12.  Surveys & Reports
13.  Public Agency Approvals/Inspection Fees
14.  All Millwork and Millwork Supports
15.  Dex-o-Tex Flooring and Base by Owner
16.  Cleaning of area behind millwork panels-Medical Waste Hazard
17.  Removal/Replacement of all equipment and supplies in Room 317
     Dialysis Equipment and Storage
18.  H & H Woodworking to place all rubbish in owner provided containers
19.  Relocation of TV Brackets
20.  All Chemical Tubing and Water feed to Dialysis Equipment
21.  All Waterproofing (3rd Floor)
22.  New Flooring and Base (3rd Floor)

Page 2 of 8

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

39

McQUILKIN ASSOCIATES, LLC
PROJ: ISLAND REHABILITATIVE SERVICES
LOC: NEW YORK, NY

DATE: 2/15/13
REV: 2/26/13

| CSI# | TRADE SUMMARY | | TOTAL |
|------|---------------|--|-------|
| 02050 | DEMOLITION | | 78,900 |
| 03300 | CONCRETE | | 22,300 |
| 04200 | MASONRY | | 10,000 |
| 06100 | ROUGH CARPENTRY | | 23,150 |
| 06400 | MILLWORK | | By Others |
| 07150 | FIRESTOPPING | | 5,000 |
| 07500 | ROOFING | | 3,050 |
| 07900 | JOINT SEALERS | | 2,500 |
| 08300 | SPECIAL DOORS | | 5,000 |
| 09250 | GYPSUM BOARD | | 18,000 |
| 09500 | ACOUSTICAL CEILING | | 10,913 |
| 09900 | PAINTING | | 6,000 |
| 15300 | FIRE PROTECTION | | 8,550 |
| 15400 | PLUMBING(INCLUDES DEDUST ALTERNATE) | | 475,172 |
| 15500 | HVAC | | 22,000 |
| 16050 | ELECTRICAL | | 36,000 |
| 19000 | SUPERVISION | | 200,000 |
| | | SUBTOTAL | 926,535 |
| | GENERAL CONDITIONS | 10% | 92,653 |
| | | SUBTOTAL | 1,019,188 |
| | OVERHEAD & PROFIT | 15% | 152,878 |
| | | TOTAL | 1,172,066 |

TOTAL COST APPROVED BY: _____ TOTAL    1,172,066

DATE    _____

Page 3 of 6

N:/gsf/GSFWPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

40

McQUILKIN ASSOCIATES,LLC
PROJ: ISLAND REHABILITATIVE SERVICES
LOC: NEW YORK, NY

DATE: 2/15/13
REV: 2/26/13

| CSI# | DESCRIPTION | QUANTITY | UNIT | UNIT COST | AMOUNT |
|------|-------------|----------|------|-----------|--------|
| 02050 | **DEMOLITION** | | | | |
| | Cellar | | | | |
| | Sawcut CMU Wall | 100 | LF | 25.00 | 2,500 |
| | Remove CMU Wall | 100 | SF | 15.00 | 1,500 |
| | Third Floor | | | | |
| | Remove Millwork | 300 | LF | 20.00 | 6,000 |
| | Remove Metal Pan bottom of Millwork for Acid Basin | 3 | EA | 1,700.00 | 5,100 |
| | First, Second, Fourth through Roof | | | | |
| | Temporary Protection | 10 | EA | 250.00 | 2,500 |
| | Sawcut Openings for Access Doors | 10 | EA | 1,000.00 | 10,000 |
| | Remove/Patch Walls for Access Doors | 10 | EA | 2,000.00 | 20,000 |
| | Laborer | 480 | HRS | 50.00 | 24,000 |
| | Debris Containers | 1 | LS | 4,800.00 | 4,800 |
| | Debris Removal | 1 | LS | 2,500.00 | 2,500 |
| | | | | | 78,880 |
| 03300 | **CONCRETE** | | | | |
| | PermaCrete Floors | 1 | LS | 6,800.00 | 6,800 |
| | PermaCrete Walls | 1 | LS | 9,000.00 | 9,000 |
| | Patch Penetrations | 10 | EA | 200.00 | 2,000 |
| | Concrete Curb @ Dialysis Equiment Room | 10 | LF | 200.00 | 2,000 |
| | Concrete Floor Patching at Cellar | 100 | SF | 25.00 | 2,500 |
| | | | | | 22,300 |
| 04200 | **MASONRY** | | | | |
| | Remove/Replace Glass Block | 40 | LF | 50.00 | 2,000 |
| | Infill CMU Walls | 100 | SF | 80.00 | 8,000 |
| | | | | | 10,000 |
| 06100 | **ROUGH CARPENTRY** | | | | |
| | Temporary Protection | | | | |
| | Dustproof Partitions | 250 | LF | 85.00 | 21,250 |
| | Doors in Dustproof Partitions | 4 | EA | 350.00 | 1,400 |
| | Misc. Wood Blocking | 1 | LS | 500.00 | 500 |
| | | | | | 23,150 |
| 06400 | **MILLWORK** | | | | |
| | | | | | By Others |
| 07150 | **FIRESTOPPING** | | | | |
| | Firestop Pipe Penetrations | 50 | EA | 100.00 | 5,000 |
| | | | | | 5,000 |

