**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STEPHEN PERLBINDER and ASTRID SABELLAROSA
as Trustee of the ASR 2020 FAMILY TRUST and the
STEPHEN PERLBINDER 2016 FAMILY TRUST F/B/O
ASTRID SABELLAROSA, individually and derivatively on
behalf of 210 EAST 86TH STREET CORP.,

Plaintiffs,

-*against*-

BARTON MARK PERLBINDER,

Defendant.

-*and*-

210 EAST 86th STREET CORP.,

Nominal Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Index No. 655732/2021

**<u>VERIFIED COMPLAINT</u>**

Plaintiffs Stephen Perlbinder and Astrid Sabellarosa, in her capacity as Trustee of the ASR 2020 Family Trust and the Stephen Perlbinder 2016 Family Trust F/B/O Astrid Sabellarosa (together, "Plaintiffs"), individually and derivatively on behalf of 210 East 86th Street Corp. (the "Company"), by and through their undersigned attorneys, as and for their Verified Complaint against defendant Barton Mark Perlbinder state as follows:

**<u>NATURE OF THE ACTION</u>**

Plaintiffs bring this action to save the Company from Defendant. As its President, he has exercised de-facto control over the Company either as its fifty-percent owner or in control of fifty percent of its shares with his daughter, using it for his own purposes without any oversight from, or allegiance to the interests of, its shareholders. After nearly four decades under his management, the Company's sole asset, a building on East 86th Street in Manhattan, sits vacant, in need of

1

serious repairs, and mired in debt, with Defendant diverting what income the building generates away from the Company to himself and various other entities under his control.

This situation is untenable. The Company's building is primarily outfitted for medical office space and sits smack between two subway lines in an upscale and well-trafficked neighborhood. Its prime location notwithstanding, by summer 2022 only two of its eleven occupiable floors will be fully leased. Under Defendant's mismanagement, some floors in the building have sat empty for years; one has *never* had a tenant. Defendant's refusal to negotiate reasonably with tenants has emptied the building, and as the Company's President he has refused to fill it with paying tenants unless he is first promised cash incentives for doing so.

Indeed, Defendant's pattern of behavior is unmistakable: if Plaintiffs identify or secure a potential tenant for the building, Defendant will refuse to consider such a transaction despite it being plainly in the Company's interest (and at least once sabotaging such a potential transaction). If Defendant, however, identifies or proposes a potential tenant for the building, he will only commit to securing such transaction if he is personally promised a disproportionate share of the resulting income, irrespective of Plaintiffs' ownership of half the Company, or if he can otherwise capitalize personally on the transaction. Defendant treats the Company and its building as if they were his and his alone, without any regard for the fiduciary duties he owes to it and its shareholders.

Defendant's mismanagement of the Company extends beyond the nearly empty building on the Upper East Side. What income is generated by its few tenants is quickly misappropriated by Defendant: he has caused the Company to extend "loans" to various other entities under his control, now totaling more than $20 million. Defendant has the Company extend these loans—which generate no interest, and have no discernible maturity date—while simultaneously keeping the Company itself in debt, having refinanced the building's mortgage in 2015 (the proceeds of which he partially transferred to himself for his own personal use). Meanwhile, the Company pays

2

for his Porsche and his personal staff, and Plaintiffs' efforts to determine the full extent of Defendant's self-dealing and the scope of his self-interested transactions have been stymied by his control of the Company.

Plaintiffs thus seek the Court's assistance in helping to put the Company's house in order. They see the building at issue as not only an asset to the Company, but an asset to the community as well. Filling its office space with medical offices and reviving its lobby movie theater, as Plaintiffs have sought to do, would enrich both the Company and the neighborhood surrounding the building. Defendant stands in the way of these efforts, refusing to allow the Company to prosper due to his singular focus on lining his own pockets. Plaintiffs bring this action to claw the Company's building back from the brink, recover the funds that Defendant has misappropriated from it, and allow the Company to succeed.

## **THE PARTIES**

1.      Plaintiff Stephen Perlbinder ("Stephen") is an individual residing in New York County.

2.      Plaintiff Astrid SabellaRosa ("Astrid") is an individual residing in New York County and brings this action in her capacity as Trustee of the ASR 2020 Family Trust (the situs of which is the State of New Jersey) and the Stephen Perlbinder 2016 Family Trust F/B/O Astrid Sabellarosa (the situs of which is the State of New York). Astrid has been duly authorized by a majority of the Trustees of each aforementioned Trust to commence this action on their behalf.

