**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

STEPHEN PERLBINDER and ASTRID SABELLAROSA
as Trustee of the ASR 2020 FAMILY TRUST and the
STEPHEN PERLBINDER 2016 FAMILY TRUST F/B/O
ASTRID SABELLAROSA, individually and derivatively on
behalf of 210 EAST 86TH STREET CORP.,

                         Plaintiffs,

        *-against-*

BARTON MARK PERLBINDER,

                       Defendant.

        *-and-*

210 EAST 86th STREET CORP.,

               Nominal Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Index No. 655732/2021

**AFFIDAVIT OF ASTRID**
**SABELLAROSA IN**
**SUPPORT OF EMERGENCY**
**MOTION FOR THE**
**APPOINTMENT OF A**
**TEMPORARY RECEIVER**
**AND INJUNCTIVE RELIEF**

STATE OF NEW YORK     )
                          ) ss.:
COUNTY OF NEW YORK   )

      **ASTRID SABELLAROSA**, being duly sworn, deposes and states:

      1.     I am a Plaintiff in this action in my capacity as Trustee of the ASR 2020 Family

Trust and the Stephen Perlbinder 2016 Family Trust f/b/o Astrid SabellaRosa (the "Trusts"), which

collectively own 25% of the shares of nominal defendant 210 East 86th Street Corporation (the

"Company"), the owner of the building located at 210 East 86th Street Corp. (the "Building").

      2.     I respectfully submit this Affidavit in support of Plaintiffs' emergency application

for the appointment of a temporary receiver and for preliminary injunctive relief.

## I.  **INTRODUCTION**

3.      Over a year ago, I authorized my attorneys to commence this lawsuit in the hopes of bringing order to the Company and its management of the Building, which is not properly functioning.  Despite our filing of the Complaint, and the continued protests of my side of the family, my Uncle Barton Mark Perlbinder ("Mark"), who holds only a 34% minority interest, has continued to exercise *de facto* control in managing the Company and unilaterally directing its finances for his own personal benefit.  The resulting corporate chaos and illegal acts (which I explain below) have only worsened in recent months, and I have been left with no choice but to now authorize this emergency motion seeking the appointment of a temporary receiver and injunctive relief.

4.      The immediate reason for my bringing this motion is because we can no longer even lease the vacant spaces in the Building, which contains many vacant medical offices.  Due to Mark holding an effective veto power over new leases and renewals, the Building's vacancy rate has now reached roughly 67%.  In recent months, Mark has preconditioned his approval of new leases as well as routine lease *renewals* on his being paid personal brokerage commissions even though he has no brokerage agreement with the Company and is supposed to be acting as our fiduciary.  Mark is now openly holding the Company hostage to his extortionate demands, with the result being that the Building will continue to lose its tenants "unless and until" Mark is paid the illegal brokerage commissions.  Our annual rent roll, which was $7.86MM in 2016, is set to soon decrease to an unsustainable $2.3MM as a direct result of Mark's outrageous actions.  I have thus been left with the choice of either letting Mark act illegally and beyond his corporate authority as a 34% minority shareholder or filing this emergency motion for a temporary receiver in the hopes of stabilizing the Company and Building, which are at risk of being unable to meet their obligations.

5.      Since the filing of the Complaint, the Company has acted illegally in multiple ways. At Mark's direction, and over my side of the family's objection, the Company has made millions of dollars in dividend payments, "loans", as well payments for Mark's personal expenses without documentation or authorization.  In April 2022, Mark directed a unilateral payment of $125,000 from the Company to Perlbinder Construction LLC when attempting to "cure" his contempt of court for taking frozen funds in violation of a preliminary injunction—even though our accountant has told me that unilateral dividend payments to shareholders could result in the Company losing its S Corp status, which could cause all shareholders to owe millions in back taxes.  Similarly, even though we filed the Complaint in this action objecting to Mark having the Company pay for his luxury car, Mark simply went ahead last week and signed a new lease on behalf of the Company for a new Porsche with a value of over $115,000.  Despite my attorneys sending formal objection letters, Mark has also continued in recent months to have the Company make millions in unauthorized "loans" to other companies in which he exercises control and holds interests, including MDM Management, Inc., an entity solely owned by Mark, which he uses to pay personal expenses such as his chef and staff at his Hamptons beach house.

6.      The Building's operations are equally rife with continuing illegality that puts its tenants and other occupants at risk. After Mark did renovations to the Building over a decade ago, he never obtained a Temporary Certificate of Occupancy for several floors, yet he has for years simply rented the space to a medical office that is open to the public.  For years, Mark has also failed to cure continuing violations requiring the installation of sprinklers, another serious safety and liability issue.  Mark is fond of speaking of his real estate experiences from the 1960s, and he continues to manage the family properties as if we were still operating in that era when enforcement of laws and regulations was much laxer.  Mark's actions put other shareholders at risk of catastrophic liability in the event that tenants or occupants are harmed by his actions.

7.      I previously directed my attorneys to try to resolve these matters privately. Unfortunately, we have seen no meaningful progress, with the pervasive illegality at the Company becoming even more dire in recent months.  It is with reluctance that I have authorized my attorneys to bring this motion to seek relief on an emergency basis.  Absent judicial relief, the Company is in immediate danger of failing and various liabilities. We will continue losing our remaining tenants, operating in violation of laws and regulations, and having millions of dollars misappropriated through a web of entities for so-called "loans" that are not properly documented, and which will take years to untangle (if that is even possible).

8.      As explained below, the Company—which has no shareholders agreement, board, elected officers, and commingled resources and finances—desperately needs a receiver to oversee its dysfunctional finances, lawfully operate, and to protect its shareholders and tenants from the consequences of Mark's actions.

## II.    **BACKGROUND**

### A.    **My Involvement with Perlbinder Realty**

9.      For many years, my father Stephen Perlbinder ("Stephen"), now aged 82, permitted his younger brother, Barton Mark Perlbinder, now aged 79, to handle the day-to-day management of the Perlbinder family properties that the two brothers jointly owned.  My father Stephen was not closely involved in the family business and trusted his brother Mark to act as a fiduciary and to protect the family properties.

10.     Over the past fifteen (15) years, however, my side of the family has grown more and more concerned with Mark's personal and professional actions, which have only worsened as Mark has grown older.  Mark's erratic and gross mismanagement of the family properties has become increasingly apparent over the past decade and resulted in his personal tax issues, disputes with our cousins (the Wests and Bergers) with whom we jointly own properties, massive tax arrears

on jointly owned properties, as well as chronic vacancies, lawsuits, violations, and losses at the family properties. This is now a matter of public record.

11. It is against this backdrop of increasing dysfunction that I have in recent years become more involved with Perlbinder Realty in an effort to protect the interests of my father, my sister, and the Trusts of which I am a trustee and beneficiary. I currently work at the offices of Perlbinder Realty, which manages the family properties. In this capacity, I regularly confer with Perlbinder Realty's employees, professionals (such as brokers and attorneys), and review its books and records as they relate to the Perlbinder family investments. This Affidavit is based upon knowledge obtained in that capacity.

