**<u>EXHIBIT A</u>**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

REPLACEMENT ASSOCIATES, LLC,

                          Plaintiff,

         -against-

210 EAST 86TH STREET CORP., BARTON MARK
PERLBINDER, MUFFY FLOURET as Trustee of the
MUFFY FLOURET 2012 FAMILY TRUST and as
Trustee of the MARK PERLBINDER 2023
IRREVOCABLE TRUST, STEPHEN PERLBINDER,
ASTRID SABELLAROSA as Trustee of the ARTICLE
4 TRUST UNDER ASR 2020 FAMILY TRUST and as
Trustee of the STEPHEN PERLBINDER 2016 FAMILY
TRUST F/B/O ASTRID SABELLAROSA, ANDREA
JO STEIN, as Trustee of the ARTICLE 4 TRUST
UNDER AJS 2020 FAMILY TRUST and as Trustee of
the STEPHEN PERLBINDER 2016 TRUST F/B/O
ANDREA JO STEIN,

                         Defendants.

-------------------------------------------------------------------X

Index No. 654792/2024

**AMENDED COMPLAINT**

       Plaintiff, Replacement Associates, LLC ("Plaintiff"), by its attorneys, Sills Cummis &

Gross P.C., as and for its Amended Complaint against defendants 210 East 86th Street Corp.

("Landlord"), Barton Mark Perlbinder ("Perlbinder"), Muffy Flouret, as Trustee of the Muffy

Flouret 2012 Family Trust ("2012 Muffy Trust") and as Trustee of the Mark Perlbinder 2023

Irrevocable Trust ("2023 Perlbinder Trust"), Stephen Perlbinder ("Stephen"), Astrid Sabellarosa,

as Trustee of the Article 4 Trust Under ASR 2020 Family Trust ("Astrid 2020 Trust") and as

Trustee of the Stephen Perlbinder 2016 Family Trust F/B/O Astrid Sabellarosa ("2016 Astrid

Trust"), Andrea Jo Stein, as Trustee of the Article 4 Trust Under AJS 2020 Family Trust

("Andrea 2020 Trust") and as Trustee of the Stephen Perlbinder 2016 Trust F/B/O Andrea Jo

Stein ("2016 Andrea Trust"), alleges as follows:

## NATURE OF ACTION

1.     Plaintiff was the owner of a dialysis facility located on the Upper East Side of Manhattan. It brings this action to recover millions of dollars in compensatory and punitive damages as a result of Perlbinder's and Landlord's false and fraudulent conduct and promises, misrepresentations, and omissions, which resulted in the closure of Plaintiff's long running business and the loss of a multi-million dollar joint venture partnership with the world's preeminent dialysis facility operator.

2.     Because Perlbinder exercised complete domination and control over Landlord with the remaining defendants' knowledge and implied or explicit consent, and defendants disregarded the corporate form, comingled funds, and otherwise abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice, Landlord's corporate veil should be pierced and Perlbinder and the remaining defendants -- all shareholders of Landlord -- are personally liable for Landlord's acts and omissions.

3.     In public filings, Landlord and its shareholders have admitted that Plaintiff was "the anchor tenant in the Medical Office portion of the Building" located at 210 East 86th Street, New York, New York (the "Building"), and that Plaintiff's "tenancy [is] vital to the Building." They further admitted in public filings that the loss of Plaintiff as a tenant at the Building would result in a vacancy rate of "over 80%," that the Building's "rent roll, which was $7.86MM in 2016, will shrink to roughly $2.33MM and that the Building will be operating at an unsustainable loss."

4.     One would think that Landlord, Perlbinder and the remaining defendants would do anything to keep the "vital" "anchor tenant" at the Building and treat it fairly, honestly, and with respect.

5.      Instead, Landlord and Perlbinder repeatedly lied, made false promises and misrepresentations to, and withheld material information from, Plaintiff despite having a twenty-year relationship during which Plaintiff always paid its rent on time and provided critical, essential services to thousands of patients in the community.

6.      For example, after Plaintiff exercised its option to extend its lease in 2017, Landlord, acting by and through Perlbinder, breached the lease by improperly resetting Plaintiff's rent to an above-market rate of $130.00 per square foot when, upon information and belief, market rents were in the range of $80-$90 per square foot. Defendants have since admitted in public filings that Perlbinder routinely overcharged tenants ("Mark's practice of demanding rents that are totally out of line with the market, even when the market proves those rents to be way too high with units sitting vacant for years.").

7.      To save its business, Plaintiff sought a rent reduction and to extend its lease. Before he would entertain such a discussion, however, Perlbinder insisted that Plaintiff pay all brokerage commissions because he claimed that Landlord did not pay commissions, although it is standard industry practice in New York City, and Landlord's own listings provided for its payment of commissions. Plaintiff reluctantly agreed although it was unaware of the reasons for Perlbinder's demand, including Perlbinder's intention to hold any transaction with Plaintiff hostage to his receipt of "illegal" brokerage commissions.

8.      Plaintiff would later advise Perlbinder and Landlord about a joint venture partnership proposal it had received from the world's leading provider of dialysis services by which Plaintiff would receive millions of dollars, but that deal was contingent on Plaintiff obtaining a five year lease extension at a fair market rental rate.

3

9.    Perlbinder, with whom Plaintiff exclusively dealt for twenty years and who Plaintiff knew to be Landlord's sole and unilateral decision maker, agreed to lower Plaintiff's rent to $108 per square foot effective January 1, 2021 and to extend Plaintiff's lease an additional five years. Perlbinder and Landlord then repeatedly -- and falsely -- misrepresented to Plaintiff that the formal lease modification agreement had been drafted and would be forthcoming.

10.    For over two years, however, Perlbinder and Landlord refused to send the formal lease modification agreement that they represented had been drafted and to make good on their promises and representations. Yet, Perlbinder and Landlord continued to promise and represent to Plaintiff that its rent would be reduced to $108 per square foot, albeit with a later effective date due to the passage of time, and that Plaintiff need not seek alternate space, all the while knowing that these promises and representations were false at the time they were made, and knew that they would not be performed and/or had a present intention not to perform.

11.    Plaintiff's second five-year lease extension option expired as a result of being lulled by these false promises and representations.

