**EXHIBIT C**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of the Application of

BARTON MARK PERLBINDER, individually; and MUFFY FLOURET, individually, and as Trustee of the MARK PERLBINDER 2023 IRREVOCABLE TRUST and as Trustee of the MUFFY FLOURET 2012 FAMILY TRUST, on behalf of 175 WEST 12TH STREET GARAGE CORP., 210 EAST 86THSTREET CORP., 245 EAST 36TH STREET GARAGE CORP., 400 CONCRETE CORP., EAST 53RD GARAGE CORP., 400 EAST 54TH STREET GARAGE CORP., PERLBINDER REALTY CORP., RIVERCOURT GARAGE CORP., 330 W. 56 STREET CORPORATION, BAR-MAR ASSOCIATES LLC, PERLBINDER HOLDINGS, LLC, S&M 52ND FEE LLC, STEPHEN & MARK 53 ASSOCIATES LLC, THE 400 EAST 54TH STREET COMPANY LLC, THREE AT 53RDCOMPANY LLC, TWO AT 54TH COMPANY LLC, THE MS PARTNERSHIP and SAN-DAR ASSOCIATES,

        Petitioners,

For an Omnibus Judicial Dissolution of (i) 175 West 12th Street Garage Corp., 210 East 86th Street Corp., 245 East 36th Street Garage Corp., 400 Concrete Corp., East 53rd Garage Corp., 400 East 54th Street Garage Corp., Perlbinder Realty Corp., Rivercourt Garage Corp., and 330 W. 56 Street Corporation pursuant to Business Corporation Law §§ 1104 and 1104-a; (ii) Bar-Mar Associates LLC, Perlbinder Holdings, LLC, S&M 52nd Fee LLC, Stephen & Mark 53 Associates LLC, The 400 East 54th Street Company LLC, Three At 53rd Company LLC, Two At 54th Company LLC, pursuant to Limited Liability Company Law § 702, and (iii) The MS Partnership and San-Dar Associates, pursuant to Partnership Law §§ 62, 63 and other relief

   -against-

STEPHEN PERLBINDER, individually; ASTRID SABELLAROSA, individually and as Trustee of the ARTICLE 4 TRUST UNDER ASR 2020 FAMILY TRUST and as Trustee of the STEPHEN PERLBINDER 2016 FAMILY TRUST F/B/O ASTRID SABELLAROSA and as Trustee of the JULIUS PERLBINDER FAMILY TRUST; ANDREA JO STEIN, individually and as Trustee of the ARTICLE 4 TRUST UNDER AJS 2020 FAMILY TRUST and Trustee of the STEPHEN

Index No.: _____

**VERIFIED PETITION**

> PERLBINDER 2016 FAMILY TRUST F/B/O ANDREA STEIN; and BRIAN E. RAFTERY, as Trustee of the ARTICLE 4 TRUST UNDER ASR 2020 FAMILY TRUST and the ARTICLE 4 TRUST UNDER AJS 2020 FAMILY TRUST,
>
> Respondents.

Petitioners, Barton Mark Perlbinder ("Mark"), individually, and Muffy Flouret ("Muffy"), individually, and as Trustee of the Mark Perlbinder 2023 Irrevocable Trust (the "2023 Mark Trust"), and as Trustee of the Muffy Flouret 2012 Family Trust (the "2012 Muffy Trust" and when referred to with Mark, Muffy, and the 2023 Mark Trust, collectively, "Petitioners"), by and through their undersigned counsel, Rosenberg & Estis, P.C., as and for their Verified Petition against respondents, Stephen Perlbinder ("Stephen"), individually, and Astrid Sabellarosa ("Astrid"), individually, and as Trustee of the Article 4 Trust Under ASR 2020 Family Trust (the "2020 Astrid Trust") and as Trustee of the Stephen Perlbinder 2016 Family Trust F/B/O Astrid Sabellarosa (the "2016 Astrid Trust"), and as Trustee of the Julius Perlbinder Family Trust (the "JPF Trust"), Andrea Jo Stein ("Andrea"), individually and as Trustee of the Article 4 Trust under AJS 2020 Family Trust (the "2020 Andrea Trust"), and Brian E. Raftery ("Brian"), as Trustee of the 2020 Astrid Trust and the 2020 Andrea Trust (collectively, "Respondents"), respectfully allege as follows:

## NATURE OF THE ACTION

1. This is an omnibus special proceeding seeking, among other things: (i) judicial dissolution of 175 West 12th Street Garage Corp., 210 East 86th Street Corp., 245 East 36th Street Garage Corp., 400 Concrete Corp., East 53rd Garage Corp., 400 East 54th Street Garage Corp., Perlbinder Realty Corp., Rivercourt Garage Corp., and 330 W. 56 Street Corporation (collectively, the "Corporations"), pursuant to Business Corporation Law ("BCL") §§ 1104 and 1104-a; (ii)

judicial dissolution of Bar-Mar Associates LLC, Perlbinder Holdings, LLC, S&M 52nd Fee LLC, Stephen & Mark 53 Associates LLC, The 400 East 54th Street Company LLC, Three At 53rd Company LLC, and Two At 54th Company LLC (collectively, the "LLCs"), pursuant to Limited Liability Company Law ("LLC Law") § 702; (iii) judicial dissolution of The MS Partnership and San-Dar Associates (together, the "Partnerships"), pursuant to Partnership Law §§ 62 and 63; and (iv) upon dissolution, the appointment of a Court ordered receiver to wind up the affairs of the Corporations, the LLCs, and the Partnerships (collectively, the "Entities" and each an "Entity"), as well as an accounting.