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

41

McQUILKIN ASSOCIATES, LLC
PROJ: ISLAND REHABILITATIVE SERVICES
LOC: NEW YORK, NY

DATE: 2/15/13
REV: 2/26/13

| CSI# | DESCRIPTION | QUANTITY | UNIT | UNIT COST | AMOUNT |
|---|---|---|---|---|---|
| 07500 | **ROOFING** | | | | |
| | Pipe Sleeve | 1 | EA | 350.00 | 350 |
| | Weatherproof Pipe Enclosure | 20 | LF | 60.00 | 1,200 |
| | Patch roofing @ Penetrations | 1 | LS | 1,500.00 | 1,500 |
| | | | | | 3,050 |
| 07900 | **JOINT SEALERS** | | | | |
| | Misc. Caulking | 1 | LS | 2,500.00 | 2,500 |
| | | | | | 2,500 |
| 08300 | **SPECIAL DOORS** | | | | |
| | Access Doors - 2 x 2 | 10 | EA | 500.00 | 5,000 |
| | | | | | 5,000 |
| 09250 | **GYPSUM BOARD** | | | | |
| | Pipe Enclosures at Third Floor | 500 | SF | 30.00 | 15,000 |
| | Patch Existing Walls | 1 | LS | 3,000.00 | 3,000 |
| | | | | | 18,000 |
| 09500 | **ACOUSTICAL CEILING** | | | | |
| | Remove/Reinstall Existing Ceilings | 2,100 | SF | 4.50 | 9,450 |
| | Replace 30% of Ceiling Tiles | 650 | SF | 2.25 | 1,463 |
| | | | | | 10,913 |
| 09900 | **PAINTING** | | | | |
| | Paint GB Walls | 1,000 | SF | 1.50 | 1,500 |
| | Paint Ductwork at Cellar | 1 | LS | 1,500.00 | 1,500 |
| | Misc. Painting | 1 | LS | 3,000.00 | 3,000 |
| | | | | | 6,000 |
| 15300 | **FIRE PROTECTION** | | | | |
| | Floor Control Valve Assembly | 1 | EA | 2,500.00 | 2,500 |
| | New Sprinkler Heads - Upright | 8 | EA | 250.00 | 2,000 |
| | Piping - 2" | 20 | LF | 60.00 | 1,200 |
| | Piping - 1 1/4" | 20 | LF | 30.00 | 600 |
| | Piping - 1" | 40 | LF | 26.00 | 1,040 |
| | Fitting & Hangers | 1 | LS | 710.00 | 710 |
| | Testing | 1 | LS | 500.00 | 500 |
| | | | | | 8,550 |

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

McGINLKIN ASSOCIATES,LLC
PROJ: ISLAND REHABILITATIVE SERVICES
LOC: NEW YORK, NY

DATE: 2/15/13
REV: 2/26/13

| CSI# | DESCRIPTION | QUANTITY UNIT | | UNIT COST | AMOUNT |
|------|-------------|----------|------|-----------|--------|
| 15400 | **PLUMBING** | | | | |
| | Quote From Danica | 1 | LS | 562,852.00 | 562,852 |
| | Revised Alternate- Use Polyurthane for Vent Piping in lieu of Durkon | | | | (87,680) |
| | | | | | 475,172 |
| 15500 | **HVAC** | | | | |
| | New Supply Duct Extensions and Grille for Fan Coil Units | 20 | EA | 1,000.00 | 20,000 |
| | Fire Damper for 5th Floor Bathroom | 1 | EA | 2,000.00 | 2,000 |
| | | | | | 22,000 |
| 16000 | **ELECTRICAL** | | | | |
| | Power to Cellar Equipment from Third Floor | 1 | LS | 15,000 | 15,000 |
| | Relocate Receptacles in New Millwork | 60 | EA | 300 | 18,000 |
| | Wiring of Leak Detection for Acid Diluting Basins | 6 | EA | 500 | 3,000 |
| | | | | | 36,000 |

Page 6 of 6

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

43

EXHIBIT C

Form of Letter of Credit

IRREVOCABLE AND UNCONDITIONAL
<u>STANDBY LETTER OF CREDIT NO.</u>

_____, 2013

<u>Beneficiary</u>                                    <u>Account Party</u>

210 East 86th Street Corp.                   Replacement Associates, LLC
c/o Perlbinder Realty
429 East 42nd Street
New York, New York 10022

Ladies/Gentlemen:

We hereby establish this Clean, Irrevocable and Unconditional Standby Letter of Credit No. _____ (the "Letter of Credit") in favor of 210 East 86th Street Corp. and its transferees as hereinafter provided, as Beneficiary, for the account of _____, as Account Party, in the amount of U.S. _____ ($_____) Dollars, available by draft(s) of Beneficiary drawn on us payable at sight.