3.      Defendant Barton Mark Perlbinder ("Mark") is an individual residing in New York County.

4.      Nominal Defendant 210 East 86th Street Corp. is a New York S-corporation with an address c/o Perlbinder Realty at 429 East 52nd Street, New York, New York 10022.

3

## JURISDICTION & VENUE

5.  Jurisdiction is proper pursuant to CPLR § 301.

6.  Venue is proper pursuant to CPLR §§ 501, 503, and 507.

## FACTUAL ALLEGATIONS

I.  Perlbinder Realty and the Company

7.  Perlbinder Realty was founded over a century ago by Joseph Perlbinder, who developed apartment buildings throughout New York City. His son, Julius, inherited Perlbinder Realty and expanded it, building the family company into a well-known real estate development business, holding various valuable properties throughout Manhattan. Both of Julius' sons, Mark and Stephen, have worked at the family business; Mark eventually became its President, and Stephen its Vice-President. As relevant to this lawsuit, Mark has a daughter, Muffy Flouret; Stephen has two daughters, Plaintiff Astrid and Andrea Jo Stein.

8.  As its President, Mark has for years dominated and controlled Perlbinder Realty and its various affiliate entities, exploiting them for his own personal benefit. This complaint focuses solely on his gross mismanagement of one of those entities: the Company.

9.  Stephen and Mark jointly owned the Company until 2012 after which, in a series of transactions (i) Mark transferred 16% of the Company shares to his daughter Muffy's 2012 Family Trust, such that they together control half of its shares, and (ii) Stephen transferred 32% of the Company shares to two trusts established for the benefit of his daughters, including the Stephen Perlbinder 2016 Family Trust F/B/O Astrid Sabellarosa. In 2020, Stephen transferred his remaining 18% ownership interest in the Company to two other family trusts for the benefit of his daughters, including the ASR 2020 Family Trust.

10.  The Company has never had a shareholders' agreement, by-laws, or board of directors, and has never held shareholders' meetings or issued resolutions with respect to action

4

taken on its behalf. Rather, Mark as its President has exercised de facto control of the Company, usually acting unilaterally and without notice to Plaintiffs, and transferring Company funds to other entities under his control without explanation and for his own benefit.

II.    The Building at 210 East 86th Street

11.    The Company has as its sole asset that certain building located at 210 East 86th Street in New York, New York (the "Building"), purchased by the Company in 1982 using proceeds from a sale of the Perlbinder family's interest in another property. The Building is located on the southern side of East 86th Street between Second Avenue and Third Avenue on the Upper East Side of Manhattan. It is largely outfitted for medical office space, and is situated in a densely populated and upscale neighborhood minutes away from both the Q and 4/5/6 subway lines, and a few doors down from Fairway supermarket.

12.    The Building has nine floors on top of its ground level, as well as a basement altogether comprising approximately 98,000 square feet of usable commercial space, including a 23,000 square foot movie theater. The Company has struggled to lease its space under Mark's management. At present, *only three* of the Building's eleven occupiable floors are fully leased and, as discussed below, that number will be down to two by summer 2022. Six of the Building's occupiable floors sit entirely vacant, and many of them have been for years.

13.    Although it sits mostly vacant with relatively minimal rental income, the Building's taxes and staff still need to be paid, as do monthly payments on its $10 million mortgage, which was increased considerably when Mark inexplicably had the Building refinanced in 2015. Whatever revenue the Building generates, however, is quickly funneled out of the Company by Mark to Mark for his own personal benefit, as discussed below.

5

III.        Defendant Misappropriates Company Assets and Mismanages the Building

14.        The Building's high rate of vacancy is not the result of a temporary blip in market conditions, or some one-off downturn impacting the Building.  There is no reasonable excuse for the fact that the Building sits almost entirely vacant and has been unable to achieve anywhere close to full occupancy at any time.  Indeed, one floor in the Building—which Mark had constructed on top of the then-existing structure at significant cost to the Company—has *never* had a tenant, sitting vacant for more than two decades.  Another two floors in the Building have sat vacant for more than six years.

15.        Rather, the state of the Building is the result of Mark's misconduct: as described below, he will not pursue, let alone approve of, any transaction that does not benefit him personally and disproportionately.  He views the Company and the Building it owns as first and foremost a cash cow for his benefit, and operates it without any regard for the Company itself, or its shareholders.

A.        *Mark Demands Exorbitant Rent*

16.        The Building sits vacant due to Mark's insistence on demanding grossly above-market rent from prospective tenants and renewals of existing tenancies, and then refusing to budge until they walk away for comparable and more affordable space elsewhere.  Mark demands these over-the-top amounts irrespective of what the market will allow, over Plaintiffs' objections—in the extremely limited instances he bothers to consult with Plaintiffs at all.