12. My increasing involvement with the Company has been out of necessity. I am an architect by training, the mother of two children, and serve on a school board. In stepping in at Perlbinder Realty, my objective has always been to protect the family properties, and to put them under the control of competent management. I would have no objection to the entire portfolio of family properties being placed with third-party management or in receivership to end the dysfunction, self-dealing, and unnecessary wasting of family assets. Mark's own words and actions demonstrate that he is not remotely fit to act as a fiduciary or to lawfully manage the family properties, which are now losing millions of dollars each year in total.

**B.** **The Company**

13. 210 East 86th Street Corp. is a New York corporation formed in 1982 for the purpose of purchasing the Building located at 210 East 86th Street. A copy of the Company's Certificate of Incorporation is attached at Exhibit 1.

14. Until 2012, Stephen and Mark each held fifty (50%) stakes in the Company.

15. Since 2012, Stephen and Mark have each made transfers for the benefit of their children, with fifty percent (50%) now being held by each side of the family, as set forth below:



16. The Company does not have a shareholders' agreement or bylaws. I am unaware of any annual meetings of shareholders ever having been held, directors ever having been elected, or corporate executives ever appointed. The Company does not have a board of directors.

17. The Secretary of State's website indicates that no biennial statement has been filed for the Company since July 2, 2018, and that the Company is "Past Due."

18. For many years, Mark has exercised practical control over the Company's operations and held himself out as its "President" despite never being elected by shareholders. Mark signs contracts that he claims bind the Company and then takes unilateral action without notice to my side of the family when he sees fit. Last year, Mark went so far as to sign a brokerage agreement as "President" over the objection of my side of the family holding 50% of shares. Mark simply took me off the signature block before signing on behalf the Company.

19.     Mark resents having to even deal with me.  In his testimony in the parallel litigation, he has dismissively referred to me as "the daughter" and one of "the girls."  (NYSCEF Index. No. 656259/2021, Doc. Nos. 172 at 54:22; 145 at 198:25).

20.     Early in my tenure at Perlbinder Realty, I requested meetings to discuss the serious issues facing the family properties, in the same way that I participate in family meetings with our cousins (the Wests and Bergers) on the properties we jointly own with them.  I am the only Perlbinder family member to regularly meet with our cousins, with whom Mark's relationship has deteriorated.  Mark dismissively responded to my requests for similar Perlbinder family meetings and to work together by saying that my side of the family should liquidate our interests: "Please present your plan to liquidate.  You and I can't function together.  Your approach is totally alien from mine."  A copy of this email is attached as Exhibit 2.

21.     Although she receives a substantial salary, Mark's daughter Muffy Flouret (whose trust holds a 16% interest in the Company) does not actually work for Perlbinder Realty and is no longer closely involved with the Company.  At the outset of this lawsuit, Muffy emailed my father to ask that he reconsider this legal action since Mark is, in her words, "ill" and "needs help."

22.     In 2019, Muffy and my counsel engaged in discussions to finally elect a proper board of directors to oversee management of the Company and to hold Mark accountable. Unfortunately, Muffy and I could not reach agreement on moving forward with finally electing a proper board of directors.  And, now, Muffy has instead opted to align with her father in the current family lawsuits.  The result is that Mark continues to exercise practical control over the deadlocked Company by directing its actions.  The family accountant David Katzenberg has told me that Muffy will never legally oppose Mark, now aged 79, due to the risk that Mark will retaliate by disinheriting Muffy.  Muffy is in a totally conflicted position and will not take the necessary steps to stop her father's gross mismanagement and obvious self-dealing.

23.    Muffy is thus now represented by the same counsel as Mark, and in March of this year, joined in his lawsuit in Florida to disqualify me as a Trustee of the Julius Perlbinder Family Trust.  In the Florida lawsuit, Muffy claims that my filing of the parallel litigation at 400 East 54th Street on behalf of the Trust (which Mark had not paid a distribution in six (6) years) was "malicious" and not in the best interests of the Trust.  Mark and Muffy's contention in the Florida lawsuit is ridiculous.  I believe this demonstrates that Muffy is under the control of her father.

24.    The Company's financial management and controls have since its inception in 1982 been entrusted to David Katzenberg, who has been the family accountant for approximately fifty (50) years.  David is likewise under Mark's control and takes instruction from him.  In 2009, David was forced to surrender his CPA license due to tax issues, and earlier this year, he facilitated Mark's contempt of court by using funds frozen by the Court to pay Mark's personal expenses despite David knowing the funds were frozen by the Court.  When I confronted him, David directly told me he made the transfers because he thought I would never see the bank records and that the contempt would go undetected.

25.    David Katzenberg does the accounting for the Company and creates very basic unaudited annual financial statements and tax returns.  These documents are insufficient for shareholders to fully understand the full financial condition of the Building and are typically prepared only at the last minute. David only provides annual financial statements after I specifically request them.  The Company does not otherwise prepare interim financial reports, budgets for operations and capital expenditures, or shareholder reports on finances or operations. The Company's bookkeeping and reporting is inadequate and makes it difficult to ascertain whether expenses are legitimate and reasonable.  In recent months, I have come across numerous red flags in our accounting records.  For example, I came across large unexplained payments to employees that, when confronted, David told me were "loans" for the employees' personal

purposes (totaling up to six figures for one such employee). Several weeks ago, David hurriedly asked me to sign a $5,000 check for a "loan" to a parking garage attendant who David told me was "great." David has no authority to make such loans to employees without first consulting all shareholders. In recent months, I have also learned that certain leased apartments do not appear on our rent rolls at all, with no indication of where the rents are going. This is all extremely disturbing. Based upon these and other issues, I have serious concern that our financial controls are so inadequate as to make the Company ripe for undetected theft that will be impossible to ever get to the bottom of in an accounting given our poor recordkeeping.

26. The Company typically only has operating funds in its bank account and does not reserve for capital expenditures or other long-term liabilities. Through the years, Mark has refused to establish reserves for any of the Perlbinder family properties, with the result being that Mark constantly responds to entirely predictable cashflow "emergencies" by directing David to "find" money to meet immediate cash needs. The resulting web of literally hundreds of intercompany transfers and commingling of family resources and assets (without full documentation and recordkeeping) is extremely difficult keep track of or to reconstruct. It will be very difficult to untangle all of this after-the-fact in an accounting, particularly without the assistance of David, who is now seventy-eight (78), with no plan in place for succession or continuity.

### C. **The Building**

27. The Building is located at 210 East 86th Street between Second and Third Avenues (Block 1531, Lot 40) in the Upper East Side of Manhattan (the "Property"). It was originally constructed in 1966 and has not been modernized. The front of the Building is depicted below:



28.     The Building is situated on a block-through lot and has nine (9) stories in its tower

facing East 86th Street, with a three-story rear that extends to East 85th Street and was utilized as

a movie theater until February 2019. A cross-section of the Building's interior is depicted below:



29.     The Building contains roughly 100,000 square feet of rentable space, including:

a.      An approximately 14,000 square-foot cellar space currently occupied by Weill Cornell Medical Center (the "Cellar").

b.      Two vacant retail units totaling roughly 4,000 square feet with entrances facing East 86th Street (the "Retail Units").

c.      A vacant quad movie theater totaling approximately 23,000 square feet (the "Movie Theater").

d.      A lobby and roughly 61,000 square feet of Class C medical office spaces on the second through ninth floors (the "Medical Offices").