12.    With Plaintiff's lease expiration approaching in February 2023 and the potential loss of not only its business but of the joint venture partnership, Plaintiff was advised for the first time that its lease would be extended for only six months *so that it could find and build out other space*.

13.    Plaintiff was later forced to accept a one year extension because it was legally obligated to remain open and to treat patients unless and until the New York State Department of Health, Division of Hospitals and Diagnostic Treatment Centers ("DOH") approved a closure

4

plan for the facility and all of Plaintiff's patients were transferred to other facilities – a process than can take six months or more.

14.     The parties then discussed a new long-term lease.  Perlbinder said, however, that before Landlord would consider such a transaction, Plaintiff would have to fire its broker and hire Landlord's broker, CBRE.  With just eight months left on its lease, Plaintiff again was forced to agree to this outrageous demand to save its business and joint venture partnership.

15.     Under Perlbinder's direction, Landlord's broker (CBRE) ghost-drafted a "proposal" for Plaintiff's broker (CBRE) for a new 31 year lease which, for reasons then unknown to Plaintiff, was conditioned on the approval of the building's "managing agent," Rose Associates ("Rose"), with whom Plaintiff had never dealt and was never informed by Rose or defendants of that status.  As far as Plaintiff knew, the building did not have a managing agent." Plaintiff continued to deal with Perlbinder, who fostered the impression and belief – developed over the course of 20 years -- that he was Landlord's sole representative and decision maker.

16.     Plaintiff would later learn from one of the defendants that Perlbinder was involved in intra-family litigation and was holding Plaintiff's rent reduction, lease extension and new lease hostage to his receipt of what some of the defendants termed "illegal" brokerage commissions for the transaction.  Plaintiff would also learn that Perlbinder had been stripped of all authority to negotiate a lease extension or new lease with Plaintiff – including during the time of Perlbinder's CBRE proposal.  Yet, Perlbinder continued to negotiate these transactions with Plaintiff.

17.     Had Plaintiff been informed of the true facts and the true reason for the holdups -- Perlbinder's requirement that he be paid "illegal" brokerage commissions and Perlbinder having been stripped of all leasing authority – Plaintiff could have exercised its second five year option,

5

and would have had enough time to search for and obtain alternate space and DOH approval for a new facility. Notwithstanding their 20 year relationship with Plaintiff, they kept it a secret, lied, and failed to disclose this and other material information to Plaintiff.

18.  By the time Plaintiff learned that it had been defrauded, it was too late to take and renovate new space into a dialysis facility and to obtain DOH approval. As a result of defendants' false and fraudulent promises, lies, conduct, and omissions, Plaintiff was forced to close its business, lost it joint venture partnership, and suffered millions of dollars in damages.

## THE PARTIES

19.  Plaintiff is a limited liability company organized and existing under the laws of the State of New York.

20.  Landlord is a corporation organized and existing under the laws of the State of New York, having an address c/o Perlbinder Realty at 429 East 52nd Street, New York, New York 10022.

21.  Perlbinder is an individual residing in New York County with a business address c/o Perlbinder Realty at 429 East 52nd Street, New York, New York 10022.

22.  Upon information and belief, between 1982 and 2012, Perlbinder held a 50% membership interest in Landlord.

23.  Upon information and belief, in 2012, Perlbinder assigned 16% of his membership interest in Landlord to the 2012 Muffy Trust.

24.  Upon information and belief, the 2012 Muffy Trust remains a 16% shareholder in Landlord to date.

25.  Upon information and belief, Muffy Flouret is Perlbinder's daughter.

26.  Upon information and belief, Perlbinder assigned his remaining 34% membership interest in Landlord to the 2023 Perlbinder Trust.

6

27. Upon information and belief, the 2023 Perlbinder Trust remains a 34% shareholder in Landlord to date.

28. Upon information and belief, between 1982 and 2012, Stephen held a 50% membership interest in Landlord.

29. Upon information and belief, Stephen assigned his 50% membership interest in Landlord as follows: (i) 9% interest to the Astrid 2020 Trust; (ii) 16% interest to the 2016 Astrid Trust; (iii) 9% interest to the Andrea 2020 Trust; and (iv) 16% interest to the 2016 Andrea Trust.

30. Upon information and belief, the Astrid 2020 Trust remains a 9% shareholder in Landlord to date.

31. Upon information and belief, the 2016 Astrid Trust remains a 16% shareholder in Landlord to date.

32. Upon information and belief, the Andrea 2020 Trust remains a 9% shareholder in Landlord to date.

33. Upon information and belief, the 2016 Andrea Trust remains a 16% shareholder in Landlord to date.

34. Upon information and belief, at all relevant times, Landlord is and was the owner of the Building.

35. Upon information and belief, at all relevant times, Perlbinder is or was Landlord's Chief Executive Officer and/or President.

36. At all relevant times, Perlbinder represented and held himself out as the person who had sole decision-making authority for and to act on behalf of and to bind Landlord.

37. At all relevant times, Landlord acted by and through Perlbinder.

7

38. In public filings, other shareholders of Landlord have admitted that Perlbinder exercised *de facto* control over Landlord for four decades.

39. At all relevant times, Plaintiff was a tenant at the Building and the owner and operator of a duly licensed renal dialysis facility known as The Upper East Side Dialysis Center.

40. At all relevant times, The Upper East Side Dialysis Center was a New York State Article 28 facility licensed to provide dialysis to patients with end-stage kidney disease (ERSD).

41. At all relevant times, the DOH had regulatory oversight over Plaintiff, and Plaintiff was required to meet statutory and other regulatory requirements regarding its facility, including, among other things, its operations and closure.

## BACKGROUND

**A.** **The Lease**

42. Upon information and belief, pursuant to a lease agreement made as of September 1, 1998 between Landlord, as landlord, and Lenox Hill Hospital ("Lenox Hill"), as tenant (the "Lenox Hill Lease"), Lenox Hill leased the entire third floor ("Third Floor") and Suites 503 and 504 ("Fifth Floor Suites", and together with the Third Floor, the "Premises") in the Building.

43. Upon information and belief, Perlbinder negotiated and executed the Lenox Hill Lease on behalf of Landlord.

44. Lenox Hill thereafter entered into a sublease agreement with Island Rehabilitative Services Corp. ("Island Rehab") for the Premises.