2. By way of this special proceeding, Petitioners are seeking to bring finality to what has been a textbook example of familial dysfunction that has resulted in the Entities' inability to continue in existence. As described below, each of the Entities exists to carry out the business of the Perlbinder family real estate portfolio (the "Perlbinder Properties"). The Entities are no longer capable of continued business operations due to, *inter alia*, discord and dissension, breaches of various agreements, voting deadlocks and other inaction, financial unfeasibility, and frustration of business purposes, thus requiring dissolution of the Entities.

3. Respondents have readily admitted that they do not want to work with Petitioners in the family business and the two sides of the family are unable to work together to operate the Perlbinder Properties.

4. By way of background, the Perlbinders are a New York real estate family owning and operating a number of commercial and residential buildings throughout New York City.

5. The Perlbinder family real estate business had humble beginnings, being founded over a century ago by Joseph Perlbinder, a Jewish immigrant who built apartment buildings throughout New York City.

6. Following Joseph's death in 1946, his son, Julius Perlbinder, took over the family business and grew the real estate portfolio.

7. Julius remained involved in the family business, in some form or fashion, until his death in 2011.

8. Julius had two sons -- Mark and Stephen.

9. While both Mark and Stephen effectively maintained equal ownership in the family's real estate businesses (which continues to the present day, albeit now equal ownership is in most cases maintained through trusts held by each side of the family), Stephen wanted little involvement with the management and operation of the businesses from the start.

10. Notwithstanding Stephen's legal obligation as a fiduciary of the Entities to take part in the management of the family business, a duty which he never disavowed or was relieved of, he failed to do so.

11. Despite Mark's repeated requests for Stephen to take part in running the family business, Stephen instead chose to have Mark do the work. Stephen acquiesced while the business was moving forward under Mark's leadership, including Stephen signing documents affirming Mark's decisions and giving his sign-offs on various company financials in connection with his personal and business tax filings to the requisite government agencies.

12. So long as the companies generated funds to support Stephen's lifestyle without interruption, he blessed Mark's decisions in managing the family business.

13. It was not until several months into the COVID-19 pandemic, when the cash flow took a hit, that Stephen initiated suit against his brother for alleged acts relating to the family business that Stephen, at all times, was either aware of or otherwise engaged in himself.

14. Stephen has admitted as much in affidavits stating, under oath, that "[f]or years, I have permitted Mark to handle the day-to-day management of the family properties … with the expectation that Mark would act as a fiduciary. So long as my brother was acting competently and treating me fairly, I was content to play a passive role." See NYSCEF Doc. No. 120 in an action entitled *Stephen Perlbinder, et al. v. Barton Mark Perlbinder, et al.*, Index No. 656259/2021 (Supreme Court, New York County) (hereinafter, the "54th Street Action").

15. Indeed, Stephen is a self-described "silent partner" in the family businesses, "not making active day-to-day decisions in the operations of the business." See NYSCEF Doc. No. 96 at 9:10-25 in the 54th Street Action.

16. Mark and Stephen are now both in their 80s and have passed on individual ownership of most of their holdings through trusts and estates planning into trusts for their benefit and the benefit of their children, Muffy (who is Mark's daughter), on the one hand, and Astrid and Andrea (who are Stephen's daughters), on the other hand.

17. Since in or around 2023, Muffy and Astrid have become more involved in managing the various family properties for their respective sides of the family.[1]

18. As is all too common in generational family businesses, as the years progressed into further generations, so has the enmity and divisiveness amongst the Perlbinder family members.

19. At this point, Mark's side of the family and Stephen's side of the family cannot jointly operate the family businesses which they co-own.

20. As holders of equal interests in the Entities, there is a perpetual "deadlock" amongst the family members to the point where decisions necessary for the ongoing operation and

---

[1] At various points in time prior to 2023, both Muffy and Astrid worked in the family business in various capacities, doing work on behalf of the Entities and with respect to the Perlbinder Properties more generally.

management of the Perlbinder Properties cannot be made, and the various properties and the Entities are left to suffer from a debilitating state of inaction.

21. This inability to operate the Entities is highlighted by the fact that, in order to even have a conversation between family members regarding business operations, Respondents routinely require that communications be done through third-party intermediaries or attorneys.

22. The dissension among the Perlbinder family members has caused the Perlbinder Properties to fall into a state of disrepair, with the Entities' financial situations deteriorating by the day and the family being unable to collectively agree on any path forward to save the Entities and the Perlbinder Properties.