We agree to pay Beneficiary's drawing under the Letter of Credit with our own funds. We will not be subrogated to any of Beneficiary's rights as a result of any payment we make to Beneficiary under this Letter of Credit. The request for payment under this Letter of Credit shall be final and conclusive for all purposes without verification by us and shall not be subject to refutation, denial or contest.

Notwithstanding anything to the contrary contained in the ICP (as defined below) or otherwise, Beneficiary's drawing under this Letter of Credit will be paid, by wire transfer in federal funds to the account designated in Beneficiary's certificate accompanying the draft, by no later than (i) 4:00 p.m. Eastern Time on the same business day on which such draft and certificate are received by us in conformity with the terms hereof, if received by us at or before 11:00 a.m Eastern Time or (ii) 4:00 p.m. Eastern Time of the next business day following the business day on which such draft and certificate are received by us in conformity with the terms hereof, if received by us after 11:00 a.m. Eastern Time.

We hereby agree that all drafts drawn by Beneficiary under and in compliance with the terms of this Letter of Credit will be duly honored and paid as provided above, upon presentation and delivery of the draft and certificate as specified herein, if presented to our office located at: _____, New York, New York, on or before the Expiration Date (as defined below), on which date this Letter of Credit expires. In the event that the original of this Letter of Credit is lost or destroyed, Beneficiary's statement to that effect may be substituted for the original of this Letter of Credit. Partial drawings are permitted.

If demand for payment made by Beneficiary hereunder does not, in any instance, conform to the terms and conditions of this Letter of Credit, we shall give Beneficiary immediate written notice by facsimile transmission at (212) 371-1963 and by overnight delivery service that its purported drawing under this Letter of Credit was not effected in accordance with the

terms and conditions of this Letter of Credit, stating the reasons therefor and that we are holding any documents at Beneficiary's disposal or returning the same to Beneficiary. Such notice must be given to Beneficiary within one (1) business day of our receipt of Beneficiary's draft and certificate.

This Letter of Credit is transferable, at Beneficiary's option, at no cost to Beneficiary. Transfer of this Letter of Credit shall be effected by presentation to us of this Letter of Credit and all amendments (or Beneficiary's statement that this Letter of Credit and/or any amendments have been lost or stolen, as the case may be), accompanied by a certificate in the form of Exhibit 1 hereto attached with the blanks therein completed. Upon such presentation, we shall forthwith endorse the Letter of Credit to the transferee and forward same to the transferee with our advice of transfer, and Exhibit 1 hereto shall thereupon be deemed modified to reflect the change of the Beneficiary to the transferee.

This Letter of Credit expires on _____, 2013 (the "Expiration Date"). It is a condition of this Letter of Credit that it shall be deemed automatically extended without amendment for an additional one (1) year from the Expiration Date, and for an additional one (1) year period from each future Expiration Date through and including the final Expiration Date of _____, unless forty-five (45) days prior to the Expiration Date or any future Expiration Date we notify Beneficiary by certified mail, return receipt requested, or a recognized overnight courier which provides proof of delivery (such as Federal Express), that we elect not to consider this Letter of Credit renewed for any such additional period. If Beneficiary receives our notice of non-renewal then without limitation of the other provisions of this Letter of Credit, Beneficiary may draw its draft on us for the entire amount of this Letter of Credit.

This Letter of Credit sets forth in full the terms of our undertaking and such undertaking shall not in any way be modified or amended by reference to any agreement, statute, document or instrument and shall not be deemed to incorporate any other agreement, document or instrument by reference.

This Letter of Credit is subject to The International Standby Practices (ISP98), International Chamber of Commerce, Publication No. 590 ("ICP") and as to any matters not specifically covered by the ICP, this Letter of Credit shall be governed by the internal laws of the State of New York.

Yours very truly,

[Name of Issuer]


Authorized Signature

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

45

## EXHIBIT C-1

INSTRUCTIONS TO TRANSFER LETTER OF CREDIT

Dated: _____, 20____
Irrevocable Standby Letter of Credit No. _____

[Name and Address of Issuer]

Ladies and Gentlemen:

For value received, the undersigned beneficiary hereby irrevocably transfers to:

_____
(Name of Transferee)

_____
_____
(Address)

all rights of the undersigned beneficiary to draw under the above Letter of Credit (the "Letter of Credit"). Such transfer is in accordance with and permitted by the Lease Agreement (as defined in Exhibit A-1 to the Letter of Credit).

By this transfer, all rights of the undersigned beneficiary in the Letter of Credit are transferred to the transferee and the transferee shall hereafter have the sole rights as beneficiary thereof; provided, however that no rights shall be transferred to a transferee unless such transfer complies with the requirements of the Letter of Credit pertaining to transfers.

The Letter of Credit and all amendments are returned herewith, and in accordance therewith, we ask you to endorse the Letter of Credit in favor of the transferee and forward same to the transferee with your advice of transfer. Exhibit A-1 thereto will thereupon be deemed modified to reflect the change of the beneficiary to the transferee.

Very truly yours,

_____

By: _____
[Name and Title]

N:/gsf/GSF/WPDocs/210E86th/REPLACEMENT ASSOCIATES, LLC/Execution Versions/Replacement Associates RIDER 2-28-13 (final) V2.wpd

46