17.        The most recent of many examples concerns a long-term tenant that Plaintiffs recently learned will be leaving the Building in June 2022 because it could not reach an affordable deal with Mark.  ENT Allergy Associates has rented the 9th floor of the Building since 2007 and has invested significant amounts of its own money to improve that floor's sprinkler system, signaling its intention to remain in the Building long-term.  Mark handled the renegotiation of its

6

expired lease without Plaintiffs, demanding $95 per square foot of space, even after ENT disclosed that it had found similar space just blocks away from the Building for at least $20 less per square foot. Due to Mark's irrational refusal to negotiate reasonably, ENT will be vacating the Building in June 2022, at which point *no more than a third* of the Building's office space will be occupied. Mark has not identified any replacement tenant, let alone one willing to pay what he unilaterally and exorbitantly demands.

B.     *Mark Demands Kickbacks As A Precondition To Company Transactions*

18.     With sky-high rental demands alienating potential tenants in the first instance, Mark will not consider any lease transaction at the Building that does not line his pockets one way or another. He does so without subtlety, openly demanding that he be personally paid out the vast majority of income resulting from any given potential lease. He has more than once identified potentially lucrative tenants for the Building, but offered to pursue lease agreements from them *only if* Plaintiffs first agree that he will personally receive a premium payment from the Company for doing so—often one as high as eighty percent of the income generated from the deal. Absent Plaintiffs' agreement that he will get a disproportionate cut, Mark has refused to pursue such opportunities, even when such opportunities are in the Company's and Shareholders' best interest.

19.     In other words, although he and his daughter own half the Company, under Mark's direction they will only agree to fill the Building's vacancies if Plaintiffs first agree to pay Mark the lion's share of lease proceeds. Mark has refused to consider potential transactions that would generate much-needed income without Plaintiff's agreeing to such premium payments first.

20.     In the same vein, Mark has also insisted that he—or, upon information and belief, his girlfriend—be paid a broker's fee or commission on potential lease transactions, often by demanding that any prospective tenants' brokers split their fee with an entity Mark uses for his personal purposes. Such a bizarre arrangement is hardly a viable offer to the brokers the Building

7

hopes to attract, further discouraging any deals from being executed. As a result, Mark will only work with those brokers that are willing to kick back these amounts to him, narrowing the pool of potential tenants considerably.

C.     *The Few Leases At the Building Were Structured To Benefit Mark Personally*

21.     The terms by which the Building's few existing tenants signed their leases are emblematic of Mark's self-dealing. For instance, Mark negotiated a lease with Weill-Cornell Hospital in 2013, obtaining high rental amounts that he now tries to use as leverage in his fruitless negotiations with other tenants. When that deal was executed, however, Mark made sure that both he and his girlfriend received "commission" payments off the top of any proceeds coming into the Company via that lease.

22.     Mark further agreed to have the Company bear the burden of building out the leased space for Weill Cornell, only to then cause the Company to hire his wholly-owned entities to purportedly handle the construction and design work, at prices he set unilaterally for his benefit. Mark employed no competitive bidding process, ensuring that his own entities would be hired.

23.     In similar fashion, Mark purports to have secured Mt. Sinai Health System as a new tenant for the Building, but only after having the Company execute an exclusive brokerage agreement—over Plaintiffs' objection—with a single, pre-selected broker. Rather than generally market the available space to achieve the best deal to benefit the Company, as Plaintiffs had requested, Mark will only work with one broker for one potential tenant, with his primary objective being to secure a personal commission out of whatever deal materializes.

D.     *Absent A Personal Upside, Mark Will Not Allow the Building's Space to be Leased*

24.     Without such an upside promised to him, Mark will not allow the Building's empty space to be leased. The main level of the Building contains a large movie theater, one was that occupied by City Cinemas for the better part of two decades as one of the Building's anchor

8

tenants. Mark caused the Company to engage in costly decades'-long litigation with City Cinemas, achieving nothing beyond eventually running them out of the Building in 2018. Although City Cinemas is no longer a tenant, the Company still has certain claims it may pursue against it; true to form, Mark has proposed that he will be the majority beneficiary of any eventual recovery.

25.     Meanwhile, in or around 2019, Plaintiff Astrid and Mark's daughter Muffy located and successfully negotiated a replacement tenant for the Building's theater space—quite a feat given the scarcity of tenants seeking to lease a multi-theater space. They secured a letter of intent to sign a lease that would generate $1.5 million in annual rent for the Building, negotiated and drafted a lease, and won the support of the East 86th Street Association, the board of which unanimously supported what it thought would be an asset for the neighborhood.