30. The Building is situated in an upscale neighborhood just minutes away from both the Q and 4/5/6 subway lines, the cross-town M-86 bus line, and a few doors down from Fairway Supermarket, Whole Foods, Target, H&M, Sephora, Urban Outfitters, Petco, and Athleta, among others.

31. The Building is situated on a split zoning lot. The front tower of the Building facing East 86th is zoned commercial C2-8A, which allows for a range of residential, community facility, and retail uses. The theater portion of the Building that extends to East 85th Street is zoned residential R8B, under which commercial uses are not permitted as of right. The theater has operated under a zoning variance.

32. Between 2013 and 2021, the Building had its own dedicated on-site building manager, Deborah Leonard, an experienced real estate professional. By 2021, Debbie was being paid roughly $400,000 annually, along with benefits and an annual bonus. While my side of the family contended that Debbie was being overpaid, since her retirement last year, Mark has made no efforts to hire a replacement on-site building manager at a more reasonable salary to continue overseeing the Building's operations. As a result, the Building no longer has an experienced and dedicated on-site building manager, and the Building's many issues have no one directly responsible for them. I and others in the office (who are already stretched thin) are left to attend to issues that should be handled in the first instance by a dedicated asset manager. Given the current family acrimony, business proposals must often go through litigation counsel in costly, slow-moving, and adversarial correspondence, with Mark sometimes responding to my emails by copying his own litigation counsel. I do not believe Mark would agree to any replacement manager who I would suggest.

33. The Building has an onsite superintendent, Jorge Hernandez, yet Mr. Hernandez also works as the superintendent at 1291 Lexington Avenue, which is owned by Mark's daughter Muffy. The Company is thus stuck paying for the ***entire*** salary of Mr. Hernandez, even though he works for Muffy's separate building that my side of the family has no interest in.

III. **MARK'S REFUSAL TO RENT THE VACANT SPACES**

34. Despite being in a prime location, the Building currently faces a crisis of vacancies. Even though there remains strong demand for commercial space—and, in particular, medical space—in the Upper East Side, the Building has a roughly 67% vacancy rate due to Mark's refusal to work with my side of this family, and his insistence on receiving brokerage commissions and personally profiting as a precondition to entering into leases and renewals. The result is that the Building's most valuable spaces now unnecessarily sit vacant:

a. Both of the Building's two (2) Retail Units facing 86th Street are vacant.

b. The Movie Theater has been vacant since early 2019.

c. The Building has only three (3) remaining tenants in its Medical Offices. Nineteen (19) of the Building's twenty-three (23) Medical Offices totaling roughly 41,000 square feet are now vacant.

d. Six of the nine floors of the Building now sit entirely vacant, and several have sat vacant for many years. For example, the Seventh Floor has been vacant since 2013 and the Eighth Floor has never been rented since it was built.

35. Given these excessive vacancies, the rent roll of the Building has decreased dramatically in recent years. In 2016, the Building took in $7.86 million in rental income. With the departure of yet another tenant this month, the rent roll will be down to $338,000 a month, which amounts to roughly $4MM annualized. This has impacted our ability to address necessary repairs and to modernize the Building while paying our mortgage, taxes, and other overhead.

36. Mark has made it impossible to resolve this crisis of vacancies by: (i) preconditioning new leases as well as lease renewals on his receiving personal brokerage commissions; (ii) refusing to work with my side of the family; (iii) insisting that build-out construction work for new leases only be performed by Mark's own contractors, so that he can take "builder's fees" and personally profit; and (iv) demanding unrealistic rents that have proven to be totally out of line with the current market. The current situation is unsustainable and amounts to an operational deadlock with the Company unable to lease its spaces.

### i. Mark's Pre-Conditioning Leases/Renewals on Brokerage Commissions

37. A first reason that we cannot resolve the crisis of vacancies at the Building is because Mark is insisting upon being paid brokerage commissions as a precondition to any leases or renewals at the Building, even if the Company retains an actual broker to market the spaces.

38. Mark's insistence on receiving a cut of brokerage commissions makes it extremely difficult for the Company to retain and work with legitimate and reputable brokers. As a result, even though the Building now sits mostly vacant, the Company incredibly has no real estate broker currently engaged to market and lease the many vacant units.

39. Concerning the prior broker retained by Mark for the Building, his daughter Muffy wrote last year that "[h]e is a pariah among other brokers, he is considered unethical, and he should not be representing us in any way, shape or form." Mark has nevertheless defended this broker and recently circulated a new proposed brokerage agreement with him.

40. At a court hearing before a preliminary injunction was entered against him, Mark admitted that he has taken "hundreds of thousands of dollars" in commissions through the years. Mark spoke about the Company's 2013 lease of the Cellar at the Building to Weill Cornell, openly indicating that he plans to take further commissions in 2027 and 2032:

**Q** And you do that in addition to being a manager of the company. You separately act as a broker for the company?

**A** I have a license, two licenses in the office as a broker.

**Q** And --

**A** And I acted as a broker since the sixties in that capacity. This is not something new that you just discovered the wheel. I have been a broker on real estate deals and transactions for 50 years.

**Q** And has your co-manager or your co-members signed off on you entering into brokerage agreements with the company that you are acting as a co-manager for?

**A** My brother doesn't come to the office. He hasn't been in the office for the last century back into the seventies. I don't have these discussions on brokers. We have an entity. The daughter probably knows more about it than he does, MDM which is my management entity where we have other properties on a regular basis.

**Q** So is --

**A** I have taken hundreds of thousands of dollars of commissions on deals -- commercial deals in the years.

**Q** Sir, they haven't agreed to the brokerage deal.

**A** They never objected. They knew about it. I brought the deals. I was the only broker. The biggest deal I did in Cornell Pediatric Center pays 2 -- the basement 20,000 feet. Cornell commission starts again in '27 and one building was Weill $3 million -- 140 a foot in University signed it. My my commission starts again in '32 you in the lease.

**Q** As a fiduciary of the company, you think it's fair that you also act as a broker for the company?

**A** Fair? The building -- the biggest deal in the building is one-third of the rent roll that I brought to the table. Plus the movie theater which because of Covid, no one is in the theater business anymore.

([NYSCEF Index No. 656259/2021, Doc. No. 172 at 54-55](#)).

41.     Similar to his demand for brokerage commissions, Mark has also proposed that he receive a disproportionate share of the profits—in some cases, up to 80%—for tenants that he claims he will bring to the Building even though he is only a 34% shareholder.  Mark's view, as expressed to others in the office, is that "I don't work for Astrid," and that he should be compensated through commissions and profit overrides for anything he touches at the family properties.  Mark refuses to consider third-party property managers who would handle the job of leasing space at the Building.

42.     Mark reflexively responds negatively to any proposed tenants that my side of the family locates and proposes.  My belief is that Mark takes this position because he cannot attempt to personally profit from the tenants that I propose.