45. As of July 1, 2005, Island Rehab assigned the sublease agreement to Plaintiff.

46. As of July 1, 2005, Plaintiff occupied the Premises in the Building.

47. Plaintiff renovated the Third Floor to become a renal dialysis facility, which contained a waiting room, reception area, guest bathrooms, a 27 station Hemodialysis Treatment

8

Area for patients, two nursing stations, a Reverse Osmosis Water Treatment Room, machine

maintenance room, staff lounge, a RN manager office, and patient and staff bathrooms.

48.     The Fifth Floor Suites were utilized as offices for Plaintiff's Administrator,

Medical Director, Nutritionist, Social Worker and Home Training Nurse, and contained an

employee conference room, storage areas and two Home Dialysis Exam/Training Rooms.

49.     The term of the Lenox Hill Lease, and Plaintiff's sublease, expired on February

28, 2013.

50.     Plaintiff negotiated a new lease agreement with Perlbinder, acting on behalf of

Landlord.

51.     Plaintiff and Landlord thereafter entered into Agreement of Lease, made as of

February 28, 2013 (the "Lease") for the Premises.

52.     Perlbinder executed the Lease on behalf of Landlord.

53.     The term of the Lease was for five years, beginning on March 1, 2013 and

expiring on February 28, 2018.

54.     The Lease contains two options by which Plaintiff could extend the initial Lease

term for two (2) additional five (5) year terms.

55.     In the event Plaintiff exercised its option to extend the Lease term for an

additional five years, the new rent amount would be determined by the aggregate amount of rents

payable by all tenants occupying space in the Building during the year immediately preceding

the exercise of Plaintiff's option.  The Lease further provides that Landlord could disregard any

lease agreement which it reasonably believed was not reflective of the then current fair market

rental value of comparable office space in the building.

9

**B.** **Plaintiff's Exercise of its First Extension Option and Perlbinder's and Landlord's Improper Setting of an Above-Market Rent Amount**

56.     Plaintiff exercised its first option to extend the Lease for an additional five-year period.

57.     As a result, the term of the Lease, as extended, expired on February 28, 2023.

58.     Thereafter, Plaintiff was advised by Landlord that it had determined that the fair market rental of the Premises, based on tenant leases then in occupancy of the Building for the prior year, was $112 per square foot.

59.     Landlord arrived at this amount, however, by not including in its calculations any tenant leases in the Building that were for less than $100 per square foot.

60.     Upon information and belief, these tenant leases were indicative of the then fair market value of space in the Building.

61.     In addition, upon information and belief, Landlord's calculations only included those tenant leases in the Building who rents exceeded $100 per square foot and were not indicative of the then fair market value of space in the Building.

62.     By ignoring certain leases, or including others, Landlord artificially and improperly inflated its rent determination to an amount in excess of the then fair market rental, resulting in Plaintiff being overcharged and paying approximately $130 per square foot ($112 per square foot with escalations) for the Premises.

**C.** **Plaintiff Seeks to Renegotiate the Lease: Landlord's and Perlbinder's False and Fraudulent Promises and Misrepresentations Concerning the Lease Modification and Reduced Rental**

63.     The new inflated rent amount arbitrarily set by Perlbinder and Landlord threatened the sustainability of Plaintiff's business and ability to continue to treat patients at the dialysis facility.

10

64.     In or about 2020, Plaintiff engaged Michael Dubin of Savitt Partners as its real estate broker to negotiate a lease modification and extension agreement.

65.     Mr. Dubin advised Plaintiff that commercial rents in the area and what Landlord itself was asking for space in the Building was in the range of $80-$90 per square foot.  He further advised Plaintiff that it was overpaying market rents by more than fifty (50%) percent.

66.     In an action commenced against Perlbinder by family members and trusts that are or were shareholders in Landlord, entitled Stephen Perlbinder et. al v. Barton Mark Perlbinder, Supreme Court, New York County, Index No. 655732/2021 (the "Shareholder Action"), some of the defendants herein admitted that Perlbinder routinely demanded grossly above-market rents from prospective tenants and renewals of existing tenancies, and would demand over-the-top amounts irrespective of what the market would bear:

> A fourth reason we currently face excessive vacancies at the Building is because of Mark's practice of demanding rents that are totally out of line with market, even when the market proves those rents to be way too high with units sitting vacant for years. [*See* Shareholder Action; NYSCEF No. 37 at ¶ 76].

67.     Plaintiff was not made aware of the Shareholder's Action until the summer of 2023.

68.     At all times from and after 2021 to the Summer of 2023, Perlbinder, Landlord and the remaining defendants hid from and/or failed to disclose to Plaintiff the existence of the Shareholder's Action, the allegations and claims set forth therein, and that Perlbinder had been stripped of all authority to act for Landlord in January 2023.

69.     Had Perlbinder and Landlord disclosed the existence of the Shareholder Action and the allegations and claims set forth therein, Plaintiff could have taken actions to protect its business and a joint venture partnership with Fresenius Medical Care ("FMC"), including but not limited to, breaking off all discussions with Perlbinder and Landlord and taking other space.

11

70.    In or about June 2020, Mr. Dubin advised Perlbinder and Landlord that he had been retained to represent Plaintiff in the renegotiation and/or extension of the Lease.

71.    Plaintiff first approached Landlord more than two and a half years before the February 2023 Lease expiration date because it knew that if the parties could not come to an agreement, it would have enough time to relocate to alternate space at a reduced rental.

72.    As a DOH regulated dialysis facility, it takes at least two years to locate new space, negotiate a new lease, make alterations for dialysis facility usage, and apply for and obtain the requisite DOH approvals to close the current facility, open a new facility, and transfer patients from one facility to the other.

73.    Perlbinder expressed no reaction or objection to Mr. Dubin's suggestion of a rent reduction or lease extension.

74.    Instead, he was focused on only one issue – that Plaintiff pay Mr. Dubin's broker commission because Landlord does not pay broker's commissions.

75.    In order to start negotiations, Plaintiff agreed to Perlbinder's demand that it pay Mr. Dubin's broker commission, which normally would be paid by the landlord.

76.    After Plaintiff believed this issue had been resolved, it offered to pay $95 per square foot in rent for the remaining seven-year Lease term (which had two years remaining) and the parties would agree to Plaintiff's early exercise of the second renewal option, with the base tax year reset to the current year (July 2020).