23. Even the most basic of decisions involving both sides of the family are belabored over (often at great expense due to Respondents' preference to require litigation attorney involvement) and, more often than not, left unresolved due to the inability to reach anything approaching the consensus required in order for action to be taken.

24. There can be no dispute by Respondents as to the propriety of dissolving the Entities; and, in fact, as detailed throughout this Petition, Respondents' own representations make the case for dissolution.

25. Indeed, as detailed below, Stephen's side of the family was first to bring the debilitating dysfunction between the families to the forefront in a flurry of litigation commenced against Mark's side of the family, including commencing two actions of their own which each contain a cause of action for dissolution of two of the Entities.

26. Besides the claims for dissolution proceedings, Stephen's side of the family has also asserted plenary claims in three (3) lawsuits in this Court related to the operation of certain of the Entities.

27. The parties are also engaged in a partition by sale litigation in Suffolk County regarding an undeveloped parcel of land which is located behind Mark's and Stephen's respective Hamptons homes, and the brothers are also co-defendants in a lawsuit filed by their cousins for profits from the sale of condominium units where Stephen has asserted Mark bears the responsibility.

28. Respondents and their counsel have threatened -- and continue to threaten on a routine basis -- to commence more litigation and to seek temporary receivers to operate the family businesses because of the unresolved deadlock in the various Entities.

29. Respondents' threats to appoint a temporary receiver on all of the Entities is an acknowledgment, in and of itself, that the parties themselves are unable to jointly operate the Perlbinder Properties.

30. In the pending litigations, Stephen's side of the family has desperately tried to portray for the Court a "Saints vs. Sinners" narrative, alleging that every act undertaken by Mark's side of the family is either illegal, fraudulent, or a breach of a fiduciary duty owed to the family, while, conversely, alleging that Stephen's side of the family is shrouded in righteousness, trying to save the family's assets from Mark's side of the family.

31. Stephen's side of the family has accused Mark's side of the family of, among other things, "outright theft", "gross misconduct and lawbreaking", "mismanagement" of the Entities, and exploitation of the Entities for their own personal financial gain.

32. They further assert that the culmination of these purported acts has rendered the Entities incapable of supporting themselves, incapable of meeting their obligations and incapable of fulfilling their corporate purposes.

33. While Mark and Muffy have not answered or otherwise interposed counterclaims as of yet in those litigations, they will be doing so, as Stephen's side of the family has engaged in self-dealing and other wrongful conduct of their own.

34. For instance, Stephen lives -- rent free -- in an apartment in one of the family-owned buildings at 400 East 54th Street, consisting of four (4) separate apartments combined together into one 3,562 square foot apartment. Stephen has never paid rent. Stephen has also used business funds to perform renovations to that apartment at no cost to him.

35. Indeed, Stephen readily admitted that he engaged in the same exact conduct which he alleges to be wrongdoing by Mark -- selling apartments unilaterally and disbursing the entirety of the proceeds for his personal cash needs. *See* NYSCEF Doc. No. 97 at 158-25-159:10 in 54th Street Action.

36. Stephen's daughters Astrid and Andrea have also utilized Perlbinder Properties' apartments rent free. Over several years, Astrid (or her immediate family members) has occupied multiple units at jointly owned Perlbinder Properties, rent free, despite having her primary residence elsewhere. In addition, Astrid has utilized parking spaces, at no cost to herself, at various Perlbinder Properties which are owned by certain Entities. Andrea, who lives in the State of Washington, utilizes an apartment with her husband, rent-free, in the same building as Stephen whenever her family visits New York.

37. Notably, Stephen's side of the family seeks damages against Mark in the litigations, claiming that Mark improperly occupied Perlbinder Properties' apartments. There is no reference in those lawsuits to Stephen's side of the family occupying several Perlbinder Properties' apartments.

38. Astrid has engaged in other forms of self-dealing by which she benefits personally at the expense of the Entities. Although Astrid is a principal of the Entities and therefore not entitled to a salary, she claims to be an "employee" and has taken a monthly salary for years, despite claiming that Mark is not entitled to renumeration for any of the work he has done for the Entities because he is a principal.

39. Upon information and belief, Astrid is paid a salary of approximately $20,000 per month.

40. Astrid, while taking a salary at the expense of the Entities, on the one hand, has also requested that the Entities lay-off or fire existing personnel, on the other hand.

41. Astrid's self-dealing is also seen in connection with the parties' dealings with a third-party property manager.

42. At Rivercourt (defined herein), Astrid demanded that Mark's side of the family agree to the third-party property manager's request to manage Rivercourt's parking garage, owned by Rivercourt Garage Corp. (sought to be dissolved herein) claiming that the third-party manager was best suited to manage the space given its management of the building. Muffy objected, and the parties have not been able to resolve the dispute.

43. However, when that same third-party property manager requested to manage the laundry room at Rivercourt, Astrid refused. An entity owned by Astrid and Andrea collects the revenue from the laundry room without a written agreement with the owner Entity authorizing them to do so.

44. Stephen has also directed that the family businesses be used to expense elective cosmetic medical procedures for the members of his family.