26.     Mark, however, envisioned a conversion of the theater into a multi-level retail space, which would have cost the Company several millions of dollars in renovations, and required a significant variance from the New York City Board of Standards and Appeals to complete. Of course, Mark declared to Plaintiffs that when he secured such a tenant, he intended to keep eighty percent of the resulting income for himself.

27.     Plaintiffs rejected any such split of proceeds, but nonetheless agreed that both they and Mark would explore both options simultaneously. When Mark was unable to secure an LOI or any substantive interest on his end, however, he decided to sabotage the theater deal Plaintiff Astrid and his own daughter Muffy were successfully bringing to fruition for the Building. Without notice to Plaintiffs, Mark had the Building's zoning variance application—filed by Astrid on the Company's behalf with Mark's permission—withdrawn, intentionally sabotaging the theater deal. The long delay Mark engineered pushed the negotiations with the potential theater tenant into the start of the 2020 pandemic, which then put the entire transaction on an indefinite

9

hold. Mark never secured any tenant, retail or otherwise, for the space, which has now sat empty for several years.

### E. What Income the Building Generates Is Used for Mark's Personal Benefit

28. The various commissions and payments that Mark gifts himself from the Company are apparently not enough: he also uses the Company to directly fund various other personal endeavors that yield no benefit in return. For example, Mark uses Company funds to lease himself a Porsche at $1,739 each month. Last year, Mark used $15,000 in Company funds to pay a welding contractor that had repaired the chimneys in Mark's summer home on Long Island. Under Mark's direction, the Company pays tens of thousands of dollars each month to fund a management company owned exclusively by Mark to pay Perlbinder Realty personnel and Mark's personal staff, who play no role with respect to management of the Building.

29. Worse, irrespective of the debt the Building carries, Mark has directed the Company to "lend" millions of dollars to various entities, some of which he exclusively owns and controls. While an accounting is necessary to determine the full amount of funds that Mark has misappropriated in connection with his self-dealing schemes, a cursory review of the Company's financial statements underscores the degree to which Mark uses the Company for his own benefit.

30. The Company's summary financial statement indicates more than $20 million in outstanding loans purportedly due to the Company, almost all of which were made to entities under Mark's control, and some of which were made to Mark personally or to one of the entities he exclusively controls for his own benefit. As but one example, when Mark had the Building refinanced in 2015, resulting in an additional $2.3 million of debt on the property, he then had the Company "loan" him roughly $600,000 of those proceeds. His

10

personal use of those Company funds demands explanation in and of itself, but even more egregiously, Mark then directed the Company's accountant to reclassify that loan amount as a "distribution" on the Company's books, albeit one that Plaintiffs never received.

31.     Of course, Mark did this without notice to, or consent from, Plaintiffs.  Nor did Mark seek Plaintiffs' consent to have the Company transfer more than $2.8 million to himself and his management entity, or to shuffle around tens of millions of dollars in Company funds amongst various Perlbinder-affiliated entities that he controls.  None of these "loans" have been paid back to the Company, and none of them appear to be generating interest for the Company's benefit in the interim.

### F.  The Sorry Physical and Financial State of the Building

32.     Where the rest of those refinancing funds were directed remains a mystery, as they certainly were not utilized for Building maintenance: its elevators and sprinklers are long overdue for updating and remodeling—and have received numerous safety violations as a result—and its adjacent sidewalk is in urgent need of repair.  At Mark's direction, neither the proceeds of the 2015 refinancing, nor any of the Building's annual rental income, have been utilized with respect to any of these costs.

33.     Nor has any of that income been used for distributions to the Company's shareholders, considering Plaintiffs haven't received any regular distributions since at least 2019.  What distributions Plaintiffs have received in recent years have been minimal.

34.     The Building, meanwhile, is in financial disarray: there is no quarterly reporting, and no management or accounting protocols in place to monitor costs and expenses.  It has no funds set aside for future capital expenditures, and no scheduled amounts reserved for Building upkeep.

11

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

35.     Plaintiffs repeat and reallege the foregoing Paragraphs, as if fully set forth herein.

36.     The allegations in this complaint concern Mark's behavior since the refinancing of the Building in 2015 and through the present day. Stephen, who was an eighteen percent shareholder of the Company until 2020, brings this action individually and pursuant to BCL §626 derivatively on behalf of the Company, which is named as nominal defendant solely in a derivative capacity.

37.     The Stephen Perlbinder 2016 Family Trust F/B/O Astrid Sabellarosa has been a sixteen percent shareholder of the Company since at least 2012. The ASR 2020 Family Trust has been a nine percent shareholder of the Company since 2020. Astrid brings this action individually in her capacity as Trustee of both aforementioned Trusts, and pursuant to BCL §626 derivatively on behalf of the Company, which is named as nominal defendant solely in a derivative capacity.