43.     Despite what Mark claimed in his testimony at the hearing, I have repeatedly objected to his efforts to take brokerage commissions or profit overrides on Company leases.  Although she will not take action against her father due to her conflict, Mark's daughter Muffy previously told me that she believed such commissions were improper, disincentivized brokers, and presented a conflict of interest.

44.     In the Complaint we filed in January in this case, my side of the family made clear our position that Mark has "breached his fiduciary duties" by, among other things, "caus[ing] himself to be paid commissions and/or premium payments our of transactions that were meant to benefit the Company, and refused to allow transactions that would in the Company's interest if such transaction don't proportionally benefit him personally."  (NYSCEF Doc. No. 3 ¶ 44).

45.     I had hoped that by filing the Complaint, Mark would stop asking for commissions, and we could work together to get the Building leased up.  Unfortunately, since the filing of the Complaint, we barely speak, and Mark has continued to insist on commissions as a precondition to leases and even mere renewals.  This is extremely frustrating given the deteriorating financial

condition of the Building. It is totally improper for Mark to block all leases unless and until he receives disputed brokerage commissions. Mark is effectively holding the whole Company hostage. The most pronounced example in recent months has been Replacement Associates.

*Replacement Associates*

46.     The Building's largest remaining tenant in its Medical Offices is Replacement Associates, a dialysis treatment center that currently occupies two (2) floors totaling approximately 13,100 square feet for $141,221 per month (the other remaining tenants in the Building's Medical Offices occupy a mere 5,541 square feet ***in total***). As Replacement Associates is the anchor tenant in the Medical Office portion of the Building, it is critical that we do not needlessly lose this tenant, which also brings an important service to the surrounding community.

47.     In late 2021, Replacement Associates indicated that it wanted to renew its lease ending in February 2023 for a period of five (5) years.

48.     On February 2, 2022, after this lawsuit had been filed, and an initial framework on business terms for a lease renewal had been reached with Replacement Associates, the Company's transactional counsel indicated to me that "Mark has advised that he wants to be paid a brokerage commission for his work on . . . the Replacement Associates lease extension[]. . . . Mark also advised me that he will not agree to move forward with [the] transaction unless and until the brokerage issue is resolved." A copy of a chain containing this email is attached as Exhibit 3.

49.     My side of the family will not agree to Mark receiving a brokerage commission. Mark has no brokerage agreement with the Company, and no brokerage commission was paid to Mark in connection with Replacement Associates' prior lease renewal.

50.     On February 19, 2022, Mark wrote that "[t]he real stupidity of this is that Astrid fails to realize that the commission is only half her money!" A copy of this email is attached as Exhibit 4.

51.     On March 8, 2022, Mark responded to my refusal to authorize a commission by writing that "I bought the building in 1980. I gave half to your father without one penny of investment from him. I did it without his knowledge. I don't think he's been to the building in 42 years. Your lack of respect and understanding is unbelievable! Why did you pay me a commission on the sale of 23B 400 E 54th St in 2015? I sold it for $1,320,000. You didn't pay me a penny to build it for you to make you that income." (Ex. 3). While Mark claims that he "gave" my father his investment in the Building, that is untrue; the money Mark used to purchase the Building came from the proceeds of the sale of a jointly owned family property.

52.     On March 23, 2022, after my counsel raised the issue of Mark demanding brokerage commissions, Mark's litigation counsel responded that "[w]e do not feel the need to rehash Mark's objections and rebuttals to Astrid's allegations, and we maintain that any actions taken by Mark are protected by the business judgment rule." A copy of relevant portions of the letters are attached as Exhibit 5. I do not understand how Mark taking commissions for himself is a "business judgment," especially since he is not even an elected director or officer of the Company and is acting over the objection of 50% of shareholders.

53.     On July 11, 2022, after the issue had dragged on for months, Mark wrote to me:

> Astrid you're really a piece of work. Michael Dubin wanted to commission when I really done a Geo without him and then in the renewal he wanted a commission for an excess what I'm asking. You pay a stranger for doing no work and you treat me like a stranger and don't wish to pay me at all. . . . Furthermore, on the deal with the Replacement Associates you wanted to roll the rentback to March 1921 and I started the lease in January 2022. Financially the deal was better than what you had negotiated by $700,000 and he refused to pay me $83,000 for two leases.

A copy of this email is attached as Exhibit 6.

54.     On August 9, 2022, the broker for Replacement Associates wrote in a last-ditch effort to ask for a call with ownership, indicating that "I can't stress enough how disappointed the tenant is with the way it has been treated over the last two years." Mark responded to the Company's transactional counsel, suggesting that Mark would cut a side-deal directly with the tenant without the consent of other shareholders: "Tell Dr Kleiner [of Replacement Associates] to have the commission paid to me and then Astrid will agree to the deal Ashley [*sic*] does not wish to pay me a commission for $14 million of income!" A copy of this email chain is attached as Exhibit 7.

55.     On October 3, 2022, given the passage of many months with no progress, Replacement Associates (which must vacate by early next year) ***reduced*** its offer. The Company has thus been demonstrably harmed by Mark refusing to sign a renewal "until and unless" he receives a brokerage commission and allowing months to pass.

56.     Currently, we are at an impasse. Even if we are able to again agree on business terms with Replacement Associates, the Company's transactional counsel will not move forward with the lease process unless Mark agrees, yet Mark refuses to sign off "until and unless" I agree to his being paid a brokerage commission on the renewal. Mark will not otherwise agree to permit the renewal or to move forward with a reservation of his right to seek a commission in this lawsuit. Just last week, Mark was again complaining to our office manager about my refusal to authorize his commission. If the Company loses Replacement Associates, the Medical Offices will be over 80% vacant. Our rent roll, which was $7.86MM in 2016, will shrink to roughly $2.3MM and the Building will be operating at an unsustainable loss. Mark seems not to care.

57.     We desperately need a temporary receiver in place immediately with the authority to sign off on this and other leases without Mark being able to hold the Company hostage to his demands for brokerage commissions.

### ii. **Mark's Refusal to Work With My Side of the Family**

58.     A second reason that we currently face excessive vacancies is because Mark refuses to work with my side of the family on anything, including the process of filling vacancies.

59.     Mark and my side of the family are not on speaking terms.  Mark has through the years opted to treat the process of filling vacancies as some type of warped competition.  He makes boastful comments around the office that he knows how to make money, and my side of the family doesn't.  Mark has repeatedly demeaned my business acumen and, at his deposition in the parallel case, patronizingly testified about how he should be allowed to make decisions on behalf of Muffy and me because "the girls" have "no construction experience at all" and "no real estate experience at all."  (NYSCEF Index No. 646259/2021, Doc. No. 145 at 198:21-199:16).

60.     When Mark learns of potential tenants, he does not include me in the process, treats it as his deal alone, and demands brokerage commissions.  When I present a potential tenant, Mark undermines me at every turn, apparently to prove his preconceived notions of his superior business acumen and to eliminate lease prospects from which he cannot personally profit.