77.    Landlord and Perlbinder countered with $112.50 per square foot effective as of November 2020, with the base tax year reset effective as of July 2021 with Plaintiff paying all broker commissions.

78.     Ultimately, Plaintiff and Perlbinder (Landlord) agreed to $108 per square foot, effective January 1, 2021.

79.     While promising that a formal lease modification agreement would be drafted and sent to Plaintiff, none was forthcoming.

80.     Dubin suggested that Plaintiff search for alternate space. It conducted site visits and submitted a proposal for a space at 309 East 94th Street in Manhattan.

81.     Landlord and Perlbinder, however, continued to promise and represent to Plaintiff that a formal lease modification agreement would be forthcoming and urged Plaintiff not to move, specifically representing to Plaintiff that it was not at risk of being displaced.

82.     Because of the passage of time, Landlord and Perlbinder wanted and Plaintiff agreed to March 1, 2021 as the start date for the $108 per square foot rental amount. Plaintiff waited to receive the formal lease modification agreement, but none was sent in 2021 despite Plaintiff's repeated requests.

**D.      Plaintiff's Joint Venture Partnership with FMC**

83.     FMC is the world's leading provider of dialysis services to patients.

84.     Plaintiff's principal, Dr. Morton Kleiner, had entered into successful joint venture partnerships with FMC at four dialysis facilities in Staten Island, Queens and Long Island.

85.     In or about 2021, FMC approached Dr. Kleiner about a joint venture partnership in connection with the Upper East Side Dialysis Center at the Building.

86.     The partnership between Plaintiff and FMC expected to offer Plaintiff many benefits, including increased reimbursement from commercial payors, upgraded systems and state of the art dialysis equipment for its patients.

87.     As part of the proposed joint venture partnership, FMC valued Plaintiff's business at $5,000,000.00.

13

88.     As a condition to consummating the joint venture partnership, FMC required that Plaintiff have a lease in place at the Building for at least five years with a rent at fair market value.

89.     Plaintiff repeatedly advised Perlbinder and Landlord from 2021-2023 about its joint venture partnership with FMC and its need for at least a five-year lease term at a fair market rental in order to proceed with that transaction.

90.     Plaintiff also advised Perlbinder and Landlord of the benefits that FMC would bring to the Building, including new equipment, renovations to the Premises at no cost to Landlord, and increased foot traffic.

**E.     Perlbinder and Landlord Stall: Plaintiff's Second Option and Lease Expire**

91.     Plaintiff and its broker continued to follow up with Perlbinder and Landlord in 2022 to obtain the formal lease modification agreement.

92.     In January 2022, Perlbinder called Mr. Dubin and they agreed on moving forward with the lease modification and extension transaction, and Perlbinder promised and represented that the documentation would be forthcoming.

93.     Landlord insisted, however, that the new rent start date would be January 1, 2022, or a year later than originally agreed.

94.     Plaintiff continued to follow up with Perlbinder and Landlord from March 2022 to August 2022 to request the formal lease modification agreement but received no substantive response.

95.     On March 7, 2022, Mr. Dubin sent an email to Perlbinder's and Landlord's counsel stating, in pertinent part that:

> We really need to move this along or we've [Plaintiff] got to throw in the towel.  When Mark Perlbinder called me in January we responded affirmatively, so I'm not sure why we're pushing mid-

14

> March and we have no paperwork. I know you said he was out of town, but I would have assumed that his offer to my tenant was vetted and approved by his partners.
>
> Replacement Associates [Plaintiff] has requested documentation several times and have asked me to find alternative space. While I have spaces to show them, I don't want to go through the gyration of offering new space and then I [sic] your lease amendment ready to go.
>
> Please let me know where we are.

96.     Having received no response, Mr. Dubin followed up by phone on March 21,

2022. Perlbinder's and Landlord's counsel responded by email dated March 22, 2022, stating:

> I received your voicemail yesterday afternoon. Unfortunately, I have not received final authorization from my client to send you the proposed lease extension and modification agreement.
>
> I apologize for this situation, and I hope to be able to proceed to complete the lease extension on the terms we discussed in the near future.

97.     Thus, Perlbinder's and Landlord's attorney represented that the agreement had

been drafted, but that it could not be sent at that time. As Plaintiff would learn more than a year

later, Perlbinder and Landlord's attorneys had not drafted – and never drafted – the lease

modification agreement, but they continued to represent that it had been drafted and would be

forthcoming.

98.     As a result of Perlbinder's and Landlord's foot dragging and false promises, the

window in which Plaintiff had to exercise its second option closed in March 2022. Plaintiff had

not exercised its option because Perlbinder and Landlord had represented throughout 2021 and

2022 that an agreement had been reached and that Plaintiff would not need to move.

99.     Plaintiff's alternate leasing opportunity at 309 East 94th Street was no longer

available because the building had been sold. Other spaces that Plaintiff had been interested in

leasing also were no longer available. As a result of Landlord's and Perlbinder's promises,

15

representations, acts, and omissions, Plaintiff's options were limited either to stay in the Premises or be forced to close the 20-year old dialysis facility.

100.    In the Summer of 2022, and with the Lease expiring in less than eight months in February 2023, Mr. Dubin suggested to Perlbinder and Landlord that they focus on a new long term lease and sought to set up a call with Landlord's and Plaintiff's principals to discuss the terms of a new lease since Landlord failed to follow through on its agreement.  Mr. Dubin stated that he "can't stress enough how disappointed the tenant [Plaintiff] is with the way it has been treated over the last two years. . ."

101.    When Mr. Dubin received no response to his inquiries, he sent another email stating:

> Not to restate the obvious, but confused as to why ownership does not want to engage with an existing tenant.  Should we assume from landlord's silence that it's not interested in keeping the tenant, or is there something else that we're unaware of that is causing the delay in landlord's response?  Please let me know.

102.    Although there was much going on behind the scenes within Landlord's shareholder group of which Plaintiff was in the dark and that Perlbinder and Landlord failed to disclose (including the Shareholder Action and Perlbinder holding any transaction hostage to his demand for payment of "illegal" brokerage commissions), Mr. Dubin was advised to put together a proposal for a five-year lease to send to Perlbinder, which he did in late September 2022.