38.     Stephen will adequately and fairly represent the Company in enforcing and prosecuting its rights, and Astrid, in her capacity as Trustee of the Stephen Perlbinder 2016 Family Trust F/B/O Astrid Sabellarosa and the ASR 2020 Family Trust, will fairly represent the Company in enforcing and prosecuting their rights.

39.     Demand to the Company would be futile given that Mark effectively dominates and exercises *de facto* control over the Company both as its President and, with his daughter Muffy over whom he exercises control, as its fifty percent shareholder. Demanding that Mark join suit against himself would also be futile, as this complaint alleges that he has breached his fiduciary duties to the Company and diverted its assets for his own personal benefit. Furthermore, demand would be futile because the challenged misconduct is so egregious on its face that it could not have been the product of sound business judgment.

12

### FIRST CAUSE OF ACTION
### Breach of Fiduciary Duty
### (*Company Derivative Claim*)

40.　　Plaintiffs repeat and reallege the foregoing Paragraphs, as if fully set forth herein.

41.　　Defendant Mark Perlbinder is a shareholder and President of the Company.

42.　　Defendant Mark Perlbinder exercises de facto control of the Company, usually acting unilaterally and without notice to Plaintiffs.  He manages and makes all decisions for the Company, including, without limitation, decisions relating to the leasing of the Building's office space, the Building's maintenance and finances, as well the payment of taxes and distributions to Members.  Together with his daughter, Muffy Flouret, he controls half of the Company's shares.

43.　　As President, and as a shareholder in control of half the Company's shares, Mark has fiduciary obligations to the Company.  He owes the Company fiduciary duties of good faith, trust, loyalty, and due care, and he is, and at all applicable times has been, required to control and manage it in a fair, just, honest, and equitable manner, to act in furtherance of the best interests of the Company, to benefit all shareholders equally and not to act in furtherance of his personal interest or benefit, and to exercise good faith and diligence in the administration of the affairs of the Company, the use and preservation of its property and assets, and in achieving the highest obligations of fair dealings.

44.　　Mark has repeatedly breached his fiduciary duties by self-dealing and engaging in self-interested transactions that benefit himself personally, while harming the Company and misappropriating its assets for himself.  As set forth in this Complaint, Mark runs the Company and manages the Building so as to benefit himself by engaging in various self-dealing schemes. He has caused himself to be paid commissions and/or premium payments out of transactions that were meant to benefit the Company, and refused to allow transactions that would be in the Company's interest if such transactions don't disproportionately benefit him personally.  He has

13

further caused the Company to transfer millions of dollars to him or to entities under his control in the guise of disproportionate and unauthorized distributions or as "loans" that have either gone unpaid, or been wiped off the books altogether. He has also used the Company to pay for his personal expenses and to enter into contracts with his various entities at above-market prices.

45. By virtue of the foregoing, Mark has flagrantly breached his fiduciary duties to the Company. Mark's actions have been in bad faith and constitute gross negligence. Furthermore, he has put the Company at substantial legal and financial risk, siphoning off its assets for his own personal benefit, and significantly diminished the value of the Building.

46. As a direct and proximate result of the aforesaid breaches of fiduciary duty, the Company has been damaged in an amount to be determined at trial, but in no event less than $25,000,000.00 plus interest thereon, together with the costs and disbursements of this action, including reasonable attorneys' fees.

### SECOND CAUSE OF ACTION
### Breach of Fiduciary Duty
### (*Plaintiffs' Direct Claim*)

47. Plaintiffs repeat and reallege the foregoing Paragraphs, as if fully set forth herein.

48. Defendant Mark Perlbinder is a shareholder and President of the Company.

49. Defendant Mark Perlbinder exercises de facto control of the Company, usually acting unilaterally and without notice to Plaintiffs. He manages and makes all decisions for the Company, including, without limitation, decisions relating to the leasing of the Building's office space, the Building's maintenance and finances, as well the payment of taxes and distributions to Members. Together with his daughter, Muffy Flouret, he controls half of the Company's shares.

50. As President, and a shareholder in control of half the Company's shares, Mark has fiduciary obligations to the Company's shareholders. He owes them fiduciary duties of good faith, trust, loyalty, and due care, and he is, and at all applicable times has been, required to control and

14

manage it in a fair, just, honest, and equitable manner, to act in furtherance of the best interests of the Company for the shareholders' equal benefit, and not to act in furtherance of his personal interest or benefit, and to exercise good faith and diligence in the administration of the affairs of the Company, the use and preservation of its property and assets, and in achieving the highest obligations of fair dealings.