61.     In 2019, given that the Building's largest space, a 23,000 square-foot theater, had been vacated, I engaged in efforts to locate a replacement theater for the large space.  Seeking to build consensus, I involved Mark's daughter Muffy (a 16% shareholder through her trust) in the negotiations to fill the theater space.  While, even prior to the pandemic, theaters were on the decline, the Company faces limitations at the Building that make a theater an attractive tenant.  *First*, since the theater portion of the Building is zoned residential R8B, commercial uses are not permitted as of right.  It would thus be the most efficient and surest thing to continue with a theater given the existing variance.  *Second*, the space is already uniquely built for a theater with sloped floors.  While the space could be built out for another use, the process will be costly, and the Company (which does not have the funds) would likely have to bear that cost.

62.     In 2019, Mark authorized Muffy and me to move forward with negotiations with prospective theater tenants. Muffy and I then invested a substantial amount of time in negotiations with a potential tenant that had put forth an attractive offer. Muffy and I did not demand brokerage commissions or profit overrides, like Mark does when he works with brokers on lease prospects.

63.     In 2019, as Muffy and I neared the lease stage with a theater tenant, we understood that the theater variance would need to be renewed. We thus engaged an expeditor to begin this process with the New York City Board of Standards and Appeals (BSA).

64.     By August 2019, when it became apparent that Muffy and my collaborative efforts might result in us actually accomplishing what Mark hadn't—filling the long-vacant theater space—Mark began acting erratically and irrationally to sabotage our process.

65.     On August 18, 2019, Mark emailed Muffy, my father, and me to complain about the ongoing lease negotiations and claim that I had gotten the company into a "mess." Muffy responded to Mark's email, "I saw. Irrational." A copy of this email is attached as Exhibit 8.

66.     On September 11, 2019, Mark sent another email lecturing me that "[e]xactly what I told you for the variance if we decide to go for a theater," as if he was more interested in proving that he knew more than me than in doing what was best for the Company. Mark also indicated that he would be engaging in his own separate efforts to find another tenant. Muffy responded to her father: "This is not a game. It should be business" and that "This is a very good deal before us and we should take it and not waste any more time. The theater has been empty long enough."

67.     On September 12, 2019, I asked Mark to join in a phone call with our expeditor concerning the proposed variance for the theater. Mark refused to join the call or to even coherently explain his objections. Muffy responded to Mark:

You are the only one who believes in these obstacles, so we need to understand them, as you do.

We need to be on the same page for this or any other theater tenant.

I don't know why you are being so stubborn. This needs to be faced and cleared up.

A copy of this email is attached as Exhibit 9.

68.     In November 2019, after Muffy and I had initiated the variance renewal process with an expeditor, Mark inexplicably directed his counsel at Akerman to move forward with a competing variance for a retail use even though we had no retail tenant lined up. On November 6, 2019, Mark's attorney from Akerman emailed Muffy and I that the BSA "will not entertain both applications simultaneously. You cannot have active applications on the same property requesting different uses within the same space." This dysfunction and unnecessary acrimony cost us time, money, and stalled our process. A copy of this email is attached as Exhibit 10.

69.     Unfortunately, our negotiations to finalize a lease with the theater, which were delayed by Mark, fizzled out in early 2020 with the onset of the pandemic.

70.     The sad reality is that Mark will not work with me to fill the vacant spaces at the Building and acts reflexively to undermine anything that I do. After the theater episode, Muffy understandably did not meaningfully reengage and has in recent years again aligned with her father, including in the Florida lawsuit, due to her conflicted position. For my part, I have continued to seek out tenants for the Building. On September 23, 2022, I presented Mark with an LOI from a leading boutique theater chain, stating that "[g]iven the financial condition at the building and the obstacles/timing of any alternatives, I recommend we move forward with negotiations. Please let me know your view and whether you have any suggestions for the space." Mark responded by quickly nixing further negotiations without even suggesting a counterproposal.

71.     I only have so much time on my hands and cannot waste my hours if Mark is going to reflexively nix anything that I propose and attempt to turn the filling of vacant units into a warped competition to burnish his own ego and receive a disproportionate share of proceeds.  This dysfunction is yet another reason why the Building sits mostly vacant.

### iii.     Mark's Demand for Construction Work

72.     A third reason that we currently face excessive vacancies is due to Mark's insistence upon performing build-out of leased spaces work with his own contractors, so he can take "builder's fees" and personally profit.

73.     One of the Perlbinder family entities is 400 Concrete Corp., an S Corp jointly owned by my father and Mark.  400 Concrete Corp. pays Perlbinder Realty staff (including myself and Muffy) as well as various construction workers who perform work (for example, the substantial renovations to Mark's Hamptons beach house and to other apartments owned by Mark). The most recent financial statements indicate that the Company has "loaned" an astounding $6,570,262 to 400 Concrete Corp., in part, to support Mark's construction endeavors.  The work is delegated to Luis Calero, whose emails indicate the title of "Senior Project Manager" of 400 Concrete Corp.  In addition, Mr. Calero is employed as a Local 32BJ union superintendent of the family property at 429 East 52nd Street, and is also the principal of Calero Construction Corp.  As the Senior Project Manager of 400 Concrete Corp., Mr. Calero does not competitively bid out the construction work, but instead awards contracts at Mark's or his discretion, including to his own Calero Construction Corp.  Even though the work is overseen and/or performed by Mr. Calero, Mark boasts that he (Mark) should be compensated as a "builder" for the work.  In the past, Mark has gone so far as to demand and take "Builder's Fees."  Mr. Calero follows Mark's directives without consulting other shareholders, and we do not have anyone on staff to assess the reasonableness of billings or the construction work being performed, which often lack specificity

or sufficient explanation. In fact, our bookkeeper has expressed concern over Mark's refusal to examine and question any of Mr. Calero's bills, which Mark simply signs off on upon receipt. This presents a serious internal controls issue, and an audit is desperately needed. Given the lack of oversight and potential for waste and self-dealing, I do not believe we should be transacting with 400 Concrete Corp., Calero Construction, or Mr. Calero for construction work.

74. Mark's insistence on personally profiting through 400 Concrete Corp. is yet another impediment to our leasing up the Building. With respect to larger spaces like the Movie Theater in the Building that has now sat vacant for years, many prospective tenants will require that the build-out be handled by contractors with whom they are familiar. This is a non-starter for Mark, who rejects deals from which he cannot personally profit. Mark's actions limit our pool of potential tenants given that many do not want to deal with Mark, who testified that he has been a party to between 30 and 50 lawsuits. (NYSCEF Doc. No. 145 at 10:12-11:6).

75. For example, last year, the Mount Sinai Health System expressed interest in leasing all of the available Medical Offices in the Building. It is my understanding that this potentially lucrative deal, which would rescue the Building from its current predicament, did not advance beyond initial discussions given Mark's insistence that he conduct all construction and build-out for the healthcare provider through 400 Concrete Corp. This is outrageous. A potential tenant like Mount Sinai must comply with various health codes, obtain approvals following construction, and has its own preferred contractors for its specialized build-out. We should not be losing such reputable tenants simply because Mark wants to profit through 400 Concrete Corp.

### iv. Mark's Demand for Unreasonable Rents

76. A fourth reason that we currently face excessive vacancies at the Building is because of Mark's practice of demanding rents that are totally out of line with the market, even when the market proves those rents to be way too high with units sitting vacant for years.