103.    Almost three and a half months went by with no response.

104.    On January 10, 2023, Mr. Dubin finally received an email from Perlbinder's and Landlord's attorney stating that his client needed until the end of the month just to respond to the proposal.

105.    Noting that the Lease was expiring the next month in February 2023, and despite all their prior promises and representations that Plaintiff need not relocate because the lease was

16

either going to be extended or a new lease would be signed, Perlbinder and Landlord then

dropped a bombshell – they would extend the Lease another six months, with an additional short-

term extension, *to permit Plaintiff's buildout of any alternate leased location*.

### F. Landlord's One Year Lease Extension and Subsequent Agreement to a Long Term Lease

106. With only one week to go before Plaintiff's Lease expired, and despite all of the

promises and representations they had made over the prior two and a half years, Landlord and

Perlbinder advised Plaintiff that it would only agree to a one-year extension of the Lease.

107. Plaintiff was forced to accept a short term lease because it was legally obligated to

remain open and to treat patients unless and until DOH approved a closure plan for the facility

and all of Plaintiff's patients were transferred to other facilities – a process than can take six

months or more. In other words, Plaintiff could not lawfully close its doors to its patients absent

DOH approval.

108. Plaintiff nevertheless continued to press for a long-term lease necessary for

Plaintiff's survival, its patients, and its joint venture partnership with FMC.

109. On February 27, 2023, the day before the expiration of the Lease, Plaintiff and

Landlord entered into a Lease Extension and Modification Agreement (the "Lease Extension"),

extending the Lease to February 29, 2024. The agreement was signed by Perlbinder and Astrid

SabellaRosa as "authorized signatories" of Landlord.

110. Plaintiff had never dealt with Ms. SabellaRosa and was unaware of the

significance of her participation in the transaction. As far as Plaintiff was aware, Perlbinder was

and continued to be Landlord's sole representative and decision maker, and Plaintiff continued to

deal with Landlord through him.

111. On May 2, 2023, Plaintiff spoke with Perlbinder and told him that FMC is willing to commit $5 million to the joint venture partnership provided that Plaintiff was given a long-term lease with Landlord.

112. Perlbinder responded that he would consider the request but needed a few months to get back to Plaintiff with a definitive answer.

113. Plaintiff told Perlbinder that it did not have the luxury to wait another few months because FMC, among others, is pressuring Plaintiff and would withdraw the joint venture partnership offer.

114. Perlbinder said he anticipated having an answer by June 1st and if he could he would extend the Lease for an additional ten years as previously offered.

115. Plaintiff told Perlbinder in no uncertain terms that Plaintiff would be forced to close the dialysis facility if he was unable to provide a long-term lease.

116. Plaintiff confirmed the conversation in a May 2, 2023 email, stating in pertinent part, that:

> As discussed, Fresenius Medical Care and I have established a strong relationship. We have JVs in four of our other locations and they have been good partners. I will reach out to them to make contact with you about the locations you are involved in.
>
> As to the basic discussion we had, I would very much like to keep the project viable. In order to do that I must have a meaningful lease to move forward together in a JV with Fresenius. I strongly feel that we must resolve this as soon as possible, but no later than June 1st to avoid necessitating a closure of the facility.

117. Plaintiff and Perlbinder spoke again on May 5, 2023, which Plaintiff confirmed in an email, stating in pertinent part that:

> You and I discussed extending the lease for five, or even ten years. I would appreciate if you would confirm your intention to extend the lease for an additional five years, but I would be agreeable for ten years as you mentioned. Once I receive confirmation, I will

18

seek to implement a successful and viable joint venture with
Fresenius Medical Care to provide ongoing and longstanding
dialysis care to our patients. It is essential that we conclude our
agreement for the lease extension as soon as possible, with a
targeted deadline of no later than the end of this month. My
attorneys are prepared to move quickly.

\*         \*         \*

Again, I very much appreciate your agreement in this matter.
Looking forward to a favorable reply.

118.    Plaintiff sent another email to Perlbinder on May 18, 2023, confirming
Perlbinder's agreement to extend the Lease for an additional ten years and advising that, absent
an extension in short order and the FMC joint venture partnership, Plaintiff would have to apply
for closure of its dialysis facility.

119.    Perlbinder then advised Plaintiff that to obtain a long-term lease, Plaintiff would
have to fire its broker (Mr. Dubin) and retain Landlord's broker, CBRE. Plaintiff reluctantly
complied with this outrageous demand.

120.    On May 25, 2023, Plaintiff spoke with James Gale (Landlord's broker and CBRE
Vice President) and Bill Hartman (Plaintiff's "new" broker and CBRE's Vice Chairman), who
agreed to prepare a proposal for a 31 year lease to submit to Perlbinder, who they said was
anxious to move forward with extending the Lease.

121.    Landlord's broker (CBRE) thereafter ghost-drafted a lease proposal for Plaintiff's
broker (CBRE) for a new 31 year lease at $108 per square foot, which was sent to Rose in mid-
June 2023, and was made subject to Rose's approval as "Property Manager." Landlord,
Perlbinder, the remaining defendants, nor anyone else ever informed Plaintiff that Rose was the
"property manager" or that Perlbinder had been stripped of all authority, and Plaintiff continued
to deal with Perlbinder as Landlord's sole representative.

122.    CBRE told Plaintiff that Perlbinder had approved the proposal.

19

123. Plaintiff circulated the proposal to its partners and FMC with the understanding that the transaction would be moving forward because Perlbinder had approved it.

**G. Plaintiff is Advised That it Must Deal with Rose, Who Offers Only a Short-Term Extension Leading to the Closure of Plaintiff's Business and Loss of the FMC Joint Venture Partnership**

124. Plaintiff was surprised to receive a call on June 21, 2023 from Perlbinder's niece, Astrid SabellaRosa, who advised that she hired Rose as a consulting company to develop a "strategic plan" for the Building and that Perlbinder was no longer in full control of Landlord and had no authority to offer Plaintiff a 31 year lease. Plaintiff further learned that Rose could block the deal, and was urged by Ms. SabellaRosa to conduct all future negotiations and communications through Rose.

125. Plaintiff immediately contacted Rose to discuss the 31 year lease agreed to by Perlbinder.

126. On July 19, 2023, a Rose representative requested that Plaintiff submit a letter of intent from FMC. Plaintiff complied.