51.     Mark has repeatedly breached his fiduciary duties by self-dealing and engaging in self-interested transactions that benefit himself personally, while harming the Company and its Members.  As set forth in this Complaint, Mark runs the Company and manages the Building so as to benefit himself by engaging in various self-dealing schemes.  He has caused himself to be paid commissions and/or premium payments out of transactions that were meant to benefit the Company and its shareholders, and refused to allow transactions that would be in the Company's interest if such transactions don't disproportionately benefit him personally.  He has further caused the Company to transfer millions of dollars to him or to entities under his control in the guise of disproportionate and unauthorized distributions or as "loans" that have either gone unpaid, or been wiped off the books altogether.  He has also used the Company to pay for his personal expenses and to enter into contracts with his various entities at above-market prices.

52.     By virtue of the foregoing, Mark has flagrantly breached his fiduciary duties. Mark's actions have been in bad faith and constitute gross negligence.  Furthermore, he has put the Company at substantial legal and financial risk, siphoning off its assets for his own personal benefit, and significantly diminished the value of the Building.

53.     As a direct and proximate result of the aforesaid breaches of fiduciary duty, the Company has been damaged in an amount to be determined at trial, but in no event less than $25,000,000.00 plus interest thereon, together with the costs and disbursements of this action, including reasonable attorneys' fees.

15

### THIRD CAUSE OF ACTION
### Unjust Enrichment
### (*Company Derivative Claim*)

54.    Plaintiffs repeat and reallege the foregoing Paragraphs, as if fully set forth herein.

55.    As set forth in the Complaint, Mark has been personally enriched by diverting Company funds to himself for his own personal use and enjoyment.  Such use and enjoyment was at the Company's expense, insofar as Company funds—which should have been used to renovate the Building's elevators, sprinklers, or adjacent sidewalk, or otherwise pay down the Building's accruing debt—were instead diverted solely for Mark's own personal benefit.

56.    Mark's actions were unjust, deceitful, and undertaken with the specific purpose of enriching himself at the expense of the Company and its shareholders.

57.    It is against equity and good conscience to permit Mark to retain the benefit of his misappropriation of corporate funds and thus requires a restitution of the funds.

58.    As a direct and proximate result of the foregoing, Mark has been unjustly enriched and is required to pay restitution in an amount to be determined at trial, but in no event less than $25,000,000.00 plus interest thereon, together with the costs and disbursements of this action, including reasonable attorneys' fees.

### FOURTH CAUSE OF ACTION
### Unjust Enrichment
### (*Plaintiffs' Direct Claim*)

59. Plaintiffs repeat and reallege the foregoing Paragraphs, as if fully set forth herein.

60.    As set forth in the Complaint, Mark has been personally enriched by diverting Company funds to himself for his own personal use and enjoyment.  Such use and enjoyment was at the Company's shareholders' expense, insofar as Company funds—which should have been used improve the Building or otherwise make distributions proportionately to the Company's shareholders—were instead diverted solely for Mark's own personal benefit.

16

61.     Mark's actions were unjust, deceitful, and undertaken with the specific purpose of enriching himself at the expense of the Company and its shareholders.

62.     It is against equity and good conscience to permit Mark to retain the benefit of his misappropriation of corporate funds and thus requires a restitution of the funds.

63.     As a direct and proximate result of the foregoing, Mark has been unjustly enriched and is required to pay restitution in an amount to be determined at trial, but in no event less than $25,000,000.00 plus interest thereon, together with the costs and disbursements of this action, including reasonable attorneys' fees.

### FIFTH CAUSE OF ACTION
### Conversion of Funds
### (*Company Derivative Claim*)

64.     Plaintiffs repeat and reallege the foregoing Paragraphs as if fully set forth herein.

65.     In 2015, the Building was refinanced causing an excess $2.3 million in debt on the Company's books and records.  At Mark's instruction and without notice to or permission from the Company or a majority of its shareholders, at least $600,000 of those proceeds was transferred to Mark or to one of the entities he controls for his own benefit.

66.     In addition, the Company's books and records show at least $22 million in unexplained and unauthorized transfers of Company assets to Mark or entities under his control.

67.     Such unauthorized use of Company assets and funds damaged the Company in an amount to be determined at trial, together with interest and costs.