77.     We recently lost a longtime tenant ENT and Allergy Associates that occupies 8,000 square feet because of Mark's insistence upon above-market rents.  ENT was a good tenant that wanted to stay, and I wanted to keep.  ENT's broker presented Mark with market comps showing that the rent he was demanded was way too high, yet Mark refused to budge.  ENT ultimately found space for $20 per square foot less elsewhere and is soon leaving.

78.     On July 28, 2020, concerning the excessive vacancies already existing at that time, Mark's daughter Muffy wrote to him that "[w]e have apartments and offices that can be filled.  Let the market decide—lower the asking rent and then, rather than punishing your family for no sin other than wanting the best for all involved, we will all be able to pay our bills like magic.  It is really not that complicated."  A copy of this email is attached as <u>Exhibit 11</u>.

79.     Unfortunately, although Muffy apparently agrees with my side of the family, she is conflicted by fear of being disinherited by her father, who she will not join us in challenging.

## IV.     <u>MARK'S MISAPPROPRIATION OF CORPORATE FUNDS</u>

80.     The Company's finances are in a precarious a state, with corporate funds being routinely misappropriated over the objection of my side of the family.

### A.     <u>The Continuing Intercompany "Loans"</u>

81.     The Company's annual financial statements prepared by the family accountant David Katzenberg indicate that a massive amount of money has been transferred out of the Company *via* unauthorized and undocumented "loans." Attached as <u>Exhibits 12, 13, and 14</u> are copies of the Company's financial statements for 2019, 2020, and 2021, respectively.

82.     The Company's most recent annual financial statement for 2019, 2020, and 2021 indicate "Loans Receivable" of $20,872,713, $22,248,973, and $23,944,973, respectively.  These "loans" have only increased over time.  I am unaware of any authorizations, loan agreements, security, or payments of interest on these loans.  I do not even know when most of these loans

were made, since David Katzenberg's practice has been to make hundreds of transfers between entities on an as-needed basis rather than to make properly documented loans with a plan for repayment. Given our bookkeeping issues, I believe this will all be costly and very difficult to sort out in an accounting between entities, which have different ownership structures.

83.　The undocumented "loans" are even more troublesome because Mark's practice is to simply "dispute" line items on the financial statements whenever it suits his needs. For example, in the parallel lawsuit concerning 400 East 54th Street, Mark has in recent months disputed the capital accounts and also a $1 million loan from my father indicated in the financial statements. (*See* Index No. 656259/2021, Doc. No. 163 ¶¶ 76(g), 85). Even if my side of the family agreed to such loans, they would need to be documented to prevent against future disputes.

84.　The Company's 2021 financial statement indicates troublesome loans, including:

a.　$855,877 in loans to Mark personally. I do not know when these loans were made and did not authorize them.

b.　$2,519,919 in loans to MDM Management Inc., an entity wholly owned by Mark, that he uses to pay various Perlbinder Realty staff and also his own personal expenses, such as his ex-wife's driver and domestic staff, as well as his own staff at his beach house. This "loan" to MDM has increased dramatically from $515,812 in 2016 and is *in addition to* the separate "Management Fee" paid to MDM, which totaled $440,000 in 2021. On July 11, 2022, my attorneys wrote to David demanding that payments to MDM be ceased, with the management moved to a single purpose management entity that does not commingle Mark's personal expenses. A copy of this letter is attached as Exhibit 15. David responded by disregarding our instruction and telling me that he would continue paying MDM and let the lawyers figure it out. The result is that these improper practices and commingling of funds will continue if the Court does not grant relief.

c.      $6,570,262 in loans to 400 Concrete Corp., another entity that Mark uses to pay staff (including myself and Muffy, who does not actually work for the Company) and also for his construction work at various properties, including personal properties and those in which my side of the family holds no interest.  As with MDM, 400 Concrete Corp. does not own any significant assets or turn a profit.  I do not believe it could ever repay such a large loan.  400 Concrete Corp.'s finances are jumbled to such an extent that it will be extremely difficult for an accountant to ever figure out which entities and individuals have benefited from its construction spending and where all the money actually went.

d.      $9,317,024 in loans to Perlbinder Holdings LLC, an entity that has lost huge sums of money in recent years given that its largest asset is a parking lot that Mark has planned to develop for 25 years, yet failed to make any meaningful progress in developing. In recent years, Mark has incurred over $6 million in fines and legal fees in connection with a billboard that he illegally erected at the parking lot in violation of zoning regulations. Such fines are the steep price of Mark's practice, across all of the family properties (including the Building), of failing to operate in compliance with laws and regulations.

e.      $50,000 in loans to Perlbinder Construction LLC, which David Katzenberg has testified is "used for Mark's personal account" due to "tax issues" and since "he can't use his own account."  (*See* Index No. 656259/2021, Doc. No. 15).

85.     While Mark is the one directing these transfers, when it is convenient for him, Mark attempts to feign ignorance and to shift the blame to the family accountant David Katzenberg, with whom he testified he talks "literally, six to ten times a day."  (*See* Index No. 656259/2021, Doc. No. 145 at 220:8-18).  For example, when seeking to avoid being held in contempt, Mark sought to shift all of the blame to David, against whom no disciplinary action was subsequently taken.

86.     In a letter dated September 15, 2021, Mark's counsel defended the jumbled finances and comingling of funds reflected in the Company's financial statements, and explained Mark's apparent position concerning the unauthorized shuffling of funds between entities:

> For many years dating back to 1980, Mark and Stephen have entrusted David to maintain the books and accounts for the various entities of the jointly owned properties. It has always been known to both Mark and Stephen, and authorized by both, that David maintains the discretion to allocate funds where they are needed, and has exercised that discretion when either Mark, Stephen or both have required. Notably, within David's discretion is the authority to allocate monies from one entity to another to cover improvement costs for real estate assets, including those at 54th Street. Both Mark and Stephen have been recipients of David's discretion in this regard. David also maintains this discretion because the allocation of monies is not limited to improvements, but rather involves a variety of significant costs and expenses across the jointly owned properties. Given David's expertise with historically managing the books and accounts, allocation of monies is particularly within his knowledge and the reason why he was delegated with that authority as opposed to Mark or Stephen, or even Astrid.

A copy of this letter is attached as <u>Exhibit 16</u>.

87.     While it is true that my father for many years did not pay close attention to the finances of the Company, he never authorized unlawfulness at Perlbinder Realty. My father's past inaction is no reason to permit the continued diversion of corporate funds from the Company for unsecured loans with no terms of repayment, particularly given that the entities have different ownership structures, and Mark later denies knowledge or disputes items booked in the financial statements when it suits his needs.

88.     My side of the family also does not agree to delegating fiduciary responsibilities to David Katzenberg in the manner described by Mark's counsel in their September 15, 2021 letter quoted above. I do not understand how Mark could take the position that David has the legal authority as accountant to make loans and payments to shareholders at his discretion. While David is the longtime family accountant, the reality is that he has lost his CPA license for violating tax laws and has now also facilitated a contempt of court. It would be ridiculous for him to be entrusted

with the broad decision-making authority that Mark's lawyer claims. Entrusting such responsibility to David without checks or auditing in place is, itself, extremely dubious from a fiduciary standpoint. The "loans" David is making are not authorized, properly memorialized, and will only give rise to more disputes. While the loans are all to Perlbinders or Perlbinder entities, the ownership percentages of the companies are not the same. The jumbled finances also make it more difficult to conduct an accounting and to ascertain the financial condition of the properties and whether Mark (or anyone else) have engaged in wrongdoing.