127. On August 9, 2023, Rose had a call with Plaintiff and represented that Landlord would extend the lease.

128. Throughout August and September 2023, Rose continued to represent that Landlord was working on an offer for the lease extension, but it sent no proposal to Plaintiff. Rose stated that delays were due to vacation schedules, and never indicated that a long-term lease would not be forthcoming.

129. Throughout this time, Plaintiff reiterated the sense of urgency for a long-term lease, both for the FMC joint venture partnership and for DOH requirements.

20

130.     In September 2023, Rose finally advised that Landlord was only willing to enter into a six-month lease extension.

131.     Shortly thereafter, FMC withdrew its interest for the joint venture partnership with Plaintiff because of the absence of a long-term lease agreement.

132.     With no ability to find a new location and obtain the requisite DOH approvals before the expiration of the Lease, Plaintiff had no choice but to close the facility.

133.     On October 3, 2023, Plaintiff advised Rose and Perlbinder that it was closing its facility as a result of Landlord's actions and inaction.

134.     Plaintiff filed a closure plan for DOH approval and permission to close the facility and to transfer its patients to other facilities, which DOH approved.

135.     Plaintiff closed its business, lost the FMC joint venture partnership, and suffered millions of dollars in losses.

136.     While Plaintiff was in the process of transferring its patients following DOH approval of its closure plan, Rose offered to extend the Lease for an additional three years, which was too little and too late.

**H.      The Curtain is Pulled Back – Plaintiff Learns About the Shareholder Action and Perlbinder's Illegal Actions, False Promises and Misrepresentations Upon Which Plaintiff Relied**

137.     In or about July 2023, and two months before Rose offered the six month lease extension, Plaintiff learned of the existence of the Shareholder Action that had been commenced almost two years earlier in July 2021.  Plaintiff further learned that some of the defendants herein (Perlbinder's family members) and others were suing Perlbinder directly and derivatively for breach of fiduciary duty, unjust enrichment, conversion, and sought injunctive relief to prevent Perlbinder from negotiating and executing any lease, which would include the lease extension

agreement and new lease that Perlbinder had negotiated and agreed to with Plaintiff from 2020-
2023.

138. Plaintiff further learned that the plaintiffs in the Shareholder Action (some of the
defendants herein) sought the appointment of a receiver in October 2022 to take control of and
manage the Building, and that Ms. SabellaRosa submitted an affidavit and emails in support of
the receivership application.

139. In her affidavit, Ms. SabellaRosa acknowledged that Plaintiff is the largest
remaining tenant in the Building and had sought in 2021 to renew its lease for an additional five
year term, that Landlord considered Plaintiff to be "the anchor tenant in the Medical Offices
portion of the Building," and that "it is critical that we do not needlessly lose this tenant, which
also brings an important service to the surrounding community." *See* Shareholder Action;
NYSCEF No. 37 at ¶¶ 46-47.

140. Contemporaneous emails attached to Ms. SabellaRosa's affidavit show that all of
Landlord's principals agreed in February 2022 to Plaintiff's five-year lease extension at $108 per
square foot (retroactive of January 1, 2022), and that the only impediment to closing the
transaction was Perlbinder's demand that he be paid all brokerage commissions for the deal. *See*
Shareholder Action; NYSCEF No. 40.

141. After being advised by Landlord's attorney that Plaintiff may pull the deal if
Landlord does not confirm the deal terms and provide a lease modification and extension
agreement, in an email dated February 18, 2022, Ms. SabellaRosa stated that:

> we are 100% on board with the terms of the renewed leased, and
> consider Replacement Associates' [Plaintiff] tenancy vital to the
> Building. We want this deal to move forward, our only objection
> is Mark's taking a commission. Mark never responded to my last
> email asking if he was blocking this deal if he does not receive a
> commission.. . . We agree that time is of the essence here, and

22

would like clarity on these points from Mark as soon as possible so that we can proceed quickly in the best interests of the Building. [Id.]

142. The emails make clear that, although Landlord and its principals accepted all of the material terms of the proposed transaction, as of March 2022 Landlord's attorney never even started drafting the formal lease extension and modification agreement that Perlbinder, Landlord and Landlord's attorney repeatedly promised and represented had been drafted and would be forthcoming.

143. In an email dated July 11, 2022, Ms. SabellaRosa stated that:

if we can move forward without "commission payments" to Mark [Perlbinder], there is nothing stopping us from signing the lease extension for Replacement Associates today. His insistence on paying himself commissions remains the sole issue here; as soon as Mark signals his willingness to proceed with a lease without a commission for himself, we are ready to sign it immediately. [*See* Shareholder Action; NYSCEF No. 43.]

144. In August 2022, Landlord's attorney forwarded to Perlbinder and Ms. SabellaRosa an email from Mr. Dubin in which the attorney was advised that "I can't stress enough how disappointed the tenant is with the way it has been treated over the last two years." Perlbinder's response? "Tell Dr. Kleiner [of Plaintiff] to have the commission paid to me and then Astrid [SabellaRosa] will agree to a deal that Ashlwey [sic] does not wish to pay me a commission for $14 million of income!" *See* Shareholder Action; NYSCEF No. 44.

145. Had Plaintiff known that its business, its patients, and its joint venture partnership with FMC were being held hostage because of Perlbinder's unbridled greed and self-interest in obtaining for himself payment of "illegal" brokerage commissions, and that Plaintiff was consistently being lied to by Perlbinder and Landlord in 2021 and 2022, Plaintiff could have protected itself by exercising the option or relocating to other space while it had the time.

146. But the lies and omissions did not stop there.

23

147. In July 2023, Plaintiff learned that the parties in the Shareholder Action (some of the defendants herein), including Perlbinder, entered into a Stipulation and Consent Order six months earlier in January 2023 pursuant to which, in lieu of having a Receiver appointed, Rose was given exclusive authority to manage and lease space in the Building and to the resolve any issues where there was a 50-50 deadlock between Landlord's shareholders. *See* Shareholder Action; NYSCEF No. 68.

148. The Stipulation and Consent Order further provided that none of the parties to the Shareholder Action, including Perlbinder, could unilaterally bind Landlord.