### SIXTH CAUSE OF ACTION
### Declaratory Judgment Pursuant to BCL §§713, 714
### (*Company Derivative Claim*)

68.     New York Business Corporation Law ("BCL") Sections §§713, 714 forbid transactions between a corporation and its directors, or between a corporation and any other entity in which one of more of its directors have a substantial financial interest, and provide that such

17

transactions be voided. While the BCL recognizes circumstances where such self-interested transactions may be approved by the non-interested shareholders of a corporation upon good faith disclosure, no such approval or disclosure has occurred here.

69. As described above, Mark directed the Company to transfer millions of dollars to himself and to entities under his control in the guise of unsecured and undocumented "loans," and did so without disclosure to or approval by the other shareholders of the Company. Mark also caused the Company to retain for his own benefit entities under his control to perform services without disclosure to or approval by the other shareholders of the Company.

70. All such self-interested transactions were not fair and reasonable to the Company, and were not undertaken in good faith for the Company's best interest. They are thus null and void pursuant to BCL §713(a), and Plaintiffs seek a judgment from this court declaring same.

### SEVENTH CAUSE OF ACTION
### Liability Pursuant to BCL §720
### (*Company Derivative Claim*)

71. BCL Section §720 authorizes Plaintiffs to bring a cause of action against Defendant to compel him to account for his conduct as President of the Company with respect to his non-performance of his duties to the Company, and his taking of Company assets for his own benefit. The BCL further authorizes Plaintiff to bring a cause of action against Defendant set aside his unlawful transfer of Company assets to himself for his benefit.

72. As described above, Mark directed the Company to transfer millions of dollars to himself and to entities under his control in the guise of unsecured and undocumented "loans," and did so without disclosure to or approval by the other shareholders of the Company. Mark also caused the Company to retain for his own benefit entities under his control to perform services without disclosure to or approval by the other shareholders of the Company.

18

73.     All such self-interested transactions were not fair and reasonable to the Company, and were not undertaken in good faith for the Company's best interest.  They are precisely the sort of actions that BCL §720 contemplates as actionable violations to be adjudicated in this court.

## EIGHTH CAUSE OF ACTION
### Equitable Accounting
### (*Company Derivative Claim*)

74.     Plaintiffs repeat and reallege the foregoing Paragraphs, as if fully set forth herein.

75.     As set forth above, Mark owes fiduciary duties to the Company and its shareholders of good faith, trust, loyalty, and due care, and he has always been required to control and manage the Company in a fair, just, honest, and equitable manner, to act in furtherance of the best interests of the Company, to benefit all shareholders equally and not act in furtherance of his personal interest or benefit, and to exercise good faith and diligence in the administration of the affairs of the Company, the use and preservation of its property and assets, and in achieving the highest obligations of fair dealings.

76.     Mark has repeatedly breached these fiduciary duties by self-dealing and engaging in self-interested transactions that benefit himself personally, while harming the Company and its shareholders.

77.     The finances of the Company are complex, and have been maintained exclusively by Mark, such that a detailed analysis of how much of the Company's assets have been diverted for his benefit will be difficult, if not impossible, without Mark's provision of an accounting with respect to his diversion and dissipation of corporate assets.  Said accounting will require an analysis of the records of Mark's own various entities to which he has diverted funds.  Mark has purposely hidden behind a convoluted web of corporate entities, and thus, equity demands that Mark be called to account therefor.

19

78. A formal demand for an accounting would be futile insofar as Mark has denied any wrongdoing. The corporate records that have been provided to Plaintiffs are incomplete, contain various unexplained transfers, and raise further questions for which Mark must be called to account.

79. Accordingly, Plaintiffs are entitled to an order for Mark to equitably account for his diversion and dissipation of the corporate assets of the Company.

### NINTH CAUSE OF ACTION
### Permanent Injunction
### (*Company Derivative Claim*)

80. Plaintiffs repeat and reallege the foregoing Paragraphs, as if fully set forth herein.

81. Mark has used his position as President and *de facto* fifty percent shareholder of the Company to engage in blatant self-dealing and to misappropriate corporate assets for his own benefit. He has refused to allow the Company to benefit from transactions that didn't benefit him in some personal capacity, and used the Company to pay for his personal expenses and to enter into contracts with his various entities at above-market prices. These actions constitute egregious breaches of his fiduciary duties.

82. Mark remains in control of the Company. Mark denies any wrongdoing, even as he continues to block Plaintiffs' efforts to lease the Building's space, use the Building's income to make needed repairs, and ensure that it is financially sound. There is imminent risk that absent entry of an injunction, Mark will continue acting in his own self-interest to the detriment of the Building's and the Company's, and will continue to misuse Company assets.