**B.**     **Mark's Continued Use of Company Funds for Personal Expenses**

89.     As explained in the Complaint, Mark uses Company funds to pay personal expenses. While I had hoped the filing of a Complaint would put Mark on notice of wrongfulness and bring these improper practices to an end, Mark has nevertheless continued to have the Company pay his personal expenses, as if there were no issue with this.

90.     As I explain above, the Company has loaned $2,519,919 to MDM Management, Inc., an entity solely owned by Mark, which he uses to pay personal expenses such as his own chef and staff at his Hamptons beach house. Despite my demands that payments to MDM cease, David Katzenberg continues to make the payments. David informed me several weeks ago that New York City tax authorities had raised issues concerning payments from another family entity to MDM being booked as loans rather than as dividends to shareholders. David told me he had received a notification from the City, but despite my repeated requests, failed to provide it to me. David claims that this was a "mistake" on his part, and I fear the tax implications of David's actions for the Company and my side of the family.

91.     I understand that my father also has certain staff on the payroll of Perlbinder Realty. For over a year now, with the support of my father, I have repeatedly demanded that David Katzenberg immediately end all of these practices and to instead simply distribute the funds to

shareholders, who can make their own payments to the employees. This is evidenced in the correspondence from my counsel. (Ex. 15). The Perlbinder Realty payroll should not include personal employees. Despite my repeated demands, David has continued these unauthorized practices, which is a large part of the reason we are now filing this motion. A receiver is unfortunately needed to help clean this mess up.

92. In May 2021, Mark had the Company pay $15,296.94 to Maspeth Welding to repair the chimney on his Hamptons beach house. Only after I came across the payment by happenstance when reviewing Company records did David Katzenberg agree to recharacterize the expense as a dividend, at my explicit request. But this merely illustrates the serious issues with the Company's bookkeeping and accounting, which will take hundreds of hours to audit and in many cases does not even have full invoices and supporting documentation to permit a full audit. A copy of Maspeth Welding's invoice for that work is attached as Exhibit 17.

93. In the Complaint in this case, my family objected to Mark continuing to use $1,739 per month in Company funds to pay for his Porsche. My understanding is that this is booked as a Company expense, even though such a vehicle is not necessary for corporate purposes. My hope was that this practice of the Company paying for Mark's luxury car would stop after we raised it in the Complaint, but it unfortunately has not. I was made aware in June 2022 that Mark attempted to unilaterally DocuSign an extension of the lease (despite being on notice that my side of the family objected to the car). Now, just last week, on October 12, 2022, Mark signed a new lease on behalf of the Company for a new Porsche Panamera 4 Executive (with a value of over $115,000). On this new lease, the Company made a down payment of $9,665.71 and must make monthly payments of $1,837.25. The Company also pays for Mark's auto insurance.

**C.     Mark's Squandering of the December 2021 MAC Cosmetics Settlement
and Theft of Funds in an Attempt to "Purge" His Contempt**

94.     In recent years, the Building's largest remaining retail tenant, MAC Cosmetics,
indicated that it wanted to buy out the remainder of its lease.

95.     On December 15, 2021, we entered into a Lease Termination and Surrender
Agreement under which the Company was paid $3,062,105 (which is why the Company's revenue
and income for 2021 are artificially inflated). While this might seem like found money for the
Company, the funds were sorely needed to make critical repairs and to pay for the concessions or
build-out/tenant improvements that new tenants will demand as a condition to leasing space.

96.     On December 17, 2021, knowing that Mark would attempt to divert the $3 million
in settlement proceeds that the Company needed, I emailed Mark, David Katzenberg, and the
Company's corporate attorney that the $3 million could not be distributed out of the Company:

> David just confirmed that we are in receipt of the MAC wire.
>
> Per our prior emails: "We are agreeing to the MAC settlement terms proposed and
> to the December timeline, which should not be misinterpreted as in any way
> endorsing whatever steps that Mark now proposes to use the MAC settlement
> proceeds to pay fines, RE taxes, arrears, or liens in other family properties."
>
> David,
> Please keep MAC settlement funds in the 210 E 86th Street Corp. bank account
> until we agree on how to make the best use these funds.

A copy of this email is attached as Exhibit 18.

97.     On December 19, 2021, since we were already in litigation, my counsel also wrote
a letter to Mark's litigation counsel, objecting to any further diversion of the Company funds
(including the MAC Settlement Proceeds):

> Please be aware that the Company, which owns 210 East 86th Street (the
> "Building"), desperately needs the funds that Mark proposes to simply take without
> any plan for repayment. With the departure of M.A.C. Cosmetics and the
> forthcoming departure of tenant ENT, the Building will be operating at roughly
> 66% vacancy, with insufficient funds to pay over $1.8 million in annual carrying

costs. Worse still, the Company currently needs over $1 million to repair the Building's critical systems, including its gas line, boiler, elevators, sprinklers, sidewalk, and vault, as well as over $5 million for work to re-let approximately 64,816 square feet of space (including a former movie theater space that cannot be re-let without significant work). Without immediate funds for these critical purposes, the Building will fall further into disrepair, accrue violations, sit mostly vacant, and become a non-performing asset that loses millions of dollars a year—like other Perlbinder family investments that Mark has ruined. As such, our clients simply cannot allow Mark to further destroy the Company by diverting the critical funds it needs to survive.

A copy of this letter is attached as Exhibit 19.

98.     With the assistance of David Katzenberg, Mark has disregarded the directives of my side of the family concerning the use of the MAC Settlement Proceeds. Following the settlement, the Company had $3,193,494 in cash on hand. As of October 17, 2022, the Company's register indicates that it had $282,629.85 in cash on hand, with its register revealing dozens of transfers to other entities in the over ten (10) months since December 16, 2021, including:

- 51 transfers totaling $956,500.00 to 400 Concrete Corp.
- 45 transfers totaling $531,500.00 to MDM Management Inc.
- 13 transfers totaling $652,000.00 San-Dar Associates
- 13 transfers totaling $234,200.00 to Perlbinder Realty Corp.
- 4 transfers totaling $93,500.00 to 245 East 36th Street Garage Corp.
- 2 transfers totaling $20,500.00 to East 53rd Street Garage Corp.
- 2 transfers totaling $27,600.00 to MS Partnership
- 2 transfers totaling $19,000.00 to Stephen & Mark 53 Associates
- 1 transfer totaling $40,000.00 to Berkeley Associates Company

A copy of the Company's checking account register for December 1, 2021 to the present is attached as Exhibit 20.

99.     The Company has not fully documented the funds transferred to other entities over the past ten (10) months, and it will be an extremely difficult to ever trace all of these funds given the number of transfers, which David moves through entities without full bookkeeping to explain the purpose of transfers.