149. Perlbinder was thus stripped of all authority to deal with Plaintiff and to act on and for Landlord's behalf.

150. But that did not stop Perlbinder from continuing to deal with Plaintiff in 2023 and to make promises and representations concerning a future lease that both he and Landlord knew would never be kept or fulfilled.

151. Perlbinder, Landlord, the remaining defendants, and Landlord's attorney failed to disclose the existence of the Stipulation and Consent Order, never directed Plaintiff to Rose for the lease negotiations or tell Plaintiff that Perlbinder had been stripped of all authority even though, upon information and belief, they knew Perlbinder continued to deal with Plaintiff as Landlord's representative.

152. Instead, Perlbinder continued to hold himself out as having the exclusive authority to act on Landlord's behalf in the lease negotiations. He continued to negotiate and agree on terms, forced Plaintiff to fire its broker and to hire Perlbinder's and Landlord's broker (CBRE), and then agreed to a new 31-year lease with Plaintiff.

24

153.     Moreover, although Plaintiff never knew that Perlbinder was holding Plaintiff's lease extension agreement hostage to his receipt of "illegal" brokerage commissions and that the remaining defendants had all agreed to the terms of the extension, Rose never broke the "deadlock" to move forward on that transaction, with or without paying Perlbinder a commission, although it had the authority to do so.

154.     Instead, in August 2023, Rose offered to extend the Lease for only six months, reneging on promises that Perlbinder, Landlord and Rose itself made.

155.     As a result, Plaintiff was forced Plaintiff to close its business, lost the FMC joint venture partnership with FMC, and suffered millions of dollars in losses and damages.

I.     **Pierce the Corporate Veil: Landlord's Shareholders are Personally Liable for the Improper Actions of Landlord and Resulting Injury to Plaintiff**

156.     At all times herein mentioned, Perlbinder exercised *de facto* control over Landlord.

157.     Upon information and belief, Perlbinder used Landlord as his personal piggy bank and used corporate funds for his own personal benefit.

158.     As set forth in public filings in the Shareholder Action, at Perlbinder's direction, Landlord made millions of dollars of dividend payments, $23 million in "loans" and millions in payments for Perlbinder's personal expenses, without documentation, and Perlbinder used $125,000.00 of Landlord's funds to purge his personal contempt of court.

159.     As set forth in public filings in the Shareholder Action, Landlord, at Perlbinder's direction, leased a $115,000.00 Porsche solely for Perlbinder's personal use and paid for same.

160.     As set forth in public filings in the Shareholder Action, Perlbinder has used Landlord's funds to renovate his Hamptons beach house and two apartments, and to pay the salaries of his ex-wife's driver, his personal chef and house staff.

25

INDEX NO. 654792/2024

RECEIVED NYSCEF: 03/11/2025

161.     As set forth in public filings in the Shareholder Action, Landlord, at Perlbinder's direction, made hundreds of intercompany transfers and commingled family resources and assets.

162.     As set forth in public filings in the Shareholder Action, Landlord has disregarded corporate formalities, including but not limited, having inadequate books and records, failing to hold annual shareholders meetings or election of officers or directors, failing to have a board of directors, and failing to file bi-annual statements with the New York Secretary of State.

163.     Upon information and belief, Perlbinder was never elected as Landlord's "President."

164.     Upon information and belief, at all times herein mentioned, the 2012 Muffy Trust, the 2023 Perlbinder Trust, Stephen, the Astrid 2020 Trust, the 2016 Astrid Trust, the Andrea 2020 Trust and the Andrea 2016 Trust were aware of, acquiesced in, fostered, aided and abetted, permitted, and consented to the acts and omissions set forth in Paragraphs 157—163 hereinabove.

165.     Upon information and belief, at all times herein mentioned, the 2012 Muffy Trust, the 2023 Perlbinder Trust, Stephen, the Astrid 2020 Trust, the 2016 Astrid Trust, the Andrea 2020 Trust and the Andrea 2016 Trust, were aware of, acquiesced in, fostered, aided and abetted, permitted, consented to and benefitted from Perlbinder's domination and control over Landlord.

166.     Upon information and belief, at all times herein mentioned, the 2012 Muffy Trust, the 2023 Perlbinder Trust, Stephen, the Astrid 2020 Trust, the 2016 Astrid Trust, the Andrea 2020 Trust and the Andrea 2016 Trust were aware of, acquiesced in, fostered, aided and abetted, permitted, consented to and knew Perlbinder was negotiating a lease extension or new lease with Plaintiff for Landlord and his acts and omissions set forth hereinabove.

26

167.    Upon information and belief, at all times herein mentioned, the 2012 Muffy Trust, the 2023 Perlbinder Trust, Stephen, the Astrid 2020 Trust, the 2016 Astrid Trust, the Andrea 2020 Trust and the Andrea 2016 Trust were aware of, acquiesced in, fostered, aided and abetted, and permitted Perlbinder after January 2023 to negotiate a new lease with Plaintiff.

168.    Upon information and belief, at all times herein mentioned, the 2012 Muffy Trust, the 2023 Perlbinder Trust, Stephen, the Astrid 2020 Trust, the 2016 Astrid Trust, the Andrea 2020 Trust and the Andrea 2016 Trust benefited directly or indirectly from Landlord's and Perlbinder's acts and omissions as set forth hereinabove.

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS
#### (Breach of Contract)

169.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 168 as if set forth in full herein.

170.    The Lease is an enforceable contract.

171.    The Lease provides that, in the event Plaintiff exercises its option to extend the Lease term for an additional five years, the new rent amount is determined by the aggregate amount of rents payable by all tenants occupying space in the Building during the year immediately preceding the exercise of Plaintiff's option.

172.    The Lease further provides that Landlord could disregard any lease agreement which it reasonably believed was not reflective of the then current fair market rental value of comparable office space in the building.

173.    Plaintiff exercised its first option to extend the Lease for an additional five-year period.

174.    As a result, the term of the Lease, as extended, expired on February 28, 2023.

175.     Plaintiff was advised by Landlord that it had determined that the fair market rental of the Premises, based on tenant leases then in occupancy of the Building for the prior year, was $112 per square foot.

176.     Landlord arrived at this amount, however, by not including in its calculations any tenant leases in the Building that were for less than $100 per square foot, in violation of the Lease.

177.     Upon information and belief, these tenant leases were indicative of the then fair market value of space in the Building.