83. Plaintiffs have no remedy at law.

84. Accordingly, Plaintiffs are entitled to an injunction permanently enjoining Mark from (i) transferring any funds out of the Company except in the ordinary course of the Building's operation; (ii) negotiating any leases or potential leases without full notice to and participation by

20

Plaintiffs, and (iii) executing any leases, brokerage agreements, or other documents on the Company's behalf without written consent from the Plaintiffs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully prays for the following relief:

A.     On the First Cause of Action on behalf of the Company against Defendant, for an amount to be determined at trial, but in no event less than $25,000,000.00 plus interest thereon, together with the costs and disbursements of this action, including reasonable attorneys' fees.

B.     On the Second Cause of Action against Defendant, for an amount to be determined at trial, but in no event less than $25,000,000.00 plus interest thereon, together with the costs and disbursements of this action, including reasonable attorneys' fees.

C.     On the Third Cause of Action on behalf of the Company against Defendant, for an amount to be determined at trial, but in no event less than $25,000,000.00 plus interest thereon, together with the costs and disbursements of this action, including reasonable attorneys' fees.

D.     On the Fourth Cause of Action on behalf of the individual Plaintiffs against Defendant, for an amount to be determined at trial, but in no event less than $25,000,000.00 plus interest thereon, together with the costs and disbursements of this action, including reasonable attorneys' fees.

E.     On the Fifth Cause of Action on behalf of the Company against Defendant, for an amount to be determined at trial, but in no event less than $22,000,000.00 plus interest thereon, together with the costs and disbursements of this action, including reasonable attorneys' fees.

F.     On the Sixth Cause of Action on behalf of the Company against Defendant, for an order declaring the self-interested transactions he engineered between the Company and either himself or entities under his control to be null and void, and thereby unwound for the benefit of the Company and its shareholders;

21

G.  On the Seventh Cause of Action on behalf of the Company against Defendant, for an amount to be determined trial, but in no event less than $25,000,000.00 plus interest thereon, together with the costs and disbursements of this action, including reasonable attorneys' fees;

H.  On the Eighth Cause of Action against Defendant on behalf of both the Company and the individual Plaintiffs, for an order for Defendant to equitably account as a fiduciary for his diversion and dissipation of the corporate assets of the Company.

I.  On the Ninth Cause of Action on behalf of the Company against Defendant, for an injunction permanently enjoining Mark from (i) transferring any funds out of the Company except in the ordinary course of the Building's operation; (ii) negotiating any leases or potential leases without full notice to and participation by Plaintiffs, and (iii) executing any leases, brokerage agreements, or other documents on the Company's behalf without written consent from the Plaintiffs.

J.  An award of costs and expenses incurred in bringing this action, including reasonable attorneys' fees; *and*

K.  Such other and further relief as the Court deems just and proper.

Dated: New York, New York
      January 27, 2021

           **STEIN ADLER**
           **DABAH & ZELKOWITZ LLP**

      By:       */s/ Noam Besdin*
              Adam J. Stein, Esq.
              Noam Besdin, Esq.
         1633 Broadway, 46th Floor
        New York, New York 10019
        (212) 867-5620
             *Attorneys for Plaintiffs*

22

## VERIFICATION

STATE OF NEW YORK    )
                              )  ss.
COUNTY OF NEW YORK  )

        ASTRID SABELLAROSA, being duly sworn, deposes and says:

        1.     I am a Plaintiff in the above-titled action in my capacity as Trustee of the ASR 2020 Family Trust and the Stephen Perlbinder 2016 Family Trust F/B/O Astrid Sabellarosa (the "Trusts").

        2.     I am also the daughter of Stephen Perlbinder, a Plaintiff in the above-entitled action. Last year, my father granted me a durable power of attorney to act on his behalf in connection with the various Perlbinder family investments, including 210 East 86th Street Corp., the above-captioned nominal defendant. On my father's behalf, I have for many years regularly visited the Perlbinder Realty offices, conferred with its employees, and reviewed its books and records. As such, I have personal knowledge of the matters set forth in the Verified Complaint.

        3.     I have read the foregoing Verified Complaint and the same is true to my knowledge, except as to matters which are therein stated to be alleged on information and belief and as to those matters I believe them to be true.

        4.     I make this verification in my capacity as Trustee of the Trusts. I also make this verification as my father's agent. The reason this verification is additionally made by me pursuant to CPLR § 3020(d)(3) as my father's agent and not by my father personally is because all the material allegations of the Verified Complaint are based upon my personal knowledge and the book and records I have reviewed.

                                              _____
                                                Astrid Sabellarosa

Sworn to me on this
27th day of January 2022:

BARBARA J HILL
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01HI6242110
Qualified in Orange County
Commission Expires May 31, 2023