100.    On April 29, 2022, after Mark had taken funds frozen by this Court in the parallel lawsuit concerning 400 East 54th Street, David transferred $125,000 from the Company to Perlbinder Construction LLC in an apparent attempt to "cure" Mark's contempt of court.  No proportionate dividend was paid to other shareholders.  Although my side of the family was already on record with our objection to transferring money out of the Company, Mark claimed that he "believe[d] that David was intending to distribute monies from 86th Street for quite some time now." (NYSCEF Index No. 656259/2021, Doc. No. 205 ¶ 15).

101.    When I asked David how he could have violated a court order, David responded that he understood the funds could not be used, but did not think I would ever look at the bank records.  Fortunately, I learned of the transfers from David's subordinate.  It is extremely disturbing to me that David would have the audacity to say such a thing to me and knowingly violate a court order simply because he thought no one would ever find out.  This makes me wonder what else David is doing and thinks I will not find out about.  The Company cannot operate this way.

102.    Concerning Mark's taking of $125,000, this Court commented that:

> There's no evidence that Mr. Perlbinder had unilateral authority, legally, to just withdraw funds from a corporation, effectively as a dividend, on his own initiative. Nothing has been presented to me that would suggest that he would have that right, and it certainly would be an unusual corporate charter that would permit a single shareholder to unilaterally dividend themself $125,000, or whatever it was. It's possible, but I didn't see any evidence of that.  So that purging is actually doubly improper, because it actually may well end up as part of a motion in the other case, in terms of withdrawing funds.

(NYSCEF Index No. 656259/2021, Doc. No. 223 at 35:17-36:2).

103.    David's paying what was effectively a unilateral dividend to Mark is especially troublesome because David has explained to me at other times that if the Company does not pay proportionate dividends, it is at risk of losing its S Corp status, in which case, shareholders could owe millions in back taxes.  That David would make such a transfer to Mark despite knowledge

of this risk of IRS scrutiny is reckless and further reason that we need a temporary receiver in place to oversee the Company's finances.

104.    On May 6, 2022, David next called me "as a courtesy" to let me know that he would be making a $200,000 dividend payment to the shareholders of the Company because, yet again, "Mark needs money."  On behalf of my side of the family, I responded that the Building was on the brink and that David should not be making any distributions.  David said that he had no choice, and then made the dividend payments to the shareholders over my objection.

105.    On May 9, 2022, my counsel wrote to David: "Mark cannot make unilateral decisions at the Company with respect to transferring money in/out for any reason, let alone for his personal benefit. . . . you are not authorized to transfer any Company funds to Mark or make any distributions to shareholders without approval and/or instruction by a majority of the Company's shareholders."  A copy of this letter is attached as Exhibit 21.  As the Company's register makes clear (Ex. 20), the directive of my counsel has been disregarded.

106.    As I feared at the time of the MAC Settlement, with the assistance of David, Mark has exhausted the $3,062,105 in just a matter of months, with no plan in place for funding capital expenditures, and little money spent on actual improvements to the Building.

107.    I do not know how the Company is going to pay for the repairs that are currently necessary to cure the violations described below, to modernize, and to make the substantial contribution to tenant improvements that new tenants will likely demand as part of signing a lease. Mark has no plan for any of this.  The Company cannot continue to be run in this manner.  We desperately need a receiver in place to address these issues and to oversee the Company's finances given the risk that further corporate funds will be misappropriated.

## V.    MARK'S FAILURE TO RESOLVE VIOLATIONS AND SAFETY ISSUES

108.    Due to Mark's neglect, mismanagement, failure to establish reserves, and diversion of funds, the Building has failed to modernize, with violations and safety issues going unresolved for years.

a.    ***The C of O.***  The Eighth (8th) and Ninth (9th) Floors were added to the Building over a decade ago by Mark's contractors, yet Mark never obtained a Temporary or final Certificate of Occupancy.  As such, I do not believe these floors can be legally occupied.  Mark has nevertheless rented the Ninth Floor for over a decade, which is illegal and could result in violations and fines, not to mention liability issues to the medical provider and its patients (for example, if there is a fire).  This puts our entire family at risk.

b.    ***The Sprinklers***.  The Building has incurred fines and is in violation of Local Law 26, which was precipitated by the 9/11 tragedy, and required that the Building be fully sprinklered by July 1, 2019.  Attached as Exhibit 22 are open violations from the City of New York.  Despite Local Law 26 being adopted in 2004 and giving property owners fifteen (15) years for implementation, Mark failed to reserve funds for the expense of installing sprinklers and has proposed hiring an unlicensed engineering firm.  The lack of sprinklers presents another potential source of liability.  The failure to cure such violations puts us in violation of our mortgage agreement, a copy of which is attached as Exhibit 23.

c.    ***Carbon Emissions***.  The Building has violations for failing to take the simple step of posting its Energy Rating on its storefront.  Copies are attached as Exhibit 24.  I also understand that the City has adopted Local Law 97 that will become effective in 2024 concerning carbon emissions, and that building owners are being advised to take steps (such as retrofitting) to bring their properties into compliance.  As with other regulatory requirements, Mark has no plan or funds reserved to address these new regulations.

    d.    ***Mechanical Systems***.  I am unaware of any effort to ascertain the useful life and condition of the Building's mechanical systems and to reserve for inevitable replacement costs.  Mark's practice has been to wait for systems to break.  For example, I understand that the boilers are twenty (20) years old and out of warranty and the chiller is over thirty (30) years old and out of warranty.

    e.    ***Elevators***.  The Building has two old elevators that often malfunction and require service.  The DOB has found five (5) violations since 2017, and dozens more in the preceding years.  I believe that a professional assessment is necessary to determine whether the contracted maintenance is adequate and if a modification/upgrade is required.

    f.    ***The Sidewalk Vault***.  The roof of the sidewalk vault underlying the East 86th Street Sidewalk has deteriorated, is corroding, appears to be held up by several shoring poles, and is apparently in need of repair.  This is a significant safety issue that requires an assessment by a qualified engineer and likely repair work.  Pictures are below:





109. Based upon my experience working in the office and consultation with contractors, I believe a professional assessment of the Building is necessary. I also believe these serious issues demonstrate just how harmful it has been for Mark to transfer millions in corporate funds elsewhere, as described below. The funds are needed to resolve issues and modernize the Building.

## CONCLUSION

110.    I thank the Court for its consideration of this Affidavit. I had originally hoped the filing of this lawsuit would result in Mark taking steps to stop the diversion of corporate funds identified in the Complaint and to work collaboratively to address the vacancies and other serious issues facing the Building. At this point, unfortunately, these issues have only worsened, and we now face a crisis. I do not believe we should have to wait years for the end of the case, jeopardizing the viability of the Company, while its funds are diverted through a web of entities, violations go unaddressed, and we lose good-paying tenants due to Mark's demand for brokerage commissions. We desperately need a receiver to end this dysfunction. I thus respectfully request the Court grant Plaintiffs' motion for the appointment of a temporary receiver and an injunction.

ASTRID SABELLAROSA

Sworn to before me on
18th of October 2022

Notary Public

ROMA JAIPAUL
Notary Public - State of New York
NO. 01JA6325243
Qualified in Queens County
My Commission Expires May 26, 2023