178.     In addition, upon information and belief, Landlord included in its calculations tenant leases in the Building that were for more than $100 per square foot that were not indicative of the then fair market value of space in the Building, in violation of the Lease.

179.     By ignoring certain leases, or including others, Landlord artificially and improperly inflated its rent determination to an amount in excess of the then fair market rental, in breach of the Lease.

180.     As a result of the foregoing, Landlord thereafter overcharged Plaintiff, and Plaintiff paid Landlord an amount in excess of the rent that should have been charged, in violation of the Lease.

181.     By reason of the foregoing, Landlord breached the Lease.

182.     By reason of the foregoing, Plaintiff suffered compensatory damages, in an amount to be determined at trial.

183.     By reason of the foregoing, all defendants are personally liable for the damages sustained by Plaintiff.

**AS AND FOR A SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**(Fraud)**

184.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 168 as if set forth in full herein.

185.     Perlbinder and Landlord knew that Plaintiff required a long-term lease at fair market rental rates for the continued viability of its business and for its joint venture partnership with FMC, and that Plaintiff's search for new space, renovations of said space into a dialysis facility, DOH approval for any move to a new location would take a substantial amount of time likely exceeding two years.

186.     Perlbinder and Landlord repeatedly represented to Plaintiff, among other things, that Landlord would enter into a long-term lease for the Premises at the rate of $108 per square foot, that a formal lease modification agreement was drafted and would be forthcoming, that Plaintiff did not need to look for or obtain alternate space, that Perlbinder had authority to negotiate for and to bind Landlord, that Landlord would agree to a transaction if Plaintiff paid its own broker's commission and then all leasing commissions, that Landlord would do a 31-year lease transaction if Plaintiff fired its broker and hired Perlbinder's and Landlord's broker (CBRE), and that Perlbinder (and Landlord) agreed to the 31-year lease proposal ghost-written by Perlbinder's and Landlord's broker (CBRE).

187.     Perlbinder and Landlord's representations were material.

188.     Perlbinder and Landlord knew that their representations were false at the time they were made, and knew that they would not be performed or had a present intention not to perform, and did so for the purpose of misleading Plaintiff.

189.     Perlbinder and Landlord made false representations to Plaintiff to induce Plaintiff to remain in the Premises and not seek alternative space.

190.    Perlbinder and Landlord knew that Plaintiff would rely upon their representations.

191.    Plaintiff relied on Perlbinder's and Landlord's false representations to its detriment.

192.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but no less than $6,000,000.00.

193.    By reason of the foregoing, all defendants are personally liable for the damages sustained by Plaintiff.

194.    In addition, because Perlbinder's and Landlord's false promises, misrepresentations, and omissions were willful, wanton, intentional, and were made with the willful and/or reckless disregard of Plaintiff's rights, defendants are liable for, and Plaintiff is entitled to recover, punitive damages in the amount of $12,000,000.00.

195.    Despite having superior knowledge, Perlbinder and Landlord concealed and failed to disclose to Plaintiff, among other things, the existence of the Shareholder Action and the Stipulation and Consent Oder; that defendants had all agreed to the material terms of a seven year lease extension agreement at $108 per square foot; that Perlbinder was holding the transaction hostage to his demand for payment of "illegal" brokerage commissions; that Rose had been appointed the Building's exclusive agent in January 2023; that Perlbinder had no authority to force Plaintiff to hire Landlord's broker (CBRE) and to have CBRE ghostwrite a thirty-one year lease proposal to which Perlbinder and Landlord had purportedly agreed; and that Perlbinder had no authority to bind Landlord after January 2023.

196.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but no less than $6,000,000.00.

30

197.    By reason of the foregoing, all defendants are personally liable for the damages sustained by Plaintiff.

198.    In addition, because Perlbinder's and Landlord's concealment and omissions were willful, wanton, intentional, and were made with the willful and/or reckless disregard of Plaintiff's rights, Perlbinder and Landlord are liable for, and Plaintiff is entitled to recover, punitive damages in the amount of $12,000,000.00.

199.    By reason of the foregoing, all defendants are personally liable for punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Promissory Estoppel)

200.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 168 as if set forth in full herein.

201.    Perlbinder and Landlord repeatedly promised Plaintiff that Landlord would enter into a lease extension and modification agreement and/or long-term lease for the Premises that Plaintiff had been occupying for the past 20 years.

202.    Perlbinder and Landlord repeatedly promised Plaintiff that a formal lease extension and modification agreement at $108 per square foot had been drafted and was forthcoming, and that Plaintiff did not need to look for alternate space.

203.    Perlbinder acted as Landlord's alter ego when making the foregoing promises to Plaintiff.

204.    Perlbinder and Landlord knew that Plaintiff's joint venture partnership with FMC was reliant upon a minimum five year lease agreement at a fair market rent, and that Plaintiff would rely on its promises to enter into such a transaction.

205.    Plaintiff reasonably relied upon the repeated promises of Perlbinder and Landlord.

31

206. Plaintiff was injured as a result thereof, including but not limited to, loss of its business and closure of The Upper East Side Dialysis Center facility, and loss of the FMC joint venture partnership.

207. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but no less than $6,000,000.00.

208. By reason of the foregoing, all defendants are personally liable for the damages sustained by Plaintiff.

**WHEREFORE**, Plaintiff demands judgment against all defendants, as follows:

A.  On the First Cause of Action, compensatory of damages in an amount to be proven at trial;

B.  On the Second Cause of Action, compensatory of damages in an amount to be proven at trial, but no less than $6,000,000.00, and an award of punitive damages in the amount of $12,000,000.00;

C.  On the Third Cause of Action, compensatory of damages in an amount to be proven at trial, but no less than $6,000,000.00;

D.  On all causes of action, awarding Plaintiff such other and further relief as this Court deems just and proper, together with Plaintiff's attorneys' fees, costs and disbursements.

Dated: New York, New York
March 10, 2025

**SILLS CUMMIS & GROSS P.C.**

By: ___/s/ Mitchell D. Haddad_____
       Mitchell D. Haddad, Esq.
       Lori K. Sapir, Esq.
101 Park Avenue, 28th Floor
New York, New York 10178
(212) 643-7000

*Attorneys for Plaintiff*
*Replacement Associates, LLC*

33